Joshua Prince, Esq.
Prince Law Offices, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505
Attorney ID # 306521
610-845-3803
610-845-3903 (fax)
Joshua@PrinceLaw.com

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Michael L. Keyes**, | : | |
| | : | |
| **Jonathan K. Yox**, | : | |
| | : | |
| **Plaintiffs** | : | Civil Action  # |
| | : | |
| v. | : | |
| | : | |
| **Eric H. Holder, Jr.,** | : | |
| Attorney General of the United States | : | |
| | : | |
| **B. Todd Jones**, | : | |
| Director of the Bureau of Alcohol, Tobacco, | : | |
| Firearms and Explosives | : | |
| | : | |
| **James B. Comey** | : | Complaint – Civil Rights |
| Director of the Federal Bureau of | : | |
| Investigation | : | |
| | : | |
| **United States of America** | : | |
| | : | |
| **Defendants** | : | |

---

**FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

NOW COMES Plaintiffs Michael L. Keyes and Jonathan K. Yox, by and through

their attorneys, Joshua Prince, Esq. and Prince Law Offices, P.C., and complain of

Defendants as follows:

## INTRODUCTION

1. This is an action to uphold the Constitutional right to keep and bear arms, which "guarantee[s] the individual right to possess and carry" firearms and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783, 2797, 2821 (2008).

2. In contravention to Plaintiffs' fundamental Second Amendment right to keep and bear arms in their private capacity, Defendants have collectively and separately prohibited a certain class of individuals from obtaining, possessing and utilizing firearms in their private capacity, while permitting those same individuals to obtain, possess and utilize firearms in their official capacity as a law enforcement officer, pursuant to 18 U.S.C. § 925(a)(1).

3. Specifically, individuals who have been involuntarily committed are prohibited in their private capacity from acquiring, possessing, or utilizing a firearm under 18 U.S.C. § 922(g), while being permitted to acquire, possess and utilize firearms when benefiting, in an official capacity, "United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." 18 U.S.C. § 925(a)(1).

4.  However, those individuals are not afforded any means to demonstrate following their release from commitment their fitness to regain their Second Amendment right to acquire, possess, and utilize a firearm in their private capacity.

5. This ban on individuals acquiring, possessing, and utilizing firearms in their private capacity based solely on the fact of a single, isolated past involuntary

commitment is an overbroad infringement on the Second Amendment because there is no reasonable procedure pursuant to which an individual could regain their Second Amendment Rights upon demonstrating their current mental and emotional fitness.

6.  As a consequence of this overbroad ban, sane, trustworthy, competent individuals that are not a threat to themselves or others and are not in any way mentally ill are forever prohibited from exercising their Second Amendment rights by the bare fact of a one-time involuntary commitment without consideration of individual present circumstances.

## PARTIES

7.  Plaintiff Michael L. Keyes, a Master Trooper with the Pennsylvania State Police, is a natural person and citizen of Pennsylvania and the United States, residing in Duncannon, Perry County, Pennsylvania, who was involuntarily committed as an adult at Holy Spirit Hospital, Cumberland County, in 2006. Mr. Keyes presently intends to purchase and possess a handgun and long gun for self-defense within his home, but is prevented from doing so only by Defendants' active enforcement of the policies complained of in this action. Although Plaintiff is prohibited in his private capacity from possessing and using firearms because of Defendants' active enforcement of the policies complained of in this action, Defendants' active policies permit him to possess and use firearms in his official capacity as a law enforcement officer and which Plaintiff actively does in his employment for the Pennsylvania State Police (hereinafter, "PSP").

8. Plaintiff Jonathan K. Yox, a former U.S. Army Corporal of the 82nd Airborne, who was honorably discharged, is a natural person and citizen of Pennsylvania and the United States, residing in Glenmoore, Chester County, Pennsylvania, who was involuntarily committed as a juvenile at York Hospital, Lebanon County, in 2006. Mr. Yox presently intends to purchase and possess a handgun and long gun for self-defense within his home, but is prevented from doing so only by Defendants' active enforcement of the policies complained of in this action. Although Plaintiff is prohibited in his private capacity from possessing and using firearms because of Defendants' active enforcement of the policies complained of in this action, Defendants' active policies permit him to possess and use firearms in his official capacity as State Correctional Officer at the State Correctional Institution at Graterford and which Plaintiff actively does in his employment for the Pennsylvania State Department of Corrections.

9. Defendant Eric H. Holder, Jr. is sued in his capacity as the Attorney General of the United States. As Attorney General, Holder is responsible for executing and administering laws, customs, practices, and policies of the United States, and is presently enforcing the laws, customs, practices, and policies complained of in this action. Defendant Holder also has ultimate authority for supervising all the functions of the Department of Justice and of the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"), which is an arm of the Department of Justice.

10. Defendant B. Todd Jones is sued in his capacity as the Director of the ATF. ATF is responsible for prevention of federal offenses involving the use, manufacture,

and possession of firearms, including the unconstitutionally broad ban challenged

in this case. Defendant ATF also regulates, via licensing, the sale, possession, and

transportation of firearms and ammunition in interstate commerce. As Director of

the ATF, Jones is responsible for the executing and administering laws, customs,

practices, and policies of the United States, and is presenting enforcing the laws,

customs, practices, and policies complained of in this action.

11. Defendant James B. Comey is sued in his capacity as Director of the Federal

Bureau of Investigation (hereinafter "FBI"). FBI is the agency primarily

responsible through its National Instant Check System (hereinafter "NICS")

Section for performing background checks for federal, state, and local law

enforcement authorities and maintaining the NICS database reflecting that

Plaintiffs are prohibited from acquiring, possessing and utilizing a firearm by the

unconstitutionally broad ban complained of in this action. As Director of the FBI,

Comey is responsible for the executing and administering laws, customs,

practices, and policies complained of in this action.

12. Defendant United States of America is a proper defendant in this action pursuant

to 5 U.S.C. § 702.

## JURISDICTION AND VENUE

13. This case concerns certain subject matter under the original and exclusive

jurisdiction of the federal courts of the United States of America.

14. This action seeks relief pursuant to 28 U.S.C. §§ 1331, 1343, 1346, 2201, 2202,

and 2412, and 5 U.S.C. § 702. Therefore, jurisdiction is founded on 28 U.S.C. §

1331 in that this action arises under the Constitution and laws of the United States.

15. This Court has authority to award costs and attorney fees pursuant to 28 U.S.C. § 2412 and 18 U.S.C. § 925a.

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C), as a substantial part of the events and omissions giving rise to the claim occurred in this judicial district.


## STATEMENT OF FACTS RELATING TO PLAINTIFF KEYES

17. Plaintiff Keyes is:

    a.  over the age of 21;

    b.  is not under indictment;

    c.  has never been convicted of a felony or misdemeanor crime of domestic violence;

    d.  has never been convicted of a crime punishable by more than one year;

    e.  is not a fugitive from justice;

    f.  is not an unlawful user of or addicted to any controlled substance;

    g.  has not been adjudicated a mental defective;

    h.  has not been discharged from the Armed Forces under dishonorable conditions;

    i.  has never renounced his citizenship; and

    j.  is not the subject of a restraining order relating to an intimate partner.

18. Plaintiff Keyes would honorably serve our County in the U.S. Air Force, leaving active duty in 1989 with an Honorable Discharge as an Airman 1st Class and would be fully discharge from the Air Guard in 1993 as a Senior Airman.

19. Plaintiff Keyes was hired by the PSP on October 6, 1991.

20. Plaintiff Keyes is currently employed, and has been employed for the past twenty-three (23) years, with the PSP and has obtained the rank of Master Trooper.

21. On August 25, 2006, as a result of an emotionally devastating divorce, Plaintiff became depressed and was involuntarily committed as a result of imbibing in alcoholic beverages and making suicidal statements, initially pursuant to 50 P.S. § 7302, in the absence of any due process, and then later, pursuant to 50 P.S. § 7303; he was released by September 8, 2006.

22. At no point did Plaintiff Keyes ever threaten use of a firearm against himself or others.

23. As a result of his isolated involuntary commitment in 2006, Defendants contend that Plaintiff Keyes lost his private capacity firearm rights by operation of 18 Pa.C.S. § 6105(c)(4) and 18 U.S.C.§ 922(g)(4), which both prohibit an individual who has been involuntarily committed to a mental institution from being able to own, possess, use, or purchase a firearm or ammunition; however, pursuant to 18 U.S.C. § 925(a)(1), federal law includes an exception for state actors, including police officers, in their official capacity.

24. On December 3, 2008, Plaintiff Keyes filed for Restoration of his State Firearm Rights with the Perry County Court of Common Pleas, pursuant 18 Pa.C.S. § 6105(f).

25. On July 1, 2009, the Honorable Keith B. Quigley issued a Memorandum and Order "that Petitioner has in fact met his burden of showing that he may possess a firearm without risk to himself or any other person under the applicable provisions of law." A copy of Memorandum and Order are attached hereto and incorporated herein as Exhibit A.

26. As the July 1, 2009 Order only relieved Plaintiff Keyes' state firearm disability, on May 9, 2012, Plaintiff Keyes filed a request for expungement of the involuntary commitment, which was denied by the Perry County Court of Common Pleas.

27. On appeal to the Superior Court, the Superior Court held that the language "the court may grant such relief as it deems appropriate" found in 18 Pa.C.S. § 6105(f)(1) does provide the court with the power to expunge and affirmed the trial court's decision. *In re Keyes*, 83 A.3d 1016, 1022 (2013), reargument denied (Feb. 24, 2014), appeal denied, 101 A.3d 104 (Pa. 2014).

28. In September of 2011, Plaintiff Keyes had a performance evaluation conducted on his performance as a PSP Trooper. A copy of his performance evaluation is attached hereto and incorporated herein as Exhibit B.

29. Petitioner received an overall rating of "Outstanding," the highest possible rating, which he obtained in each of the six applicable categories. Id.

30. On November 14, 2011, Captain Maynard H. Gray of the PSP issued a determination reinstating Plaintiff Keyes to full, unrestricted, duty, based upon the evaluations of Petitioner's doctor, Richard W. William, Ph.D., and an independent

evaluation by the PSP's chosen doctor, Roger J. Cadieux. A copy of the determination is attached hereto and incorporated herein as Exhibit C.

31. The PSP's doctor found, "that Trooper Keyes is medically and psychiatrically cleared to perform all the duties of a full, unrestricted trooper" and the PSP's State Police Psychologist, Michael A. Asken, Ph.D., and the Department accepted these determinations. Id.

32. In his official capacity as a PSP Master Trooper, Plaintiff Keyes carries on a daily basis a Sig Sauer 227 handgun (previously a Glock 37 handgun) and when on patrol, he carries an AR-15 select-fire (fully automatic) rifle and a Remington 870 shotgun.

33. Plaintiff is currently qualified, through the PSP, with the Sig Sauer 227, Glock 37, AR-15, and Remington 870.

34. In qualifying with the AR-15, he qualified with a perfect score of 150 out of 150.

35. In qualifying with the Remington 870, he qualified with an almost perfect score of 99 out of 100.

36. In qualifying with the Glock 37, he qualified with a score of 279 out of 300.

37. In qualifying with the Sig Sauer 227, he qualified with a score of 272 out of 300.

38. As the Honorable Judge Quigley found, Plaintiff Keyes is not a risk to himself or others in possession and use of firearms and he actively possesses and utilizes firearms on a daily basis, in his official capacity as a PSP Master Trooper.

39. After the Superior Court issued its decision in *In re Keyes*, ATF Philadelphia Division Counsel Kevin White confirmed that ATF's position and policy was that Mr. Keyes remains prohibited under federal law from purchasing, possessing and

utilizing firearms in his private capacity but could continue to possess and utilize firearms in his official capacity as a PSP Master Trooper.

40. ATF Division Counsel Kevin White also confirmed that there is currently no mechanism available in Pennsylvania or under federal law for Mr. Keyes to obtain relief from his federal disability, as a result of his commitment.

41. Plaintiff Keyes is a responsible, law-abiding American citizen, who has no history of violent behavior, or of any other conduct that would suggest he would pose any more danger by possessing firearms than an average, law-abiding responsible citizen.

42. Plaintiff Keyes does not pose any threat to himself or to society, as found by the Honorable Keith B. Quigley. *See*, Exhibit A.

43. In point of fact, Plaintiff Keyes actively possesses and utilizes a firearm in his official capacity as a PSP Master Trooper, without any history of risk or threat to himself or others.

44. Plaintiff Keyes desires and intends, in his private capacity, to purchase, possess and utilize firearms for self-defense and for defense of his family.

45. Plaintiff Keyes refrains from purchasing, possessing and utilizing firearms, in his private capacity, because he reasonably fears arrest, prosecution, incarceration and fine, under 18 U.S.C. § 922(g)(4), instigated and directed by Defendants, should he attempt to purchase, possess or utilize a firearm.

46. Plaintiff Keyes is unwilling to purchase, possess or utilize a firearm, in his private capacity, because doing so would subject him to arrest, prosecution, fine and

incarceration, at Defendants' instigation and direction, for violating 18 U.S.C. § 922(g)(4).

## STATEMENT OF FACTS RELATING TO PLAINTIFF YOX

47. Plaintiff Yox is:

    a.  over the age of 21;

    b.  is not under indictment;

    c.  has never been convicted of a felony or misdemeanor crime of domestic violence;

    d.  has never been convicted of a crime punishable by more than one year;

    e.  is not a fugitive from justice;

    f.  is not an unlawful user of or addicted to any controlled substance;

    g.  has not been adjudicated a mental defective;

    h.  has not been discharged from the Armed Forces under dishonorable conditions;

    i.  has never renounced his citizenship; and

    j.  is not the subject of a restraining order relating to an intimate partner.

48. In 2005, when Mr. Yox was 14 years old, his parents began an emotionally devastating divorce.

49. Due to the stress of his parents' divorce, in early 2006 Plaintiff Yox encountered an older girl who introduced him to cutting and made a suicide pact with him.

50. On March 30, 2006, Plaintiff Yox was involuntarily committed for a mental health examination to York Hospital, initially pursuant to 50 P.S. § 7302, in the

absence of any due process, and then later, pursuant to 50 P.S. § 7303; he was released by April 6, 2006.

51. Thereafter, in his senior year of high school, Mr. Yox received grades of "A" and "B" and was awarded the "Student Turnaround Achievement Award."

52. In 2008, at the age of 17, Plaintiff Yox enlisted in the U.S. Army.

53. Plaintiff Yox would honorably serve our County in the U.S. Army, leaving the service in 2012 with an Honorable Discharge as a Corporal in the 82nd Airborne. A copy of his Honorable Discharge is attached hereto and incorporated herein as Exhibit D.

54. Plaintiff Yox served one year overseas, six and a half months of which was in a combat zone in Afghanistan.

55. During Plaintiff Yox's service in the Army, he was trained to use, and did use, the following weapons: M4 and M16 select fire (fully automatic) rifles, .50 Caliber Machine Gun, M240 Machine Gun, M249 Machine Gun, Mark 19 Grenade Launcher, 12 gauge shotgun, M203 Grenade Launcher, high explosives, incendiary grenades, and flashbangs.

56. Upon his return from Afghanistan, Mr. Yox was not recommended for further psychological evaluation after his deployment debriefing.

57. On or about the end of September or early October, 2012, Mr. Yox, after a Pennsylvania Instant Background Check System (PICS) search, was denied purchase of a firearm.

58. Mr. Yox appealed the denial to the Pennsylvania State Police, which informed him via letter dated October 16, 2012, that he was prohibited pursuant to 18

Pa.C.S. § 6105 and 18 U.S.C. § 922(g) from owning a firearm based on his involuntary commitment in 2006. A copy of the PSP's letter of October 16, 2012, is attached hereto and incorporated herein as Exhibit E.

59. On August 14, 2013, Plaintiff Yox filed a Petition to Vacate and Expunge his Involuntary Commitment with the Lancaster County Court of Common Pleas, after being evaluated by Psychologist Anthony Fischetto in February and March of 2013. A copy of Psychologist Fischetto's report and Addendum report are attached hereto and incorporated herein as Exhibit F.

60. Dr. Fischetto stated, "It is this psychologist's opinion within a reasonable degree of psychological certainty, based on the finding this psychologist's 23 page report dated 03-17-2013, that Mr. Yox does not appear to pose a threat to himself or others in possession of a firearm." Id.

61. Unfortunately, the Superior Court issued its decision in *In Re Keyes*, two weeks prior to the hearing on his Petition.

62. On May 5, 2014, after explaining that he was bound by the Superior Court's decision in *In re: Keyes* and therefore prohibited from granting expungement, the Honorable Jay Hoberg issued an order granting Plaintiff Yox state relief from any disability imposed pursuant to 18 Pa.C.S. § 6105. A copy of the Order and Amended Memorandum are attached hereto and incorporated herein as Exhibit G.

63. In granting state relief, Judge Hoberg found, "The Petition no longer suffers from the mental health condition that was the basis for his commitments" and "The Petitioner may safely possess a firearm without risk to himself or any other person." Id.

64. After receipt and review of Judge Hoberg's Order of May 5, 2014, ATF Philadelphia Division Counsel Kevin White confirmed that ATF's position and policy was that Mr. Yox remains prohibited under federal law from purchasing, possessing and utilizing firearms in his private capacity, even though he was committed as a juvenile, but could continue to possess and utilize firearms in his official capacity as a State Correctional Officer for the Pennsylvania Department of Corrections.

65. ATF Division Counsel Kevin White also confirmed that there is currently no mechanism available in Pennsylvania or under federal law for Mr. Yox to obtain relief from his federal disability, as a result of his commitment.

66. Plaintiff Yox is a responsible, law-abiding American citizen, who has no history of violent behavior, or of any other conduct that would suggest he would pose any more danger by possessing firearms than an average, law-abiding responsible citizen.

67. Plaintiff Yox does not pose any threat to himself or to society, as found by the Honorable Jay Hoberg. *See*, Exhibit G.

68. In point of fact, Plaintiff Yox actively possesses and utilizes a firearm in his official capacity as a State Correctional Officer, without any history of risk or threat to himself or others.

69. Plaintiff Yox desires and intends, in his private capacity, to purchase, possess and utilize firearms for self-defense and for defense of his family.

70. Plaintiff Yox refrains from purchasing, possessing and utilizing firearms, in his private capacity, because he reasonably fears arrest, prosecution, incarceration

and fine, under 18 U.S.C. § 922(g)(4), instigated and directed by Defendants,

should he attempt to purchase, possess or utilize a firearm.

71. Plaintiff Yox is unwilling to purchase, possess or utilize a firearm, in his private

capacity, because doing so would subject him to arrest, prosecution, fine and

incarceration, at Defendants' instigation and direction, for violating 18 U.S.C. §

922(g)(4).

## STATUTES AND REGULATIONS

72. 18 U.S.C. § 922(g) provides the following:

> (g) It shall be unlawful for any person –
> …
> (4) who has been adjudicated as a mental defective or who has been
> committed to a mental institution;
> …
> to ship or transport in interstate or foreign commerce, or possess in or
> affecting commerce, any firearm or ammunition; or to receive any firearm
> or ammunition which has been shipped or transported in interstate or
> foreign commerce.

73. Although 18 U.S.C. § 922(g) does not specify that it applies to juveniles and 18

U.S.C. § 922(x) addresses firearms disabilities specific to juveniles, the ATF's

current policy is to declare juvenile involuntary commitments prohibiting, even

though it is currently involved in Rulemaking, ATF-51P - RIN 1140-AA47,

wherein it specifically solicited public comments for purposes of enacting a new

regulation on, "whether the term 'committed to a mental institution' includes a

commitment that occurred when the person was under the age of 18." Fed. Reg.

Vol. 79, No. 4, 775.

74. 18 U.S.C. § 925(a) provides an exception to the firearms disability of Section

922(g)(4), where the individual is benefitting, in his/her official capacity, the U.S.

or state government: [1]

> The provisions of this chapter, except for sections 922(d)(9) and 922(g)(9)
> and provisions relating to firearms subject to the prohibitions of section
> 922(p), shall not apply with respect to the transportation, shipment,
> receipt, possession, or importation of any firearm or ammunition imported
> for, sold or shipped to, or issued for the use of, the United States or any
> department or agency thereof or any State or any department, agency, or
> political subdivision thereof.

75. Further, under 18 U.S.C. § 925(c), an individual prohibited from acquiring a

firearm may apply to the Attorney General for relief from the prohibition, which

the Attorney General may grant if "the applicant will not be likely to act in a

manner dangerous to public safety and that the granting of the relief would not be

contrary to the public interest."

76. The ATF has promulgated a rule detailing the manner that a review under 18

U.S.C. § 925(c) may be sought. 27 C.F.R. § 478.144.

77. However, notwithstanding the provisions of 18 U.S.C. § 925(c) and 27 C.F.R.§

478.144 (2011), which purport to provide a means to request relief for an

individual prohibited from acquiring a firearm, the United States Congress has

specifically denied any funding "to investigate or act upon applications for relief

from Federal firearms disabilities under 18 U.S.C. 925(c)." The Consolidated and

Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, 128 Stat.

2130.

---

[1] Both Plaintiff Keyes and Plaintiff Yox fall under this exception, when in their official
capacity as a PSP Master Trooper and State Correctional Officer, respectively.

78. Due to the above lack of funding, ATF does not in fact provide any review under 18 U.S.C. § 925(c) to provide relief from a federal prohibition on purchasing, possessing or utilizing a firearm.

79. Because Defendant ATF does not provide a review for relief from a federal prohibition on acquiring or possessing a firearm, Plaintiffs cannot avail themselves of any federal procedure to vindicate their Second Amendment rights on the grounds that they do not present a threat to themselves or others.

80. Under the NICS Improvement Amendments Act of 2007 (NIAA), Congress provided an alternate route for relief from a federal prohibition on acquiring a firearm in which the various states may elect to provide an ATF-approved program to review, approve, or deny applications for such relief. NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121 Stat. 2559, 2569-70.

81. To date, the Commonwealth of Pennsylvania has failed to institute such an ATF-approved program, and Plaintiffs cannot therefore avail themselves of any state or federal procedure providing relief from a federal prohibition on purchasing, possessing or utilizing a firearm in their private capacity.

82. ATF Division Counsel Kevin White confirmed that there is currently no mechanism available in Pennsylvania or under federal law for Mr. Keyes or Mr. Yox to obtain relief from their federal disabilities, resulting of their commitments.

## COUNT I: SECOND AMENDMENT AS-APPLIED VIOLATIONS
### (*Plaintiffs v. All Defendants*)

83. The foregoing paragraphs are incorporated herein as if set forth in full.

84. Defendants Eric Holder, B. Todd Jones, James B. Comey and the United States of America have, together and separately, violated Plaintiffs' Second Amendment rights.

85. Defendants contend that 18 U.S.C. § 922(g)(4) prohibits any individual who has ever been involuntarily committed – without regard to the reason for the commitment or the present circumstances of the individual – from purchasing, possessing and utilizing a firearm.

86. Notwithstanding the NIAA, no state relief from the federal prohibition under 18 U.S.C. § 922(g)(4) exists in Pennsylvania due to Pennsylvania's failure to provide for a procedure for such relief.

87. These federal laws and policies prohibiting Plaintiffs from purchasing, possessing and utilizing a firearm, in their private capacity, and providing for no review of the prohibition because of a lack of federal funding and reliance upon a nonexistent state program constitutes an over-broad infringement and an impermissible burden on Plaintiffs' right to keep and bear arms under the Second Amendment to the United States Constitution.

88. This over-broad restriction has already been found to violate the Second Amendment by the 6th Circuit Court of Appeals in *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014).

89. As a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Second Amendment rights, Plaintiffs have suffered and continue to suffer from an unlawful deprivation of their fundamental constitutional right to keep and bear arms.

90. Plaintiffs have incurred attorney's fees and costs as a direct result of prosecuting the present court action.


## COUNT II: SECOND AMENDMENT AS APPLIED VIOLATIONS
### (*Yox v. All Defendants*)

91. The foregoing paragraphs are incorporated herein as if set forth in full.

92. Defendants Eric Holder, B. Todd Jones, James B. Comey and the United States of America have, together and separately, violated Plaintiff Yox's Second Amendment rights by denying him the ability to purchase, possess and utilize a firearm as a result of a juvenile commitment.

93. 18 U.S.C. § 922(g)(4) prohibits an *adult* individual who has ever been involuntarily committed from purchasing, possessing and utilizing a firearm.

94. Neither 18 U.S.C. § 922(g) nor 18 U.S.C. § 922(x) prohibit an individual, who was involuntarily committed as a juvenile, from purchasing, possessing and utilizing a firearm.

95. The Defendants' custom, practice, and policy of prohibiting an individual as a result of a juvenile involuntary commitment is an infringement and an impermissible burden on Plaintiff Yox's right to keep and bear arms under the Second Amendment to the United States Constitution.

96. As a direct and proximate result of the above infringement and impermissible burden on Plaintiff Yox's Second Amendment rights, Plaintiff has suffered and continues to suffer from an unlawful deprivation of his fundamental constitutional right to keep and bear arms.

97. Plaintiff Yox has incurred attorney's fees and costs as a direct result of prosecuting the present court action.

## COUNT III: FIFTH AMENDMENT DUE PROCESS AS-APPLIED VIOLATIONS
### (*Plaintiffs v. All Defendants*)

98. The foregoing paragraphs are incorporated herein as if set forth in full.

99. Defendants Eric Holder, B. Todd Jones, James B. Comey and the United States of America have, together and separately, violated Plaintiffs' Fifth Amendment right to due process by denying them the ability to purchase, possess and utilize a firearm, as a result of an involuntary commitment, when Pennsylvania's Mental Health and Procedure Act (hereinafter, "MHPA") lacks any standard for a commitment, in violation of the U.S. Supreme Court's holding in *Addington v. Texas*, 441 U.S. 418 (1979), and when they are not afforded notice and an opportunity to be heard on the matter prior to the deprivation and/or through a post-deprivation proceeding to seek review and relief from the deprivation.

100.    Pennsylvania's MHPA is found at 50 P.S. § 7101, et seq.

101.    Nowhere within the MHPA has the Pennsylvania General Assembly set-forth a standard for a civil commitment, as required by the U.S. Supreme Court in *Addington*.

102.    The US Supreme Court declared, "To meet due process demands, the standard has to inform the factfinder that the proof must be greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases." *Addington v. Texas*, 441 U.S. 418, 432-33 (1979).

103.    In the absence of individuals being provided the due process necessary under the U.S. Constitution, Defendants' custom, practice, and policy of prohibiting an individual as a result of a Pennsylvania involuntary commitment is an infringement and an impermissible burden on Plaintiffs' due process rights under the Fifth Amendment to the United States Constitution.

104.    In violation of the Plaintiffs' right to due process, Plaintiffs have been deprived of their Second Amendment right to keep and bear firearms without being afforded notice and an opportunity to be heard on the matter prior to the deprivation and/or through a post-deprivation proceeding to seek review and relief from the deprivation.

105.    As a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Fifth Amendment rights, Plaintiffs' have suffered and continue to suffer from an unlawful deprivation of their fundamental constitutional rights to due process and to keep and bear arms.

106.    Plaintiffs' have incurred attorney's fees and costs as a direct result of prosecuting the present court action.


**COUNT IV: FIFTH AMENDMENT EQUAL PROTECTION AS-APPLIED VIOLATIONS**
(*Plaintiffs v. All Defendants*)

107.    The foregoing paragraphs are incorporated herein as if set forth in full.

108.    Defendants Eric Holder, B. Todd Jones, James B. Comey and the United States of America have, together and separately, violated Plaintiffs' Fifth Amendment right to equal protection by denying them the ability to purchase,

possess and utilize a firearm, in their private capacity, as a result of an involuntary commitment, while permitting them to possess and use firearms in their official capacity, while benefitting the U.S. or state government.

109.     In violation of the Plaintiffs' right to equal protection under the Equal Protection Clause of the Fifth Amendment, Plaintiffs' have been deprived of their right to keep and bear firearms in their private capacity, while being permitted to possess and utilize firearms in their official capacity, when benefiting the U.S. or state government.

110.     As a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Fifth Amendment rights, Plaintiffs' have suffered and continue to suffer from an unlawful deprivation of their fundamental constitutional rights to equal protection and to keep and bear arms.

111.     Plaintiffs' have incurred attorney's fees and costs as a direct result of prosecuting the present court action.


### COUNT V: NIAA
#### (*Plaintiffs v. All Defendants*)

112.     The foregoing paragraphs are incorporated herein as if set forth in full.

113.     Under the NICS Improvement Amendments Act of 2007 ["NIAA"], Congress provided an alternate route for relief from a federal prohibition on acquiring a firearm in which the various states may elect to provide an ATF-approved program to review, approve, or deny applications for such relief.

114.     To date, ATF has failed to approve Pennsylvania's relief program, even though it meets the criteria set-forth by the Congress.

115.    Specifically, pursuant to Section 105 of NIAA,

    (a)    A relief from disabilities program is implemented by a State in accordance with this section if the program –

      (1)    permits a person who, pursuant to State law, has been adjudicated as described in subsection (g)(4) of section 922 of title 18, United States Code, or has been committed to a mental institution, to apply to the State for relief from disabilities imposes by subsections (d)(4) and (g)(4) of such section by reason of the adjudication or commitment;

      (2)    provides that a State court, board, commission, or other lawful authority shall grant relief, pursuant to State law and in accordance with the principles of due process, if  the circumstances regarding disabilities referenced in paragraph (1), and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of relief would not be contrary to the public interest; and

      (3)    permits a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial.

    (b)    If, under a State relief from disabilities program implemented in accordance with this section, an application for relief referred to in subsection (a)(1) of this section is granted with respect to an adjudication or a commitment to a mental institution or based upon a removal of a record under Section 102(c)(1)(B), the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18, United States Code.

116.    Pennsylvania's relief from disabilities program, pursuant to 18 Pa.C.S. §

6105(f)(1), provides that an individual who, pursuant to section 6105(c)(4), has

"been adjudicated as an incompetent or who has been involuntarily committed to

a mental institution for inpatient care and treatment under section 302, 303 or

304" of Pennsylvania's Mental Health and Procedures Act, may petition the court

for relief and that "the court may grant such relief as it deems appropriate if the

court determines that the applicant may possess a firearm without risk to the applicant or any other person."

117.    The Superior Court recently acknowledged that *de novo* review was required of mental health commitment challenges and trial court proceedings related thereto. *See generally*, *In re Vencil*, 2015 PA Super 157, 120 A.3d 1028 (2015).

118.    Accordingly, Pennsylvania's relief program meets the criteria of NIAA; however, Defendants have refused to accept Mr. Keyes' and Mr. Yox's relief Orders and contend that since they have not approved Pennsylvania's relief program, the Orders are insufficient.

119.    Specifically, in relation to Mr. Yox, the Order and Memorandum reflect, in pertinent part, that:

    a.  "The Petitioner no longer suffers from the mental health condition that was the basis for his commitments."

    b.  "Petitioner may safely possess a firearm without risk to himself or any other person."

    c.  "Petitioner never threatened to harm another individual and never actually attempted suicide."

    d.  "Petitioner is not currently in counseling and has not taken any prescription medication for mental health or depression since he stopped taking Zoloft."

e. "At the hearing, both Petitioner's girlfriend, and brother testified. Both testified that they do not have any concerns over Petitioner owning and possessing firearms."

120. Specifically, in relation to Mr. Keyes, the Order and Memorandum reflect, in pertinent part, that:

a. "[T]he Court finds that Petitioner has in fact met his burden of showing that he may possess a firearm without risk to himself or other person."

b. "[W]e are impressedthat the Petitioner has made significant and substantial progress with the issues that caused the commitment and otherwise troubled him in his life."

c. "We are impressed that even the doctor that opined concerning the Petitioner's depression condition, found him, at the time, to not be a danger to himself or others."

d. "We are also impress with the fact that Petitioner's expert concluded that he was not currently a threat to himself or others."

e. "We also not that some of his prior behavior, suicidal in nature, has not reoccurred in recent years and never involved the use of a firearm."

f. "We also observed the Petitioner as he testified and were impressed [sic] what appears to be a reasonably stable mental position at this point."

g.  "We noted nothing close to what would mandate any type of inpatient, involuntary or otherwise, treatment."

h.  "Petitioner…is not prone toward any type of rash or imprudent action and, in our judgment, is certainly reasonably fit to again possess firearms.

121.  Therefore, as a direct and proximate result of the above infringement and impermissible burden on Plaintiffs' Second Amendment rights, Mr. Keyes and Mr. Yox have suffered – and continue to suffer – from an unlawful deprivation of their fundamental constitutional right to keep and bear arms.

122.  Plaintiffs' have incurred attorney's fees and costs as a direct result of prosecuting the present court action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court enter judgment in their favor and against Defendants, as follows:

a)  Declare that 18 U.S.C. § 922(g)(4), its derivative regulations, and all related laws, policies, and procedures violate Plaintiffs' right to keep and bear arms as secured by the Second Amendment to the United States Constitution.

b)  Declare that 18 U.S.C. § 922(g)(4), its derivative regulations, and all related laws, policies, and procedures do not apply to Plaintiff Yox's juvenile involuntary commitment.

c)  Declare that 18 U.S.C. § 922(g)(4), its derivative regulations, and all related laws, policies, and procedures violate Plaintiffs' right to due process under the

Due Process Clause of the Fifth Amendment to the United States Constitution, as Pennsylvania's MHPA lacks any standard for a commitment.

d) Declare that 18 U.S.C. § 922(g)(4), its derivative regulations, and all related laws, policies, and procedures violate Plaintiffs' right to due process under the Due Process Clause of the Fifth Amendment to the United States Constitution, as Plaintiffs' were not afforded notice and an opportunity to be heard on the matter prior to the deprivation and/or through a post-deprivation proceeding to seek review and relief from the deprivation.

e) Declare that 18 U.S.C. § 922(g)(4), its derivative regulations, and all related laws, policies, and procedures violate Plaintiffs' right to equal protection under the Equal Protection Clause of the Fifth Amendment to the United States Constitution, as Plaintiffs' are treated differently merely based on whether they are acting within their official or private capacity.

f) Declare that a valid Pennsylvania court order issued pursuant to 18 PA.C.S. § 6105(f) meets the criteria of Section 105 of NIAA;

g) Permanently enjoin the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing against Plaintiffs 18 U.S.C. § 922(g)(4) and all its derivative regulations, and all related laws, policies, and procedures that would impede or criminalize Plaintiffs' exercise of their right to keep and bear arms.

h) Permanently enjoin the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from

enforcing 18 U.S.C. § 922(g)(4) in relation to Plaintiff Yox's juvenile

involuntary commitment.

i)   Permanently enjoin the Defendants, their officers, agents, servants,

employees, and all persons in active concert or participation with them from

enforcing 18 U.S.C. § 922(g)(4) against Plaintiffs in relation to their

Pennsylvania involuntary commitments, as Pennsylvania's MHPA lacks the

requisite standard as declared by the U.S. Supreme Court's holding in

*Addington.*

j)   Permanently enjoin Defendants, their officers, agents, servants, employees,

and all persons in active concert or participation with them from refusing to

accept a valid Pennsylvania court order, issued pursuant to 18 Pa.C.S. §

6105(f), as providing relief under NIAA.

k)   Award Plaintiffs' costs and attorney's fees and expenses to the extent

permitted under 28 U.S.C. § 2412 and 18 U.S.C. § 925a.

l)   Any and all other equitable and/or legal remedies this Court may see fit.


Respectfully Submitted,


_____
Joshua Prince, Esq.
Attorney ID No. 306521
Prince Law Offices, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803 ext. 81114
610-845-3903 (fax)
Joshua@PrinceLaw.com

# Exhibit A

IN RE:
APPLICATION TO RESTORE
FIREARM RIGHTS OF
MICHAEL I. KEYES

:IN THE COURT OF COMMON PLEAS
:OF THE 41ST JUDICIAL DISTRICT
:OF PENNSYLVANIA -
:PERRY COUNTY BRANCH
:NO. CV-2008-1230

## O R D E R

AND NOW, July 1, 2009, now in accordance with the within Memorandum, the
Court finds that Petitioner has in fact met his burden of showing that he may possess a
firearm without risk to himself or any other person under the applicable provisions of
law.

As the issue of expungement was not before us and in any event contemporary
evidence relative to the initial commitment was not presented, expungement is not a
proper subject for ruling at this time.

BY THE COURT,

KEITH B. QUIGLEY, S.J.

cc:   Joanna Reynolds, Esquire
      L. Sean A. Potter, Esquire
      Court Administrator
      File

CERTIFIED A TRUE COPY

PROTHONOTARY / CLERK OF COURTS

PROTHONOTARY'S OFFICE
PERRY COUNTY
2009 JUL 10 AM 11:16
ADMITTED TO RECORD

IN RE:
APPLICATION TO RESTORE
FIREARM RIGHTS OF
MICHAEL I. KEYES

:IN THE COURT OF COMMON PLEAS
:OF THE 41ST JUDICIAL DISTRICT
:OF PENNSYLVANIA -
:PERRY COUNTY BRANCH
:NO. CV-2008-1230

## MEMORANDUM

On August 23, 2006, Petitioner was involuntarily committed to a mental institution under the Mental Health Act. That commitment on August 24, 2006, was extended for a period of 20 days.

Under those circumstances, the Petitioner was immediately ineligible to possess firearms and of course would not be eligible to carry a concealed weapon, for which a permit, in this case, by the local Sheriff, was required.

Initially, we should clarify that there are several competing interests operating, one of which, we think is probably not properly before us.

First of all, in the face of an involuntary commitment, this Court does have power to restore gun rights. However, because of the involuntary commitment, without it having been expunged, it would appear that the Sheriff is not authorized under the law to issue a Concealed Weapon Permit.

Actually, these two things are, although related, somewhat separate items. One thing also to be made clear is that the Petitioner's present employment status or perhaps, most accurately, his former employment status is not the issue before the Court. However, we would think that if the Petitioner were ineligible to hold a concealed weapon, that would certainly be a factor in employment with the Pennsylvania State Police. That is not to suggest that there are not other criteria also.

CERTIFIED A TRUE COPY

PROTHONOTARY / CLERK OF COURTS

Page 1 of 3

In any event, if the Sheriff were to receive an Application For A Concealed Weapon Permit, assuming the Court restores gun rights, the Sheriff will see a record of an involuntary commitment. In order for the Court to direct the expungement of an involuntary commitment, the Court needs to have evidence that addresses the involuntary commitment itself. Specifically, the Court cannot expunge the record unless the Court is able to conclude that the evidence that supported the commitment was insufficient to do so.

Well certainly there was evidence concerning the commitment and also evidence concerning the Petitioner's present condition, there is nothing of record that would cause this Court to believe that expungement is appropriate and, as stated earlier, that issue is probably not properly before us in any event.

However, when it comes to the issue of gun rights, exclusive of State Concealed Weapon Permits and also probably exclusive of federal prohibitions, we are impressed that the Petitioner has made significant and substantial progress with the issues that caused the commitment and otherwise troubled him in his life.

We are impressed that even the doctor that opined concerning the Petitioner's depression condition, found him, at the time, to not be a danger to himself or others.

We are also impressed with the fact that Petitioner's expert concluded that he was not currently a threat to himself or others.

We also note that some of his prior behavior, suicidal in nature, has not reoccurred in recent years and never involved the use of a firearm.

We also observed the Petitioner as he testified and were impressed what appears to be a reasonably stable mental position at this point. We noted nothing close to what

would mandate any type of inpatient, involuntary or otherwise, treatment. In short, we think the Petitioner is fully aware of his condition, which is basically that of a depressed personality, is not prone toward any type of rash or imprudent action and, in our judgment, is certainly reasonably fit to again possess firearms.

However, this opinion, under no circumstances, should be construed the grant of a license with respect to firearms when other provisions may in fact prohibit same.



KEITH B. QUIGLEY, S. J.

July 1, 2009

cc:  Joanna Reynolds, Esquire
     Sean A. Potter, Esquire
     Court Administrator
     File

# Exhibit B

# EMPLOYEE PERFORMANCE REVIEW

EPR Links Document

363L (Rev. 5/2001)

| GENERAL INFORMATION | TYPE REPORT | ☐ PROBATIONARY (CS/NCS union covered)<br>☐ PROBATIONARY (CS non-union covered) | ☐ INTERIM   ☒ ANNUAL<br>☐ INTERIM (6 month NCS/NUC/SMS) |
|---|---|---|---|

| EMPLOYEE NAME<br>Tpr. Michael KEYES | AGENCY<br>020 Pa State Police | EMPLOYEE NUMBER<br>00419775 |
|---|---|---|
| CLASS TITLE<br>Trooper | ☐ SUPERVISOR<br>☒ NON-SUPERVISOR | STATUS<br>☐ CIVIL SERVICE  ☐ NCS  ☐ SMS |
| ORGANIZATION<br>Bureau of records & Identification, Megan's Law Section | RATING PERIOD<br>FROM 09/2010   TO 09/2011 | |
| SUPERVISOR NAME<br>Cpl. Bruce E. LEHMAN | SUPERVISOR POSITION NUMBER<br>57799 | |

## GENERAL INSTRUCTIONS

☒ *Verify/complete General Information.* Indicate whether employee is a supervisor or non-supervisor.

☒ *Review with the employee the employee's job description, job standards* (expectations/objectives/duties) *for the rating cycle* to ensure the appraisal relates to the specific responsibilities, job assignments, and standards that were conveyed to the employee for the rating cycle.
(On-line Position Description Application)

☒ *Base the appraisal on the employee's performance during the entire review period,* not isolated incidents or performance prior to the current review period. Obtain/review necessary input and supporting data.

☒ *Rate* each factor in relation to the standards established and the guidelines listed on the form for each rating.

☒ *Provide an overall rating* based on the rating of the individual factors, adherence to significant performance standards, and accomplishment of essential functions. Each factor need not be of equal weight but comments should justify significant differences impacting on the overall rating.

☒ *Assess employee strengths and identify opportunities where the employee could improve or requires additional knowledge or skill.* Include projected development needs to meet anticipated assignments during the next rating period. Obtain employee input regarding their training needs. When rating employees, consider their participation and willingness to participate in employee development opportunities.

☒ The *comments sections* should be used to: support performance ratings, indicate problem areas and provide guidance to employees on how to improve performance. *Comments MUST be provided for outstanding, needs improvement, and unsatisfactory* ratings, and are highly recommended for all other ratings.  Supervisor, reviewing officer, and employee comments are to be relevant and job related. *(Additional comments for any sections should be placed on Page 5 of this form if completing form electronically or by attaching additional 8 1/2 by 11 paper in similar format.)*

☒ *Discuss/obtain comments and signature/date* of reviewing officer before discussion with employee.

☒ *Sign/date the form, meet with employee to discuss the rating,* and obtain the employee's signature/date/comments. Arrange for reviewing officer discussion if requested.

☒ *Update with the employee the job description, essential job functions, and performance standards/objectives for the next rating cycle.*

## COMMUNICATION OF PERFORMANCE STANDARDS

*Indicate when you conveyed job standards to the employee and when progress review(s) was conducted:*

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employee on
12/15/2010, 03/01/2011
    date(s)

2. Progress Review(s) was conducted on 12/15/2010, 03/01/2011 (at least one during rating cycle)
    date(s)

EMPLOYEE NAME: Tpr. Michael KEYES                                                                          EMPLOYEE NUMBER: 00419775

## JOB FACTORS

**1. JOB KNOWLEDGE/SKILLS** Measures employee's demonstrated job relevant knowledge and essential skills, such as work practices, policies, procedures, resources, laws, customer service, and technical information, as well as the relationship of work to the organization's mission. Also measured are the employee's self-improvement efforts to enhance skills and knowledge and to stay current with changes impacting the job.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Possesses superior job skills and knowledge; effectively applies them to work assignments. <br> • Willingly mentors staff; shares knowledge. <br> • Seeks/applies innovative and relevant techniques. | • Work reflects thorough and current knowledge/skill of job and impact on agency activities/related resources. <br> • Uses opportunities to expand knowledge/skills, sharing information with staff. | • Work reflects adequate knowledge/skills for job. <br> • Has some knowledge of related work. <br> • Stays current with major changes impacting on knowledge or skill. Accepts change. | • Often demonstrates a lack of basic or sufficient job knowledge/skills to perform routine functions of the job. <br> • Occasionally is resistant to changing knowledge and/or skill requirements or processes, including opportunities for knowledge/skill enhancement. | • Consistently demonstrates a lack of basic job knowledge and/or skills to perform job. <br> • Rarely takes advantage of available skill enhancement or training opportunities. <br> • Often is resistant to changing requirements. |

Comments: Tpr. Keyes came to the section approx 1 year ago. In that time he has gained an excellent working knowledge of Megan's Law and is continuing to learn as Megan's Law evolves. Tpr. Keyes is able to handle most issues that arise, with little help from supervisors. He has expressed his willingness to take on new challenges. He has a firm grasp of the section's polices, procedures and laws even-though they are constantly changing.  I have overheard Tpr. Keyes giving sound guidance to law enforcement, members of the general public and sex offenders on Megan's Law issues.

**2. WORK RESULTS** Measures employee's results in meeting established objectives/expectations/standards of quality, quantity, customer service, and timeliness both individually and in a team.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Work consistently exceeds expectations of quality, quantity, customer service, and timeliness. | • Work frequently exceeds expected quality, quantity, customer service, and timeliness standards. | • Work usually meets expectations of quality, quantity, customer service, and timeliness. | • Often has difficulty meeting expected quality, quantity, customer service, and/or timeliness standards. | • Consistently fails to meet expected quality, quantity, customer service, and/or timeliness standards. |

Comments: Tpr. Keyes is currently assigned to work on submit-a-tips. This is a high volume workload and at times this is a tedious task yet he always portrays the department in a positive and professional light when speaking with other. Tpr Keyes always has taken what steps are needed to correct issues that are found in his duties ensuring the highest quality work. Tpr. Keyes is a team player which helps the section reach its objectives of protecting the public.

**3. COMMUNICATIONS** Measures employee's performance in exchanging information in an effective, timely, clear, concise, logical, and organized manner. Communications include listening, speaking, writing, presenting, and sharing of information. Consideration is given to client/data complexity/sensitivity.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Consistently communicates in clear, effective, timely, concise, and organized manner. <br> • Is articulate and persuasive in presenting, soliciting complex or sensitive data. | • Frequently communicates in an effective, timely, clear, concise, and organized manner. <br> • Proficiently organizes and presents difficult facts and ideas orally and in writing. <br> • Seeks/provides feedback. | • Usually communicates effectively and exchanges relevant information in a timely manner. <br> • Speaks and writes clearly. <br> • Keeps others informed. <br> • Listens with understanding. | • Often fails to communicate effectively or in a timely manner. <br> • Lacks clarity of expression orally or in writing. <br> • Is inconsistent in keeping others informed. <br> • At times, fails to listen effectively. | • Consistently fails to communicate effectively or timely. <br> • Often does not keep others informed. <br> • Is an ineffective listener and/or frequently interrupts. |

Comments: Tpr. Keyes is very good at communicating with others. Part of his duties is answering a high volume of calls. Anytime I listen to Tpr. Keyes even when dealing with sex offenders that are at times very upset, he is able to resolve most issues. He speaks in a clear & professional manor on the phones & in person when dealing with others providing logical answers. Tpr. Keyes shares relevant issues with others in the section.

**4. INITIATIVE/PROBLEM SOLVING** Measures the extent to which the employee is self-directed, resourceful, and creative in performing job duties individually or in a team.  Also measures employee's performance in identifying and resolving problems; following through on assignments; and initiating or modifying ideas, methods, or procedures to provide improved customer service, redesign business processes, and accomplish duties.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Consistently resolves unit/team problems and promotes improvements. <br> • Maximizes resources, innovation/technology to streamline/improve. <br> • Analyzes full dimension of complex problems. <br> • Requires minimal supervision. | • Prevents/resolves unit/team problems. <br> • Suggests innovations to improve operations or streamline procedures. <br> • Defines and analyzes complex problems. <br> • Develops/implements solutions with moderate supervision. | • Addresses existing and significant potential problems. <br> • Suggests or assists in developing solutions individually or in a team. <br> • Carries through solution implementation with routine supervision or follow-up. | • Resolves routine problems. <br> • Exhibits little initiative in identifying problems, solutions, or improvements and/or working proactively as part of a team to address issues of concern. <br> • Requires more than routine supervision. | • Consistently fails to recognize or seek help in resolving routine problems. <br> • Demonstrates inability to work individually or in a team. <br> • Rarely suggests improvements. <br> • Requires frequent reminders and supervision. |

Comments: Tpr. Keyes is willing to try to resolve issues on his own. He asks reasonable questions with the more difficult issues to ensure a high level of accuracy.  Tpr. Keyes asks others in section how to resolve issues & also provides input to resolve issues. His interaction with PSP & other police departments in getting issues resolved is a valuable asset to the Megan's Law section and the general public.

**EMPLOYEE NAME:** Tpr. Michael Keyes

**EMPLOYEE NUMBER:** 00419775

5. **INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY (EEO)** Measures employee's development and maintenance of positive and constructive internal/external relationships. Consideration should be given to the employee's demonstrated willingness to function as a team player, give and receive constructive criticism, accept supervision, resolve conflicts, recognize needs and sensitivities of others, and treat others in a fair and equitable manner. Supervisors and team leaders also are to be assessed on their demonstrated commitment to Equal Employment Opportunity, diversity, and proactive actions to prevent/address all forms of discrimination.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Consistently promotes and maintains a harmonious/productive work environment.<br>• Is respected and trusted and often viewed as a role model.<br>• Actively promotes EEO/diversity programs. | • Frequently fosters teamwork, cooperation, and positive work relationships.<br>• Handles conflict constructively.<br>• Promotes and adheres to EEO/diversity program requirements. | • Usually interacts in a cooperative manner.<br>• Avoids disruptive behavior. Deals with conflict, frustration appropriately.<br>• Treats others equitably. Adheres to EEO/diversity program requirements. | • Often has difficulty getting along with others. Allows personal bias to affect job relationships.<br>• Requires reminders regarding needs and sensitivities of others.<br>• Inconsistently adheres to EEO/diversity program requirements. | • Interpersonal relationships are counter-productive to work unit or team functions.<br>• Often ignores EEO/diversity program requirements. |

Comments: Tpr. Keyes is well liked and respected by other members of the section. He is easy to talk to & gets along well with others. He treats all members of the section with respect & courtesy. Tpr. Keyes does not engage in petty inner office bickering. He can be counted on to participate in section functions with eagerness. He demonstrates good EEO practices at all times.

6. **WORK HABITS** Measures employee's performance relative to efficient methods of operation, customer service, proper conduct, speech, ethical behavior, and Commonwealth/agency/work unit policies and procedures, such as attendance, punctuality, safety, security, proper care and maintenance of assigned equipment, and economical use of supplies.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Work reflects maximum innovative use of time and resources to consistently surpass expectations and improve operations.<br>• Serves as role model with regard to work policies and safety standards. | • Frequently plans/organizes work to timely and effectively accomplish job duties with appropriate use of resources.<br>• Suggests/implements improvements and exceeds organizational work/safety rules and standards. | • Work is planned to meet routine work volume and timeliness and usually fulfills operational and customer service needs.<br>• Adheres to organizational work policies/safety rules and procedures with few exceptions. | • Frequently lacks organization and planning of work and does not adequately use available resources.<br>• Often does not meet standards in complying with work policies/safety rules and/or care of equipment. | • Consistently fails to meet expected standards due to lack of effective organization, use of equipment/resources, or inattention to customer service needs.<br>• Resists established work policies/safety rules and procedures. |

Comments: Tpr. Keyes is always early for the start of his shift. He often has stayed well past the end of his shift to ensure that the job gets done. He is willing work with others to ensure the operational needs met when it comes to leave.  He does not abuse department equipment or resources.

7. **SUPERVISION/MANAGEMENT** (Required for all supervisors/managers) Measures leadership, judgment, initiative, and achievement of expectations. Effectively manages program/projects, employees, budget, technology, and organizational change to produce positive results. Engages in strategic planning and measurement, performance management, teamwork, staff development, and recognition of accomplishments. Promotes customer service, diversity, inclusiveness, collaboration, effective communication, and positive labor/management relations. Uses innovation and fulfills administrative requirements.

| OUTSTANDING ☐ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Regularly exceeds expectations.<br>• Implements innovative policies, resources, and technology to maximize efficiency and service.<br>• Committed to and promotes excellence; leads by example energizing performance and teamwork.<br>• Uses and encourages creative decisions and solutions.<br>• Acts as positive change agent. | • Meets and frequently exceeds expectations.<br>• Improves efficiency and customer service.<br>• Provides staff with innovative and constructive direction, delegation, feedback, mentoring, and recognition.<br>• Adheres to performance management/administrative policies.<br>• Makes sound decisions.<br>• Promotes and maintains teamwork, inclusiveness, respect, and creativity. | • Meets most expectations timely and effectively.<br>• Maintains acceptable efficiency and customer service.<br>• Provides staff necessary direction, feedback, development, and recognition.<br>• Makes decisions that usually reflect sound judgment.<br>• Usually adheres to administrative policies.<br>• Encourages innovation, teamwork, and inclusiveness. | • Often fails to meet expectations timely and effectively.<br>• Efficiency and customer service occasionally falls below standards.<br>• Inadequately directs, trains, monitors, and recognizes staff.<br>• Inadequately fulfills administrative and performance management functions.<br>• Often lacks good judgment in decisions.<br>• Lacks leadership in promoting innovation, teamwork, and inclusiveness. | • Consistently fails to meet expectations timely or effectively.<br>• Delivers unacceptable customer service or operational efficiency.<br>• Disregards or ineffectively provides staff direction, monitoring, and development.<br>• Often ignores performance management or administrative policies.<br>• Is indecisive or lacks good judgment.<br>• Resists change. |

Comments:

| EMPLOYEE NAME: Tpr. Michael Keyes | EMPLOYEE NUMBER: 00419775 |
|---|---|

## OVERALL RATING

**INSTRUCTIONS:** Provide an overall rating based on the rating of the individual factors, adherence to significant performance standards, and accomplishment of essential functions. This rating provides an overall impression of job performance that is *supported* by the job factor ratings, not necessarily an *average* of those ratings. Thus, each factor need not be of equal weight but comments should justify significant differences impacting on the overall rating.

| OUTSTANDING ☒ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Employee consistently and significantly exceeds job expectations and standards and demonstrates a high degree of initiative, customer service, and quality of work. | • Employee meets and frequently exceeds job expectations and standards and demonstrates a high degree of initiative, customer service, and quality of work. | • Employee meets the expectations and standards of the employee's job in a fully adequate way. | • Employee meets many of the expectations of the job in a satisfactory manner but often fails to adequately meet some of the expectations or standards. Improvement is required. | • Employee fails to meet many job expectations and standards. Performance deficiencies must be corrected. |

<u>Overall Comments:</u> I enjoy working with Mike. He is a good fit for the Megan's Law Section. Mike truly makes a difference in the section even-though at times he does not see it. I look forward to working with Mike for a long time.

**EMPLOYEE STRENGTHS:** (Identify strong attributes, abilities, or proficiency in an area, to maximize the employee's contribution to the organization in utilizing these abilities and skills and to identify potential mentor relationships.) <u>Comments:</u>
1. Positive and Professional attitude.
2. Ability to resolve issues
3. Team player attitude.
4. Accuracy/quality work

**OPPORTUNITIES FOR DEVELOPMENT:** (Identify knowledge, skills, and abilities that may need improvement. Address developmental activities to assist the employee in addressing either areas of concern or opportunities for professional growth.) <u>Comments:</u>
1. Become more involved with learning legal opinions & court cases.

| Rater's Signature: CPL. | Date: 09/14/11 |
|---|---|

## REVIEWER'S COMMENTS

<u>Comments:</u> I AGREE WITH THIS RATING. I EXPECT TPR. KEYES WILL TAKE ON MORE RESPONSIBILITY IN THE ML SECTION AS HIS EXPERIENCE GROWS. THANK YOU MIKE FOR YOUR HARD WORK!!!

| Reviewer's Signature: LT.                562 | Date: 09/14/2011 |
|---|---|

## EMPLOYEE'S COMMENTS

☒ I AGREE WITH THIS RATING          ☐ I DISAGREE WITH THIS RATING

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____
                                            (DATE)

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

<u>Comments:</u>

| Employee's Signature: TPR Michael Keyes | Date: 09/14/2011 |
|---|---|

# Exhibit C

PENNSYLVANIA STATE POLICE
**DEPARTMENT CORRESPONDENCE**

**CONFIDENTIAL**

DATE:            November 14, 2011

SUBJECT:     Retraining and  Return to Full Duty – Trooper Michael L. Keyes

TO:               Trooper Michael L. Keyes

FROM:          Captain Maynard H. Gray
                     Commanding Officer
                     Troop H, Harrisburg

REFERENCES:   (a)   Independent Psychiatric Evaluation Report by Roger J.
                               Cadieux, MD, received August 24, 2011.

                       (b)   OM 7-9, J.TRAINING AFTER EXTENDED ABSENCES.

                       (c)   Special Order 2009-57, Authorizations and Restrictions for
                               Members Assigned to Limited Duty.

ENCLOSURE:    (1)    Acknowledgement of Limited Use of Badge of Office.

                     1.      You have been currently assigned to permanent limited duty
and temporarily assigned to the Megan's Law Unit, Bureau of Records and
Identification, and have been released to perform the full duties of a State Police Officer
by your treating physician, Richard W. Williams, Ph.D. The Department directed you to
be independently evaluated by Roger J. Cadieux, MD, on August 17, 2011, to
determine your fitness for full duty.  Dr. Cadieux provided his medical opinion "..that
Trooper Keyes is medically and psychiatrically cleared to perform all the duties of a full,
unrestricted trooper."  You have reported that you are not prescribed or taking any
prescribed medications. The State Police Psychologist (SPP), Michael A. Asken, Ph.D.,
and the Department accept Reference (a).  Consequently, you shall be returned to the
full duty status of a State Police Officer.   To achieve the release to a full-duty
assignment is required in accordance with Reference (b), successful completion of a retraining
program is required as a result of your absence from work beyond a two-year period.

                     2.      Accordingly, you shall report to Sergeant Joseph P. Spingler,

*An Internationally Accredited Law Enforcement Agency*

Trooper Michael L. Keyes
November 14, 2011
Page 2

at the Bureau of Training and Education, effective Monday, November 21, 2011, to commence your mandatory retraining program. Your assigned shift shall be 0800 hours to 1600 hours. Sergeant Spingler will be assigned as your supervisor throughout the retraining program and shall ensure that any approved leave usage by you is entered into SAP.

        3.    For the duration of the retraining program, you shall remain in a limited-duty status and shall not be permitted to wear your uniform, carry a weapon or your badge, pending successful completion of all phases of the training program, including but not limited to weapons qualification. Should you desire to carry your badge for identification purposes, you may complete and sign Enclosure (1).

        4.    Nearing your successful completion of the retraining program, the Director, Bureau of Training and Education shall provide notification to the Commanding Officer, Troop H, Harrisburg and the Director, Bureau of Human Resources.

        5.    Upon successful completion of the retraining program, you shall return to your Troop assignment, at Troop H, Harrisburg, and shall perform the duties required of a State Police Officer in a full-duty assignment. As the result of your federal firearms prohibition, you are prohibited from possessing and carrying any personal firearms. However, under the federal Firearms Act, your service weapon shall be provided for your use during your assigned full-duty shift and shall be relinquished and maintained at the Troop at the cessation of each shift. Further, you are prohibited from self-activating to perform police functions while off duty.

        6.    In advance of your assignment to the Bureau of Training and Education, the Commanding Officer, Troop H, Harrisburg shall meet with you to direct the retraining mandate, via correspondence, and to ascertain your preference to return to your assigned station, Newport, or preference to be assigned to another available station within Troop H; availability to be determined by the Commanding Officer.

        7.    The SPP strongly recommends that you meet with your therapist as you transition back to the full-duty assignment of a Trooper in Troop H, Harrisburg.

        8.    Should any concerns arise as to your fitness for duty during the retraining or Troop assignment, immediate appropriate action should be taken and the Director, Bureau of Human Resources should be advised of same by the Commanding Officer.

RECEIVED BY _TPR M_____ _Keyes_ DATE _11/15/11_ TIME _1200_

ISSUED BY_Captain M_____ DATE _11/15/11_ TIME _1201_

## Acknowledgment of Limited Use of Badge of Office

I acknowledge and agree that I may only use my badge of office for identification purposes. I shall not use my badge of office in connection with any police incident, nor shall I use my badge for any law enforcement purpose. I understand that if I refuse to sign this acknowledgment, I am not authorized by the Pennsylvania State Police to carry my badge of office.

11/15/11
Date

TPR _Michael B Kuyper_
Member's Signature

11/15/11
Date

Captain _M P H_
Commanding Officer's Signature

# Exhibit D

| CAUTION: NOT TO BE USED FOR IDENTIFICATION PURPOSES | THIS IS AN IMPORTANT RECORD. SAFEGUARD IT. | ANY ALTERATIONS IN SHADED AREAS RENDER FORM VOID |
|---|---|---|

## CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY
This Report Contains Information Subject to the Privacy Act of 1974, As Amended.

| 1. NAME (Last, First, Middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NUMBER |
|---|---|---|
| YOX, JONATHAN KARL | ARMY/RA | 220   29   9791 |

| 4a. GRADE, RATE OR RANK | b. PAY GRADE | 5. DATE OF BIRTH (YYYYMMDD) | 6. RESERVE OBLIGATION TERMINATION DATE (YYYYMMDD) |
|---|---|---|---|
| CPL | E04 | 19901113 | 00000000 |

| 7a. PLACE OF ENTRY INTO ACTIVE DUTY | b. HOME OF RECORD AT TIME OF ENTRY (City and state, or complete address if known) |
|---|---|
| MECHANICSBURG, PENNSYLVANIA | 69 WEST BRUCE RD FAWN GROVE PENNSYLVANIA 17321-9344 |

| 8a. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | b. STATION WHERE SEPARATED |
|---|---|
| 020508INREAR FC | FORT BRAGG, NC 28310-5000 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE | NONE |
|---|---|---|
| N/A | AMOUNT: $ 400,000.00 | |

| 11. PRIMARY SPECIALTY (List number, title and years and months in specialty. List additional specialty numbers and titles involving periods of one or more years.) | 12. RECORD OF SERVICE | YEAR(S) | MONTH(S) | DAY(S) |
|---|---|---|---|---|
| 11B1P INFANTRYMAN - 3 YRS 7 MOS//NOTHING FOLLOWS | a. DATE ENTERED AD THIS PERIOD | 2008 | 07 | 29 |
| | b. SEPARATION DATE THIS PERIOD | 2012 | 07 | 05 |
| | c. NET ACTIVE SERVICE THIS PERIOD | 0003 | 11 | 07 |
| | d. TOTAL PRIOR ACTIVE SERVICE | 0000 | 00 | 00 |
| | e. TOTAL PRIOR INACTIVE SERVICE | 0000 | 00 | 00 |
| | f. FOREIGN SERVICE | 0001 | 00 | 01 |
| | g. SEA SERVICE | 0000 | 00 | 00 |
| | h. INITIAL ENTRY TRAINING | 0000 | 00 | 00 |
| | i. EFFECTIVE DATE OF PAY GRADE | 2010 | 07 | 01 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) | 14. MILITARY EDUCATION (Course title, number of weeks, and month and year completed) |
|---|---|
| ARMY COMMENDATION MEDAL//ARMY ACHIEVEMENT MEDAL//MERITORIOUS UNIT COMMENDATION// USA/USAF PRESIDENTIAL UNIT CITATION//ARMY GOOD CONDUCT MEDAL//NATIONAL DEFENSE SERVICE MEDAL//AFGHANISTAN CAMPAIGN MEDAL W/ TWO CAMPAIGN STARS//GLOBAL WAR ON TERRORISM SERVICE MEDAL//ARMY//CONT IN BLOCK 18 | BUS DRIVERS CRS, 1 WEEK, 2011//COMBAT LIFE SAVERS CRS, 2 WEEKS, 2009//COMBATIVES LEVEL 1, 1 WEEK, 2008//U SUPPLY ENHANCED 101, 1 WEEK, 2012//NOTHING FOLLOWS |

| 15a. COMMISSIONED THROUGH SERVICE ACADEMY | YES | X | NO |
|---|---|---|---|
| b. COMMISSIONED THROUGH ROTC SCHOLARSHIP (10 USC Sec. 2107b) | YES | X | NO |
| c. ENLISTED UNDER LOAN REPAYMENT PROGRAM (10 USC Chap. 109) (If Yes, years of commitment: NA ) | YES | X | NO |

| 16. DAYS ACCRUED LEAVE PAID 0 | 17. MEMBER WAS PROVIDED COMPLETE DENTAL EXAMINATION AND ALL APPROPRIATE DENTAL SERVICES AND TREATMENT WITHIN 90 DAYS PRIOR TO SEPARATION | YES | NO |
|---|---|---|---|
| | | | X |

18. REMARKS ////////////////////////////////////////////////////////////////
BLOCK 6, PERIOD OF DELAYED ENTRY PROGRAM: 20071211-20080728//SERVED IN A DESIGNATED
IMMINENT DANGER PAY AREA//SERVICE IN AFGHANISTAN 20090815-20100815//DISABILITY SEVERANCE
PAY -- $25887.60//MEMBER HAS COMPLETED FIRST FULL TERM OF SERVICE//CONT FROM BLOCK 13:
SERVICE RIBBON//OVERSEAS SERVICE RIBBON//NATO MEDAL//PARACHUTIST BADGE//ROYAL BRITISH
PARACHUTIST WINGS//NOTHING FOLLOWS

The information contained herein is subject to computer matching within the Department of Defense or with any other affected Federal or non-Federal agency for verification purposes and to determine eligibility for, and/or continued compliance with, the requirements of a Federal benefit program.

| 19a. MAILING ADDRESS AFTER SEPARATION (Include ZIP Code) | b. NEAREST RELATIVE (Name and address - include ZIP Code) |
|---|---|
| 69 WEST BRUCE RD FAWN GROVE PENNSYLVANIA 17321-9344 | GLENDA WELLS 91 WEST BRUCE RD FAWN GROVE PENNSYLVANIA 17321 |

| 20. MEMBER REQUESTS COPY 6 BE SENT TO (Specify state/locality) PA | OFFICE OF VETERANS AFFAIRS | X | YES | NO |
|---|---|---|---|---|
| a. MEMBER REQUESTS COPY 3 BE SENT TO THE CENTRAL OFFICE OF THE DEPARTMENT OF VETERANS AFFAIRS (WASHINGTON, DC) | | X | YES | NO |

| 21a. MEMBER SIGNATURE | b. DATE (YYYYMMDD) | 22a. OFFICIAL AUTHORIZED TO SIGN (Typed name, grade, title, signature) | b. DATE (YYYYMMDD) |
|---|---|---|---|
| ESIGNED BY: YOX.JONATHAN .KARL.1369193763 | 20120514 | ESIGNED BY: WADE.PAMELA.C.1059206504 PAMELA WADE, LEAD HUMAN RESOURCE ASSISTANT | 20120514 |

### SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Include upgrades) |
|---|---|
| DISCHARGE | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENTRY CODE |
|---|---|---|
| AR 635-40, CHAP 4 | JEA | 3 |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| DISABILITY, SEVERANCE PAY, COMBAT RELATED   (ENHANCED ) |

| 29. DATES OF TIME LOST DURING THIS PERIOD (YYYYMMDD) | 30. MEMBER REQUESTS COPY 4 (Initials) JKY |
|---|---|
| NONE | |

| DD FORM 214, AUG 2009 | PREVIOUS EDITION IS OBSOLETE. GENERATED BY TRANSPROC | MEMBER - 4 |
|---|---|---|

# Exhibit E



# PENNSYLVANIA STATE POLICE
## DEPARTMENT HEADQUARTERS
### 1800 ELMERTON AVENUE
### HARRISBURG, PENNSYLVANIA  17110

October 16, 2012

File Number:   12-10-03988

JONATHAN K YOX
376 HONEY LOCUST SQUARE
LANCASTER PA 17602

Dear:   Mr. Yox

This letter is in response to your Pennsylvania Instant Check System (PICS) Challenge, Form SP 4-197, which was received by this office on October 10, 2012.

Please be advised that at this time your denial for a purchase/transfer of a firearm is confirmed. Attached is information that identifies the reason(s) for this denial.  This information is confidential and will be used only with regard to this challenge.

Please be advised that the basis for your denial can be found under 18 Pa C. S. § 6105 (c) (4).  Also, federal law 18 USC § 922 (g) (4), restricts any person adjudicated as a mental defective or involuntarily committed to any mental institution.

Your involuntary commitments in 2006 are prohibiting.

The Pennsylvania State Police will consider any information you may have regarding the incident(s) on the attached sheet. Please mail your response along with any supporting documentation within 30 days of the date of this letter. Information that may be helpful would include police reports, medical records, court documents, military records, or correspondence containing your signature along with an explanation pertaining to the circumstances and/or outcome of the incident(s).  Include your file number, name and date of birth.  Upon receipt of your documentation, the Pennsylvania State Police will review that information and will notify you in writing of our decision within 60 days of the receipt of your challenge.

Mail all responses to the Pennsylvania State Police at the address listed above, Attn: Firearms Division – PICS Challenge Unit. Should the attached information NOT pertain to you, please call the number listed below.

**Questions about the PICS Challenge Process may be directed to the following PICS Legal Assistant:  Ron Wilkins at (717) 705-4542 or (717) 705-4541 or by writing to the above address ATTN: PICS Challenge Unit.**

Sincerely,

Lieutenant Troy S. Lokhaiser
Director, Firearms Division

*An Internationally Accredited Law Enforcement Agency*

October 11, 2012

File Number: 12-10-03988

Possible Reason(s) for Denial/Undetermined:

Name: YOX,   JONATHAN   K
Mental Health Commitment Date:   03/31/2006
Issuing Authority: YORK  CO  MH  MR
Location: PA
Docket/ OTN/ Tracking #:
Date Released:

Name: YOX,   JONATHAN   K
Mental Health Commitment Date:   04/04/2006
Issuing Authority: LEBANON   CO  MH  MR
Location: PA
Docket/ OTN/ Tracking #:
Date Released:

Name:
Date of Arrest:
Arresting Authority:
Location:
Docket/ OTN/ Tracking #:
Charges:

# Exhibit F

# ALPHA OMEGA COUNSELING CENTER, INC.

### DIRECTOR:

### ANTHONY J. FISCHETTO, M.DIV., ED.D., DABPS

#### Licensed Psychologist

#### Diplomate in Forensic Psychology

#### 475 PHILADELPHIA AVENUE, P.O. BOX 66, SHILLINGTON, PA  19607

**Telephone: (610) 777-3306     Mobile Phone: 610-413-0375     FAX:  (610) 777-9494**
**E-mail:  afische101@aol.com**

### PSYCHOLOGICAL EVALUATION

Examinee: Jonathan Karl Yox
Examinee's Address: 376 Honey Locust Square, Lancaster, PA 17602
Date of Birth: 11-13-1990
Date of Report: 03-17-2013
Age at the Time of the Evaluation: 22 years old
Place of Evaluation: Alpha Omega Counseling Center
Dates of Evaluations:
02-06-2013(MMPI-2) and meeting,
02-12-2013 from 6:45PM to 8:45PM face-to-face clinical evaluation and review of the (MMPI-2),
02-26-2013 from 7:00 PM to 9:30 PM face-to-face interview and completion of the Hare (PCL-R: 2nd Edition)
03-15-2013 from 5:45PM to 7:10 PM to complete the (PAI) and the (STAXI-2) and brief discussion.
03-26-2013 from 7:45 PM to 9:30 PM to review the psychological evaluation.
Race: Caucasian
Educational Level: High School Graduate; Attending Millersville College for Applied Engineering.
Marital Status: single, never married, living with his girlfriend: Sarah Tome
Occupation and Work History: Presently working at G4S, part-time security officer on the weekends; and at Millersville College at the Student Veteran Association during the week.

Evaluator: Anthony J. Fischetto, Ed.D.
Licensed Psychologist
Diplomate in Forensic Psychology

## EVALUATION PROCEDURES

- Clinical evaluation performed and face to face time (Approximately 8+ hours)
- Minnesota Multiphasic Personality Inventory 2nd Edition (MMPI-2)
- Hare Psychopathy Checklist–Revised 2nd Edition Interview Guide
- Hare Psychopathy Checklist–Revised 2nd Edition (PCL-R: 2nd Edition)
- The Historical/Clinical/Risk Management Checklist: (HCR-20)
- Personality Assessment Inventory (PAI)

1

- State-Trait Anger Expression Inventory-2 (STAXI-2)
- Structured Assessment of Violence Risk in Youth (SAVRY)
- Review of Risk and Protective Factors for Serious, Violent, and Chronic Juvenile Offenders in the Community. U.S. Department of Justice Model
- Phone conversations with Mr. Yox's girlfriend on 02-26-2013, with Mr. Yox's former employer: Mr. Hugh McPherson on 03-06-2013, and Mr. Yox's mother on 03-07-2013.

## DOCUMENTS REVIEWED

- Wellspan Behavioral Health Initial Assessment: dated 03-31-2006
- Application for Involuntary Emergency Examination and Treatment (302): dated 03-31-2006
- Application for Extended Involuntary Treatment (303): dated 03-31-2006
- Philhaven Discharge Summary for Inpatient Hospitalization from 03-31-2006 to 04-06-2006
- Pennsylvania State Police Letter to Mr. Yox: dated 11-16-2012
- Wellspan Health York Hospital Medical Records
- Medical Records from Womack Army Medical Center
- Mr. Yox's Army Notebook.

## REFERRAL REASON FOR A PSYCHOLOGICAL EVALUATION

Mr. Jonathan Yox and his Attorney Joshua Prince from Prince Law Associates contacted this Psychologist.

The purpose of this psychological evaluation is to assist the trier of fact as to Mr. Yox's current mental state and stability as well as any current risk factors as per the above assessments and contacts with the above-mentioned references.

Mr. Yox was prohibited from the purchase/transfer of a firearm based on 18 Pa C. S. * 6105 (c) (4) and federal law 18 USC * 922 (g) (4), which restricts any person adjudicated as a mental defective or involuntarily committed to any mental institution.

The first PA State Police Letter dated 10-16-2012 stated that Mr. Yox is being denied because of his "involuntary commitments in 2006". The second PA State Police Letter dated 11-16-2012 stated that Mr. Yox is being denied because of his "involuntary commitments in 2001 and 2006". However, Mr. Yox said that the 2001 date is in error in the letter, because his two hospitalizations at the York Hospital and Philhaven were both in 2006 when he was 15 years old and that there was no treatment, incidences, or hospitalizations prior to 2006. Moreover, 2006 was the only year in which Jonathan stated to have any such mental health incidences.

## INFORMED CONSENT

At the onset of the evaluation, Jonathan Yox and his attorney Joshua Prince were advised that this psychologist would be an independent evaluator in this evaluation.
Jonathan Yox and his attorney were advised verbally and in writing that the results of my evaluation will be objective and professional, and therefore, the results of this evaluation may have positive or negative

results.  Jonathan Yox and his attorney were informed by me that I am not an advocate for the referring party, but rather an advocate for the clinical and empirical data that are responsive to the referral question.  Jonathan Yox and his attorney were further advised that I am not Mr. Yox's doctor or psychologist.  Mr. Yox was also advised that any information he provided to me, including any of my findings and conclusions regarding my review of the records and interviews of third parties would remain within the attorney-client privilege until my report was released by his attorney or I was called by the court to testify.

Mr. Jonathan Yox understood and consented to the informed consent.

Mr. Jonathan Yox also agreed and gave me permission to talk to any third party source of information. All the third parties I contacted were also informed that I was the psychologist evaluating Jonathan and that whatever they told me would not be confidential.

**MENTAL STATUS EXAMINATION:**

During my personal interviews with Jonathon Yox, he was very pleasant, cooperative, polite and friendly.  Jonathan Yox is a 22-year-old Caucasian male who was evaluated in this psychologist's office: the Alpha Omega Counseling Center in Shillington, PA. Jonathan is slim built weighing 186 lbs. and 5'9" tall. He has green eyes, was neatly groomed with short hair, and was casually dressed. He appeared his chronological age. He was alert and responsive. Eye contact was good. Speech was normal, logical and coherent. He was oriented to time, person, and place.

His mood was calm and happy. He was not hyperactive. No thought disturbances noticed or reported on the testing. He said he sleeps well and has no nightmares, no flashbacks, no PTSD. Nevertheless, sometimes he is easily awakened by noise and goes to sleep with thoughts that bother him according to his answers on the MMPI-2. He said he is not depressed. Jonathan said the last time he felt depressed was in 2010 when his former girlfriend cheated on him.

Jonathan denies any thoughts of suicide or homicide. He said he never attempted suicide or homicide. His grades in school were poor between 13 to 16 years old because he did not care at that time (C's and D's). His grades improved after being expelled from school at age 15 years old, after which he had A's B's. Presently all A's in college.

Psychomotor activity was normal, sometimes a little energetic.  He denied any hallucinations or delusions. He denied any obsessive thoughts or phobias. No unusual perceptual experiences were noted or reported. He appeared to be able to pay attention and concentrate well during the interviews. Mr. Yox indicated that he never experienced any problems with attention or concentration. He was able to complete 5 out of 5 correctly in subtracting 7's. He was able to spell "world" forwards and backwards with no problems. His social judgment was within normal limits when asked a couple scenarios. He also said he has friends and gets along with them fine with no problems. He indicates that he has a good support system.

**COGNITIVE ASSESSMENT:**

Mr. Yox appears to be at least of average intelligence overall. His memory appeared to be intact.

3

## EDUCATIONAL HISTORY:

Jonathan graduated 12th grade. Jonathan was expelled in his sophomore year for possession of cocaine at the age of 15. In his senior year, he turned things around and received A's and B's for the first time. At which time Jonathan received his "Student Turnaround Achievement Award."

## OCCUPATIONAL HISTORY:

Jonathan works at G4S Secure Solutions part time as a security officer on the weekends. He works during the week at Millersville College. He works at the Student Veteran Association.

## MILITARY HISTORY:

Jonathan was in the Army from July 29, 2008 to July 5, 2012 as an infantryman. He was in combat in the Army in the front line in Afghanistan for six and a half months and used weapons of all kinds in the military. Jonathan received an honorable discharge with no problems in the military.

## MARITAL STATUS:

He was never married. He lives with his girlfriend, Sarah, who is 20 years old. Sarah is a sales consultant at CarMax.

## CHILDREN:

Jonathan has no children.

## LIVING ARRANGEMENTS:

Jonathan lives with his girlfriend Sarah (age 20) since September 14, 2012. They have known each other since Sarah was 15 years old.

## REASON FOR WANTING TO CARRY A LETHAL WEAPON:

Jonathan has used many types of weapons in the military. He wants to be able to purchase a gun for home defense and target shooting. He also just wants to be able to have his record cleared of any hindrances to being able to purchase a weapon.

## HIS EXPERIENCE WITH LETHAL WEAPONS:

Jonathan's first experiences with weapons consist of hunting when he was 16 or 17 with his grandfather and uncle. He said he never misused a weapon. He has used weapons in the military from July 2008 until July 2012. Some of the weapons consisted of an M4, M16 assault rifles, 50 caliber, M2 40 machine gun, M2 49 machine gun, Mark 19 grenade launcher, 12 gauge shotguns, M203 grenade launchers, high explosive, incendiary grenades, and flashbangs.

## CRIMINAL HISTORY:

4

At age 15, Jonathan had a drug charge that was expunged at age 18.  The drug charge consisted of him having possession of cocaine in school.  He received six months' probation for cocaine possession at school and was sent to Manito Academy for this charge. Jonathan was a Manito for two or three weeks because he was cutting himself there after meeting a girl Heidi who was a cutter.  Jonathan was then transferred to River Rock Academy and was there for the rest of the year for being expelled. At that time, he was sad and depressed, his parents were divorcing, and he was influenced by a troubled 18-year-old girl (Heidi) at Manito Academy, who introduced Jonathan to cutting himself. His cuts were superficial and did not leave scars, he said.

**MENTAL HEALTH HISTORY:**

Jonathan was depressed and discussed suicide with his friends when he was 15 years old. He met a girl named Heidi (age 18) at Manito Academy who introduced Jonathan to cutting. Jonathan proceeded to make many "superficial" (See page 4/4 of the Wellspan Behavioral Health Initial Assessment) cut his biceps and calves. Jonathan had 120 to 130 cuts on his legs. Jonathan says there were maybe 30 cuts on his arm and 15 cuts on his leg He had a "suicide pact" with Heidi also at Manito.  Jonathan said it was a cry for help.  During this time, Jonathan's parents were separated and getting a divorce.   Jonathan said he was not really planning to hurt anyone.

Jonathan had a 302 Emergency Involuntary Admission to Philhaven psychiatric inpatient unit on 03/31/2006 when he was 15 years old. The Philhaven discharge summary stated that this was Jonathan's first inpatient psychiatric hospitalization at Philhaven.

The 2006 Philhaven discharge summary also stated the following:
Jonathan was not receiving any mental health services at the time of admission to Philhaven, that he was admitted to Philhaven for an evaluation of "significant emotional and behavioral problems, which reportedly include: increased depression, self-harm behavior, and suicidal ideation. Prior to admission, Jonathan made a suicide pact with a female peer at school. He reportedly had also been making superficial cuts on his arms and legs. Stressors reportedly include: biological parents in the process of a divorce; family history of drug and alcohol abuse, recently expelled from school; currently on probation; increased depression and suicidal ideation; increased self-abuse behavior; and other environmental and psychosocial stressors." (Philhaven Discharge Summary pp.1-2, dated 04/06/2006)

Jonathan indicated that he recovered soon and had no more mental health issues prior to that time or after that time. His MMPI-2 results were marginally valid due to Jonathan presenting himself in an overly positive light by minimizing faults and denying psychological problems.  This presentation is understandable for this type of evaluation. Jonathan's highest clinical scales on the MMPI-2 were Hy and Pd with a T score of 61 and 64, respectively. However, these clinical scores were still within the normal limits below T scores of 65. However, he reported some tendency toward impulsiveness and anger proneness under conditions of conflict. Jonathan's behavioral pattern on the MMPI-2 includes some persistent features that reflect emotional lability and impulsiveness. The MMPI-2 provided no diagnostic considerations for the "normal-range" clinical profile configuration.

**EVALUATION OF AXIS I HISTORY ONSET BEFORE AGE 15:**

Jonathan was not often truant from school. He did skip school maybe when he was 15 or 16, he said. He never ran away from home overnight. He did not initiate physical fights. He never used a weapon in a fight. He never forced anyone into sexual activity. He was never cruel to animals. He was never cruel to people. He never deliberately destroyed other people's property. He never engaged in fire setting. He did not often lie. He never stole anything while confronting a person. He never stole anything in any way from someone. No history of enuresis. Jonathan reports no psychiatric history prior to age 15.

**BEHAVIOR SINCE THE AGE OF 15:**

He has been able to maintain consistent work. He did not fail to conform to social norms. Jonathan exhibited respectful, lawful behavior. He had no trouble with the law except that one time when he was 15. Occasionally he may be irritable. He said he is not aggressive. He maintains his financial obligations. He has no debt, except for the payments on his car, which he is up to date on as well as ahead. He is able to plan ahead. He has regard for the truth, although sometimes he may not want to admit talking to former girlfriends to his present girlfriend. He has had some speeding violations. He had six speeding violations in the last five years from driving up through Virginia. He has been able to maintain a monogamous relationship for more than a year. He had one relationship for four and a half years, from the age of 15 to February 2010, 19 years old approximately. He says his girlfriend cheated on him. She was in Pennsylvania at the time and he was in Army in North Carolina. He did not blame her. He was depressed for a while. He appears to be able to express remorse.

When asked what his worst enemy would say about him, he says he does not know. He says he does not have any worst enemies. When asked what someone would say who doesn't like him, he said, "I can be an a-hole, I guess." He says he is protective of the ones he loves. He says he has a security clearance from the military and does not want to lose that. He wants to clear this up for him to get a federal job.

**EVALUATION OF ADULT ANTISOCIAL BEHAVIOR:**

He is not involved in any professional stealing. No racketeering. No dealing in illegal psychoactive substances.

**DRUG AND ALCOHOL HISTORY:**

He first drank when he was 15, he said not a lot. He last drank during the Superbowl of 2013, five beers. He barely drank at all. He did not get rowdy.

He first did drugs when he was 15. He did marijuana and cocaine socially. He was caught with cocaine at school. He had it in his shoe. The principal and the new principal took him to the office and the police put Jonathan in handcuffs and took him away. Jonathan said he felt terrible. After that, he said that he made the honor roll and the principal that brought him to the office awarded him.

Jonathan does not drink much caffeine. He quit smoking cigarettes about five months ago.

**FAMILY HISTORY:**

Jonathan grew up in Baltimore, Maryland, until 8 years old.  From age 8 to 17, he lived in York County at which time he then joined the Army to change his life around, he said.  He was raised by his mother and father.  They were separated when Jonathan was 15.  After the cocaine incident at school, Jonathan was sent to Philhaven in April 2006.  His father died July 29, 2006.  Jonathan stated that he got along fine with his mother and father.  He is close to his mother now.  Jonathan has one brother, Bill, 26 years old.  The brother has no history of drugs or alcohol.  No behavior problems.

Jonathan has had five or six serious girlfriends.  He has had sex with 14 girls, he says.  He said he never had any violence towards the girls.

**FAMILY PSYCHIATRIC HISTORY:**

A maternal cousin was in jail at the age of 31 for probably drug-related issues, Jonathan said.

## HARE PCL-R:Second Edition Interview Guide
### (Robert D. Hare's Psychopathy Checklist, Revised (PCL-R)
is the psycho-diagnostic tool most commonly used to assess psychopathy—results below)

Jonathan was evaluated for an additional two and a half hours using the HARE PCL-R: Second Edition Interview Guide with the following responses (Some of the questions were asked previously at an earlier meeting with Jonathan):

**SCHOOL HISTORY:**

The question was "Did you like school when you were a child?"  He said he enjoyed it when he was a child.  He played football when he was 8 years old.  He hated English as a child, but now he enjoys it. He said his teachers would describe him as a good kid and focused.  He said his attendance was great. His parents always made sure that he was at school.  He never failed a grade.  He said he was not a troublemaker in school.  He said he did not get into any physical fights in school.  He had two fights in his entire life.  One was when he was 14 or 15 and another one was when he was 14 or 15 with the same person who put his hands on Jonathan's girlfriend.  Jonathan said no one ever called him a bully at school.  He never hurt anyone badly when he was a child.  He said he never saw a doctor or counselor because of behavior problems at school as a child.  He said he was never suspended as a child.  He was only expelled that one time in the tenth grade when he had possession of cocaine at age 15.  He graduated from high school.  As far as educational upgrading, he said in the military he took courses in leadership, airborne school, and now he's going to Millersville University, a four-year college, and is in his first semester.  When asked if he has ever taken any technical or vocational courses, he said he is taking drafting in school at Millersville University and he took a technology class in high school, a computer-aided workshop in drafting.

**WORK EXPERIENCE:**

When asked if he has ever done any volunteer work, he says he worked at the Ronald McDonald House in the summer or spring of 2012 and he cooked breakfast.  His present girlfriend got him interested and involved with that.  He also did a Heart Walk for Lancaster with his girlfriend in the fall of 2012.

7

When asked what kind of work he has done, he says he is working at G4S Secure Solution. He has been there since December 2012. He works there part time, 16 hours a week, Friday and Saturday, the night shift, as a security officer. His area supervisor is Travis. His site supervisor is Edgar. He has a second job at Millersville University where he works on weekdays, 20 hours a week, Monday through Friday, helping with the Veteran's Association with their benefits and financial aid.

When asked how many different jobs he's had and what his longest job was, he says he worked at Maple Lawn Farm, which was his first job when he was 15-17 years old, doing agricultural labor, as well as the two jobs mentioned above. His longest job was in the military for four years, from the age of 17 to 21. According to his DD Form 214, Army discharge summary he received a "Character of Service" of "Honorable." Jonathan received a discharged ranking of an E4 Corporal.

When asked how his boss would describe his work performance and how he would describe his boss, he said the following, when he worked at the farm he said his boss would describe him as good, he did good work, and he listened well. His boss is Hugh McPherson, who was contacted by this psychologist, who confirmed that Jonathan was a hard worker and respectful. Mr. McPherson said he would love it if Jonathan were still working there. Jonathan worked the Corn Maze, Fun Park, Guest Services, with many different people and kids. Mr. McPherson said Jonathan was pleasant. Jonathan had no need to be corrected. He had good language. He never swore. There were up to 900 people in an hour at this place of business. Jonathan was helpful to people. Mr. McPherson said that there was no problem with Jonathan and that he was a "great kid".

Jonathan's job at G4S, he would say that he would be described as a "Good worker, reliable, with leadership potential, responsible. I listened well. I'm a quick learner."

At college, he says that he is dependable and all the things mentioned above. Jonathan said that he is creative and friendly.

When asked if he ever had to quit a job, he said he never quit, and never was fired. He left for bigger and better things. He told his boss he was joining the military. Jonathan said he never came in late for work. Jonathan said he never intentionally missed work when he was not sick. Jonathan said he never used drugs or alcohol at work, or went into work drunk or stoned. Jonathan said he never got into trouble at work for not obeying the rules and regulations. Jonathan said he never lost a job because he knew he was going to be fired. Jonathan said he never left a job without another job already lined up, such as the military.

When asked if he has ever been unemployed, he said right after he got out of the military, from July 5th to December 7th, 2012, he was searching for a job. He helped a contractor doing painting and tile work. When asked have you supported yourself when you were not working, he said yes, he had money saved up, and a severance check from the military. He said, "I'm not the type to ask Mommy and Daddy for money."

When asked if he ever collected unemployment insurance, he said he collected unemployment from July 5th to December 7th, 2012. He said he never collected social assistance. He never relied on someone else for money, food or lodging. He never supported himself through crime.

8

**CAREER GOALS:**

He said that his career goal is to be an engineer or architect. He always wanted to get an engineering degree. For eight years, he has been interested in 3D drawings and shapes of objects, and he is working on this career now in college and is trying to obtain an engineering degree. He says having a job is important to him. He said "Yes, definitely." He said if you do not have a job, you can't take care of yourself and your family and to be a provider.

When asked about his long-term goals, he said that he would like to have a bachelor's degree and work on a master's degree. He would like to be in Tennessee or Colorado because he likes the area with mountains and the weather.

When asked if he thinks he would have any problems accomplishing goals, he said he's sure that he'll have problems, that it will get hard finding a job with the economy being terrible.

Part of the question on this assessment is "What impact will your criminal history have on obtaining these goals, and why?" This does not apply to Jonathan because he had a misdemeanor for possession of cocaine at age 15 that had been expunged at age 18.

**FINANCES:**

He said he's never had any problems with money. He bought a car. He owes $13,000.00 on the car. He is up to date and way ahead on payments on the car. He bought the car at $23,000.00 in June 2011. He has never needed help from his parents, grandparents, or friends financially. When asked if he has ever had a bank loan, he said he had a loan for $1500.00 to buy gear in Afghanistan and he paid it off. It appeared that he did that to build his credit. He said he's never owed people money and not paid them back. He said he has one credit card and has no trouble paying it. He has never fallen behind on paying bills, like rent, telephone, electricity, or gas, he said.

**HEALTH:**

He said at age 15 in April he was in Philhaven. He was there for 20 days. He was there because his parents took him to the E.R. at York Hospital because of cuts on his arms that he self-inflicted. He was sent to Philhaven. He said he cut himself as a way to cope with stress and depression. He was depressed over his parents' divorcing. He was also expelled from school at that time, he was losing his girlfriend, and he was then recommended for outpatient treatment.

As an adult, he's never seen a mental health professional, except for the mandatory debriefing after deployment in the military. There was no recommendation for any follow-up from that interview.

When asked if he ever tried to commit suicide, he said no. He cut himself but it wasn't suicide.

**FAMILY HISTORY:**

He said he was raised by his natural mother and father. They were both responsible for his upbringing.

He says he has one older brother, 26 years old.  His brother's name is Bill Yox.  He said they all lived together until his father died July 29, 2006.  Jonathan got out of Philhaven Hospital in May 2006. Jonathan and his brother fought at times, but nothing serious, he said.  When asked about his relationship with his parents, he said it was okay back then.  His parents were separated and his father moved out.  His relationship with his father grew very strong.  They both missed each other and that's why the relationship grew more.

When asked what was life like growing up, Jonathan said, "I took for granted what I had.  I had a great house and support group.  My parents did a great job."

As a child, age 12 or younger, he was asked if he ever got in trouble for not obeying the rules.  He says "No serious trouble."  He got in trouble for not cleaning his room at times.

He said he never ran away from home.  He never lied to his parents.  He didn't steal from his parents or relatives.  He never treated his parents or caretakers badly.  He said his behavior compared to that of his brother's was the same.  He was removed from the house for the incident with cocaine at school.  He was sent to Philhaven and was diagnosed with depressive disorder.

He said he was never physically, sexually or emotionally abused.  He said his relationship with his parents now is great with his mother and brother.  His father is deceased.  He talks to his brother every day and he talks to his mother every other day.  He said his brother, Bill, lives in Bethlehem, one hour and 45 minutes from Lancaster where Jonathan lives.  His brother works in the IT Department at Lafayette College.  They have a great relationship, he says, now.  He said he provided emotional support to his family when they were going through tough times.

**FRIENDS/INTIMATE RELATIONSHIPS:**

When asked about close friends now, he says his best friend is his girlfriend.  He has a best friend that is long distance.  He has good friends in North Carolina.  He has a close friend at college.  When asked what makes a person a close friend, he said "Trust and loyalty."

When asked who the closest to him now, he said his girlfriend and his brother.  He said his girlfriend is important to him because she's a great woman and they take care of each other.  His brother is important to him because "He's my brother, my blood, my best friend.  I love my brother."  When asked how he would feel if he couldn't see these people again, he said "Pretty upset."

When asked how old he was when he started dating, he said 11 or 12.  He was with a girl for eight months.  At 11 years old, she moved to a different school.  He felt upset.  When asked what attracts him to a partner, he said "Goals" now, and intelligence and looks.

When asked if he ever had a live-in marital relationship with a man or woman, he said he's never been married.  He's living with his girlfriend now.

For the most recent relationships, presently he's dating Sarah.  They're very close, and they lived together.  They've been living together since September 2012.  He says they have so much fun together. His girlfriend prior to Sarah was Ashton for four and a half years.  The relationship ended when she

cheated on him. He was in the military at the time. He said he's still not completely over it, but he's okay with it. He was very in love with her. He liked everything about her. He disliked that she talked so much. They didn't argue much. There was no physical abuse of any kind. He was never physically abusive to any partner.

When asked if he ever cheated on his partners, he said one time in 2006. He was 16 or 17 years old. He slept with another girl. This was during his split-up with his girlfriend. When he was asked about it by his girlfriend, he said he did tell the girlfriend about the affair. When asked if anyone ever cheated on him, he said Ashton did.

When asked if he ever felt that he was deeply in love with anyone, he said yes. When asked what he thinks love is, he said, "It's trusting one another." He also said it's knowing each other and having good communication and honesty.

When asked how old he was when he had his first sexual relationship, he said he was 15 years old with a stable partner. It was a girl. When asked how many different sexual partners he has had, he said 14 girls. He said none were one-night stands.

He does not have any children. He is not required to pay any child support.

**SUBSTANCE ABUSE/IMPULSIVE BEHAVIORS:**

He said he tried alcohol but never drank much. He said he was 13 or 14 when he started marijuana and cocaine. He was 15 or 16 when he stopped. He said he might have used the substances for one and a half years max. He had one major big incident between the age of 13 and 15, he said.

He says he does not consider himself addicted to any drugs. He had six months' probation at age 15 for the cocaine possession in school. That was his only incident.

When asked if he ever did anything dangerous or get in trouble when he was stoned or drunk, he said "no". When asked if he likes to speed or take chances when he drives, he says he's speeded on the highway and has six tickets, going 86 in a 65 mile an hour zone in Virginia. Anything over 81mph is considered reckless driving in Virginia, he said.

When asked how often he gets bored, he said not much.

When asked if he enjoys taking risks, he said "no."

When asked how he spends his leisure time, he said he reads a book, he watches shows, such as: "How I Met Your Mother", "The Walking Dead", "New Girl" and "White Collar", which is a crime mystery.

When asked if he had to make a decision, how long he thinks about the pros and cons, he says that when he bought his car he spent a month or two researching the different auto places.

**ANGER CONTROL AND EMOTIONS:**

11

When asked if he ever gets angry easily, he says he does not get angry easily.  If he gets angry, it depends if someone attacks his friend or family.  If the problem comes to him, he tries to walk away.  He said he'll yell if need be.  He never threw anything.  He doesn't punch anybody.  He doesn't want to get in any trouble.  He says he does not want to jeopardize his security clearance from the military.

He said eight months ago when his girlfriend's ex-boyfriend tried to come back into the picture, Jonathan called him to stay out of their life.  Sarah's ex-boyfriend is said to be gay.  Jonathan said he would call the police if there were any other problem.  Jonathan said he would not fight this person, 1) there was no sense in it, he said. 2) He does not want to lose his security clearance. 3) It would be on his record.  This is what Jonathan said.

When asked if anyone has ever told him that he has a "bad temper", he said "no".  When he was younger, he said he had a temper in that he would get mad quickly, yell, and walk away, but not now.

Since the age of 18, he's never gotten into any physical fights, he said.  When asked if he ever lost control, he said no.  He said one time when he was playing football; he accidentally broke a guy's thumb and felt bad about it.

When asked if he tried to control other people by being verbally or physical threatening, he said "No."

When asked if he's the kind of person who has strong feelings, he said he's very sympathetic.  He's referred to as a counselor of his friends.

When asked if he sometimes pretends to be upset or sad because other people expect him to be, he said no.

When asked if he ever hurt any animals on purpose or accidentally, he said no to both questions.

**ANTISOCIAL BEHAVIORS:**

He said when he was 13 or 14 he did drugs such as "Weed and cocaine."  When asked why, he said he doesn't know.  He said, "I guess to be a rebel."  He said now he realizes it's a "Crappy way to look at it."

Before the age of 12, did you ever get into trouble with the police?  He said "no".  When asked if he has ever been arrested as an adolescent, he said he was detained for the drug possession and cuffed at school, brought to the police station and then sent home.

When asked if I look at the adolescent criminal record, how many charges and convictions would you have on it; there would be none, because the one drug charge was expunged.

As an adult, he's never been arrested by the police, he said.

When asked, did you ever commit crimes as an adult and not get caught; he said no, he never did any crimes.

12

When asked, as an adult, what was the most serious aggressive act you have done, he said his job in the infantry in the Army, meaning military service, nothing illegal.

When asked, who or what is to blame for his past cocaine possession, he said he's to blame for the cocaine possession.

When asked what factors would help keep him out of trouble in the future, he said: 1) His friends. 2) His own outlook. 3) The law. 4) He doesn't want to lose his security clearance.

He's only had one incident of being charged, at age 15. He's now 22. He's never had any criminal behavior done to victims.

When asked if he felt remorse for the past incident of the cocaine possession, he said yes, he felt terrible. He said he cried in the school office with the principal. He said it was hearsay that the school found out that he had cocaine on him and searched him.

When asked how he feels about the legal system, if he believes in obeying the law and that they are laws fair, he said, "I agree with it." It's a way to keep order. He believes in obeying the law. He said "If you don't obey the law, you're going to get nowhere in this world."

He's never used any aliases.

**GENERAL QUESTIONS:**

When asked if there is anyone's opinion that he values, he says "Anyone if it makes sense." He says his brother's opinion is important to him. When asked why, he said because his brother is looking out for him, for the best in him.

When asked if he lies a lot, he said "no".

He said when he cheated on his girlfriend, Holly; it was because he was talking to Ashton.

When asked if he ever did anything for which he has felt sorry, he said yes, getting caught with cocaine made his family and friends look bad.

When asked about some people are skillful at using others or taking advantage of them to get what they want, and asked if Jonathan was like that, Jonathan said "No." He said "Manipulation, no." When asked if he's ever been abused of being manipulative, he said no.

When asked if he ever was told that he could talk his way out of anything, he said no.

When asked if he lives a double life, he said no. When asked if he fools others, he said no.

When if other people ever told him he had too high an opinion of himself, he said no.

13

When asked how he would compare himself to most others in terms of intelligence, he said that he's pretty smart; he thinks he's above average.  He said he's above average also with his work ethic, which is strong, he says.

When asked if he's satisfied with his life the way it is, he said yes, he's happy; he wants it to be better. When asked what he would change, he said to make more money, to get a house, have a dog, along with his cat, and provide better things for his girlfriend.

When asked what is the happiest he's ever been, he said coming home from Afghanistan and seeing his family.

When asked what is the most depressed he's been, he said he was pretty depressed after the incident with the cocaine and went to Philhaven, and then also when his girlfriend cheated on him after four and a half years of being together.  They knew each other for eight years.  He said he's still not completely over it.  In dealing with this, he first tried to hide, but his buddies helped him, he talked to his friends, had a good support group, and was so busy at work in the military.

When asked if he ever feels stressed or anxious about the future, he said yeah, because nothing is given to you in this world, you have to work hard.  He's concerned about the economy and getting a job in engineering at the college.

When asked how you feel about yourself, he said "Behavior-wise, a 10", with "10" being really good. He said that he's a good person.  When asked how others would rate him, he hesitated and said "An 8." He said, "They would say 8.  All my friends would say I'm a good person."

When asked what his main accomplishments were, he said joining the military.  He says coming back to his school after expulsion when he was 15 or 16 and getting A's and B's.  He said he got the award for the greatest turnaround by the same principal who searched him and turned him in for the cocaine possession when he was 15.
He also said a good accomplishment was being part of the 82nd Airborne Division; he was promoted in the Army, and also getting into college.

When asked how he would describe his main failures, he said getting arrested for cocaine possession when he was 15.  In addition, when he was in the military, he was doing military practice, he was supposed to throw a grenade, he only threw it less than 10 feet in front of him, and he was embarrassed by that.

When asked if he could go back and change things, where would he start?  He said definitely his childhood and being a better kid overall with his parents.  "To not be such a pain in the butt."  To help his parents out and be a better son.  Build a better relationship with his father, and to have gone fishing with his father and help the father work on cars more.
When asked if he could say something to one of his victims, what would he say, this doesn't necessarily apply to Jonathan but he said that his behavior affected his mother and father, he would go back to his neighbor, his girlfriend, and her mother.  It was a shock to his neighbors that he got into this trouble with cocaine possession.  He said he was such a good kid with manners.

14

When asked are there things that we didn't talk about today that you think are important for people to know about you, he said "The simple fact that I'm a different person than I was at 15 years old. I grew up, learned a lot. I'm a driven person, good work ethic, striving for a 3.5 GPA or higher in college.

## EVALUATION RESULTS

### HARE Psychopathy Checklist - Revised: Second Edition (PCL-R) results:

Jonathan was administered the HARE Psychopathy Checklist - Revised: Second Edition, the HARE PCL-R, on February 26, 2013. This is a 20-item scale for assessment of psychopathy. It yields dimensional scores. All his scores on this assessment were in the very low range and he had a PCL-R Total Raw Score of 3, which is in the very low range. On all the subtests, all of them were in the very low range. The manual suggests a PCL-R Score of 30 as a cutoff score, classifying individual as "sociopaths". Again, all his scores were in the lowest range, which was considered very low.

### TEST RESULTS:

Jonathan was administered the MMPI-2 on February 6, 2013, monitored by this psychologist. The following results were obtained from the test:

MMPI-2 Scores:

Profile Validity: The test indicated that his clinical profile has marginal validity because of his attempt to place himself in an overly positive light by minimizing faults and denying psychological problems. His approach to the test appeared to be defensive, which is characteristic of individuals who are trying to maintain the appearance of adequacy and self-control. This response would be understandable in this situation.

The assessment indicated that he tends to deny problems and is not very introspective or insightful about his own behavior. Therefore, this clinical profile may be an estimate of Jonathan's psychological problems. He appeared to project an excessively positive self-image on this assessment. He had a high score on the Serenity Subscale, which suggests that he would like to be viewed as having no problems or pressures. He also had significant elevation on the Belief in Human Goodness Subscale, indicating a naive response, claiming goodness in all people.

Symptomatic Patterns of the MMPI: The clinical scale prototype used in the development of this interpretation included elevations of the Hy and Pd Scales. Jonathan's MMPI-2 clinical profile is within normal limits, suggesting that his symptoms and problems are not as prominent as those in most others in mental health assessment settings. However, he reported some tendency towards impulsiveness and anger proneness to conditions of conflict. These findings were inconsistent with other findings and his own self-report. When asked specifically, he says he does not have an anger problem. This behavior pattern includes some persistent personality features that reflect emotional lability and impulsiveness.

The low score on the Mf suggests rather limited range of interest in masculine activities. He tends to be somewhat competitive and needs to see himself as masculine. The results indicated he probably prefers to view women in subservient roles. Interpersonally, he is likely to be intolerant and insensitive and

15

others may find him rather crude, coarse, and narrow-minded. However, he denied being viewed as such, and the people that were spoken to in reference to Jonathan did not indicate these types of qualities.

Profile Frequency:  Jonathan's MMPI-2 high point Clinical Scale Score (Pd) occurred in 9.1% of the MMPI-2 normative sample of men. However, only 3.3% of the normative men had Pd as the peak score equal to or greater than a T score of 65, and only 1.9% had well-defined Pd high spikes. In the Pearson male outpatient sample, this was the most frequent high point Clinical Scale Score, Pd, occurring in 17.8% of the sample.

MMPI Profile Stability:  The relative elevation of his highest clinical score suggests some lack of clarity in profile definition.

Interpersonal Relations:  The MMPI suggests that Jonathan is quite outgoing and sociable, with which he agrees. He has a strong need to be around others. He says that's not necessarily the case. He is gregarious and enjoys attention.

Diagnostic Considerations: The MMPI listed no diagnostic considerations for this normal range clinical profile configuration. Jonathan's scores on the supplementary scales under Psychopathic Deviate Subscale had all T scores below 65. They ranged from 38-63. The Welsh Code two- point Scale was a 4-3, and yet still below T scores of 65.

In summary, the MMPI indicated that Jonathan was presenting himself in a more favorable light with some defensiveness. The highest scores were on scores relating to some impulsivity and proneness to anger under conditions of conflict, as well as a need for affection, which Jonathan denies.

However, under the critical items, those questions that were endorsed that would elevate the Pd Scale related to antisocial attitude, consisted of questions that he answered in relationship to the one incident he had at 15years old with the cocaine possession.

## A Historical/Clinical/Risk Management Checklist (HCR-20)

This assessment measured 20 areas of risk assessment in three different categories: Historical, Clinical and Risk Management.

**Historical:**  The results of this were not significant in predicting any risk problem. There is no history of previous violence to others. His relationships tend to be stable. He had no employment problems. No problems with substance abuse other than at early teenage years. No major mental illness. No indication of psychopathy. He had some early maladjustment when he was 15 during that one incident, but since then he has adjusted very well and excelled in areas as mentioned in the report. No personality disorder is indicated, and no indication of any prior supervision failure.

**Clinical:**  He appears to have some insight. His attitudes appear to be positive. He has no active symptoms of major mental illness. He does not demonstrate impulsivity in his behaviors and accomplishments. There does not seem to be any issue with being unresponsive to treatment.

**Risk Management:** He does not seem to have any problems with plans that lack feasibility. He does not seem to have any exposure to destabilizers. He appears to have good personal support and he appears to be compliant with any remediation attempts that were conducted when he was 15 years old and he appears to be able to deal with stress adequately.

**Personality Assessment Inventory, the PAI**

Jonathan was administered the Personality Assessment Inventory, the PAI. The PAI is a self-administered objective test of personality designed to provide information on critical client variables in professional settings. It has Validity Scales, Clinical Scales, Treatment Scales, as well as Interpersonal Scales. The results on the PAI are as follows:

The Validity Scales suggest that Jonathan may not have answered in a completely forthright manner. The results suggest that he tends to portray himself as being relatively free of common shortcomings to which most individuals will admit and he appears somewhat reluctant to recognize minor faults in himself. Therefore, the interpretive hypotheses in this report should be viewed with caution. Although there is no evidence to suggest an effort to intentionally distort the profile, the results may under represent the extent and degree of any significant findings in certain areas due to Jonathan's tendency to avoid negative or unpleasant aspects of himself.

Despite the level of defensiveness noted above, there are some areas where Jonathan described problems with greater intensity than is typical of defensive respondents. These areas could indicate problems that merit further inquiry. These areas include "History of antisocial behavior". Those areas of antisocial behavior were related to when he was 15years old with the possession of cocaine, self-mutilation and hospitalization. In addition, they relate to the multiple sexual partners he has had.

The Clinical features of the PAI reveal no elevation that should be considered to indicate the presence of clinical psychopathology. The PAI Clinical Profile is entirely within normal limits. There are no indications of significant psychopathology in the areas that are tapped by the individual clinical scales.

According to Jonathan's self-report, he describes no significant problems in the following areas: Unusual thoughts or peculiar experiences; antisocial behavior; problems with empathy; undue suspiciousness or hostility; extreme moodiness and impulsivity; unhappiness and depression; unusually elevated mood or heightened activity; marked anxiety; problematic behaviors used to manage anxiety; difficulties with health or physical functioning. In addition, Jonathan reports no significant problems with alcohol or drug abuse or dependence.

On the PAI, his self-concept appears to involve generally stable and positive self-evaluation. He is normally a confident, optimistic person who approaches life with a clear sense of purpose and distinct convictions. These characteristics are valuable in that they allow Jonathan to be resilient and adaptive in the face of most stressors. He describes being reasonably self-satisfied, with a well-articulated sense of who he is, and what his goals are. This seemed to be consistent with his clinical interview.

Interpersonal and Social Environment, as indicated on the PAI, suggests he has an exceptionally strong need to be accepted by others. The need for acceptance likely dominates his interactions. He may be

17

seen by others as too caring, trusting, and supportive for his own good. In considering the social environment of Jonathan with respect to perceived stressors and the availability of social support with which to deal with these stressors, his responses indicate that he reports having experienced very few stressful events in the recent past. Furthermore, he describes that he has a large number of individual to whom he can turn for support when needed. The combination of a stable and relatively stress-free environment with the extensive social system is a quite favorable prognostic sign of future adjustment.

With respect to suicidal ideation, Jonathan is not reporting distress from thoughts of self-harm.

With respect to anger management, Jonathan describes himself as a very meek and unassertive person who has difficulty standing up for himself, even when assertiveness is warranted. Thus, he may have some difficulty in appropriate expression of anger. However, in his interview, he said that he has stood up to people who he feels may threaten his loved ones.

Critical Item Endorsement: A total of 27 PAI items reflecting serious pathology had very low endorsement rates in normal samples.

In summary, on the PAI, he presents himself in a favorable light and appears to have a strong need to be accepted by others. He is confident and optimistic and does not endorse any psychopathology.

## State-Trait Anger Expression Inventory - 2 (STAXI-2)

Jonathan was administered the State-Trait Anger Expression Inventory - 2 on March 15, 2013. This is an inventory to assess components of anger. It assesses State Anger, which is defined as psychobiological emotional state or condition marked by subjective feelings that vary in intensity from mild irritation to annoyance to intense fury and rage. It also measures Trait Anger, which is defined in terms of individual differences and the disposition to perceive a wide range of situations as annoying or frustrating and by the tendency to respond to such situations with elevations in State Anger. Individuals with high Trait Anger scores experience State Anger more often and with greater intensity than individuals who are low in Trait Anger. The assessment also measures anger expression and anger control.

The results of the STAXI-2 indicated that all the subtests were within normal range with a lower than normal score on Anger Reaction, which indicates that Jonathan is not sensitive to criticism or perceived affronts or negative evaluation of others. It indicated that he does not experience intense feelings of anger under such circumstances.

Also, on his Anger Control-Out Subscale, he scored higher than within the normal range, indicating that he tends to expend a great deal of energy in monitoring and preventing any outward experience and expression of anger. Controlling outward and external manifestations of anger is a desirable trait. However, over control can lead to passivity, depression, and withdrawal.

He also scored higher than the normal range on Anger Control-In, which indicates that he expends a great deal of energy in calming down and reducing his anger as soon as possible. The development of internal controls of the experience and expression of anger is generally seen in a positive light, but can

reduce the person's awareness of the need to respond with assertive behavior when this might facilitate a constructive solution to a frustrating situation.  Jonathan in his personal interview indicated that he does have the ability to be assertive when he needs to, in a controlled manner, he indicated.

**The Structured Assessment of Violence Risk in Youth (SAVRY)**

The Structured Assessment of Violence Risk in Youth, the SAVRY, was also reviewed.  The SAVRY is designed for use as an aid or guide in professional risk assessments and intervention planning for violence risk management in youth.  Specifically, it is intended to assist in assessing risk in adolescents between the ages of 12 and 18 years old.  Although it may be administered to youths slightly younger or older than the target ages, a greater degree of caution is indicated because the SAVRY includes items that were selected based primarily on research conducted on adolescents between the ages of 12 and 18.  The manual goes on to say for young people that fall outside the intended age range, it is recommended that clinicians also consider using one or the other age-appropriate structured professional judgment risk protocols, such as the HCR-20, which was used in this evaluation.

However, this is another assessment to review risk factors once again to see if any were significant in Jonathan's life.  The Summary Risk Rating results are Low.

**Risk and Protective Factors for Serious Violent and Chronic Juvenile Offenders in the Community, from the U.S. Department of Justice Model**

This psychologist reviewed the list of Risk and Protective Factors for Serious, Violent, and Chronic Juvenile Offenders in the Community. U.S. Department of Justice Model to see how they may apply to Jonathan.

The Office of Juvenile Justice and Delinquency Prevention (OJJDP) coordinated an analysis of 66 studies, research reports, and longitudinal data on the individual, family, school/peer-related, and community/neighborhood risk factors for youth violence.  The report concluded that there is a cumulative impact:  the larger the number of risk factors the youth was exposed to, the greater the probability of violent behavior in the community.  In addition, the following factors were identified as predictors of youth violence (see Hawkins et al. 2000):

Individual Risk Factors   (Low for Jonathan)

- Hyperactivity, concentration problems, restlessness, and risk-taking
- Aggressiveness
- Early initiation of violent behavior
- Involvement in other forms of antisocial behavior
- Beliefs and attitudes favorable to deviant or antisocial behavior

Family Risk Factors (Low in Jonathan's life)

19

- Parental criminality
- Child maltreatment
- Poor family management practices
- Low levels of parental involvement
- Poor family bonding and family contact
- Residential mobility
- Parental attitudes favorable to substance abuse and violence
- Parent-child separation   (Jonathan's parents divorcing, father deceased)

School Risk Factors (Low to none for Jonathan)

- Academic failure
- Low bonding to school
- Truancy and dropping out of school
- Frequent school transitions
- High delinquency school rates

Peer-Related Risk Factors (Low to none for Jonathan)

- Delinquent siblings
- Delinquent peers
- Gang membership

Community and Neighborhood Risk Factors (None noted for Jonathan)

- Poverty
- Community disorganization (crime, drug-selling, gangs, poor housing)
- Availability of drugs and firearms
- Neighborhood adults involved in crime
- Exposure to violence and racial prejudice

Other Situational Adverse Factors (Low for Jonathan)

Studies show that the likelihood that a young male will engage in criminal activity doubles if he is raised without a father and triples if he is raised in a neighborhood with a high concentration of single-mother households (Hill & O'Neil, 1993).  Other adverse developmental factors include having a teenage mother, receiving inadequate parental supervision and limit setting, observing community violence, modeling of corruptive family members, and being personally victimized.

**Protective Factors**

Individual Characteristics (Average to high for Jonathan)

- Female gender

- Intelligence
- Positive social orientation
- Resilient temperament

Social Bonding to Positive Role Models (Average to high for Jonathan)

- Prosocial family members
- Teachers
- Coaches
- Youth leaders
- Friends
- Institutions (schools and youth organizations)

Other Protective Factors (Average to high for Jonathan)

- Healthy beliefs and clear standards for behavior, including those that promote nonviolence and abstinence from drugs.
- Effective early interventions
- Having a stable job
- Having a stable intimate relationship

**Phone conversations with various people that were contacted with the informed consent from Jonathan as mentioned above:**

On February 26, 2013, this psychologist called Jonathan's girlfriend, Sarah Tome. Sarah said she has known Jonathan for six years. They worked together at the farm. They dated one year and two months. She describes Jonathan as "A great guy." When asked about areas of conflict or argument, Sarah said that sometimes she has trust issues with his past girlfriends. She noticed he was talking to someone that he shouldn't have been talking to, and Sarah got upset, but this hasn't happened lately. When Sarah did catch Jonathan talking to another girl, he started crying. He said, "What are you talking about?" However, he did not lash out. He did not become aggressive; he made no threats. Sarah had no fear of Jonathan being physical in any way. Sarah said she feels he is very protective of her. Sarah said that Jonathan is not possessive or jealous. Sarah said that she feels Jonathan would be safe with guns, and she feels that there would be no threats. Sarah has hopes that they would get married.

This psychologist in a phone conversation on March 7, 2013 contacted Dawn Wells, who is Jonathan's mother. His mother says that Jonathan is a very strong person. One of the saddest things in Jonathan's life is that his father couldn't be here to see his accomplishments with the Army and college, because the father died when Jonathan was 15. Dawn doesn't see Jonathan stressed anymore like he was when he was around 15 years old. Jonathan's mother does not see Jonathan having any resentment. Jonathan's mother said that she has no concerns with Jonathan having weapons. There were guns in the family with the father having hunting rifles and handguns. There was never any violence in the family history reported.

This psychologist on March 6, 2013, contacted Mr. Hugh McPherson, Jonathan's former boss from the farm. Mr. McPherson said that he would love it if Jonathan still worked for him. Jonathan worked for Mr. McPherson from the age of 15 to 17. Mr. McPherson had a Corn Maze and a Fun Park and Guest Services with kids coming in from the age of 6-14. He said Jonathan was super and pleasant. No need to correct his language. He worked with over 900 people an hour. He said there were no problems and that Jonathan was a "great kid".


**DOCUMENTS REVIEWED:**

Documents from WellSpan Behavioral Health, Initial Assessment on March 31, 2006, was reviewed, which indicated that Jonathan was in the tenth grade at Manito which is a behavioral school. This related to him making suicide threats and a suicide pact when he was 15 years old. He was cutting himself. He was expelled from school for seven weeks prior to March 31, 2006 due to the possession of cocaine incident. He was then placed at Manito Behavioral School for three weeks prior to that time. He was very angry and distant at that time. His parents were going through a divorce. He was diagnosed with a mood disorder and oppositional-defiant disorder.

The document of the Application for Extended Involuntary Emergency Examination and Treatment, 302, was examined and indicated the same information in that Jonathan entered into a suicide pact with a girl from Manito, Heidi, who was 18. They were going to shoot each other. Heidi introduced Jonathan to cutting. Jonathan had 120-130 cuts in his legs and arms, which he says were much less. The mother and father broke up in the summer of 2005. Jonathan said that he hardly knew Heidi and that this all happened when he was at the Manito School and that he regrets such behaviors and he was never really going to hurt anyone or himself.

The Application for Extended Involuntary Treatment, 303, was reviewed, which indicated the same types of details as mentioned above.

The Philhaven Discharge Summary of Inpatient Hospitalization from 03/31/06 to 04/06/06 was reviewed and indicated a diagnosis of Axis I: Major depressive, single episode, severe, without psychotic features, adjustment disorder with depressed mood, mood disorder, NOS, rule out attention-deficit/hyperactivity disorder, marijuana abuse, cocaine abuse. Axis II: No diagnosis.
Axis III: Heart murmur by history. Axis IV: Psychosocial and environmental problems, alternative education, juvenile probation office involvement. Axis V: Current admission GAF 20. Highest GAF past year 60. Discharge GAF 42. It described the situation that was described above with Jonathan being a 15-year-old Caucasian male in the tenth grade at Manito Academy Alternative School in the York City School District, that he resided with his mother and brother, who was 19 at the time, and his mother's boyfriend, his biological parents were in the process of finishing their divorce, that he was admitted for an evaluation of significant emotional behavior problems which included increased depression, self-harm behavior and suicidal ideation as well as the rest of the information described above.

Pennsylvania State Police letter was reviewed, as described above.

WellSpan Health York Hospital records and medical records from the Army Medical Center and

22

Mr. Yox's Army Notebook was reviewed.  There were no other significant items indicated in those reports other than what has been already mentioned in the previous reports.

**Summary:**

In summary, Jonathan is a 22-year-old Caucasian male who is presently in college at Millersville and is living with his girlfriend Sarah who is 20 years old.  He indicated that he is adjusting well, even in high school, after that one major incident with cocaine possession and being expelled to a behavioral alternative school, the Manito Academy, and then being influenced by a girl in that alternative school for self-mutilation and suicidal ideation.  Jonathan was able to recover well from that and the same principal who detained him for cocaine ended up awarding him with the greatest turnaround award. Jonathan improved his grades tremendously.  He graduated and went into the military, he said he excelled in the military, and experienced many weapons in the military service with no problems.  Jonathan is working two jobs now and going to school.  The people contacted indicated that he appears to be stable and they have no fears of him being a threat.  They do not feel afraid of him in any way.  The test results did not reveal any psychopathology or psychopathy.  There did not appear to be any significant risk factors endorsed on the various assessments that were mentioned above.  According to the lengthy clinical interviews, assessments, and information from the sources contacted above, there appears to be no present risk at this time.  The limitations of this report are based on the material and information that were reviewed as listed above.

It was a pleasure working with Jonathan.  He was a pleasant young man.  He was compliant with coming to this office whenever he was requested to do so by this psychologist.  He indicated a pleasant attitude each time with no objections.  He is a clean-cut, outgoing young man who has future goals in his life and indicated a good support system.

As to the referral question, his current mental state and stability appear to be intact.  There were no significant current risk factors as per the above assessments and contacts with the above-mentioned references.

Respectfully submitted,

Anthony J. Fischetto, ED.D.
Licensed Psychologist

# ALPHA OMEGA COUNSELING CENTER, INC.

## DIRECTOR:

## ANTHONY J. FISCHETTO, M.DIV., ED.D., DABPS

### Licensed Psychologist

### Diplomate in Forensic Psychology

### 475 PHILADELPHIA AVENUE, P.O. BOX 66, SHILLINGTON, PA  19607

**Telephone: (610) 777-3306     Mobile Phone: 610-413-0375     FAX:  (610) 777-9494**
**E-mail:  afische101@aol.com**

## PSYCHOLOGICAL EVALUATION

Examinee: Jonathan Karl Yox
Examinee's Address: 376 Honey Locust Square, Lancaster, PA 17602
Date of Birth: 11-13-1990
Date of Report: 03-17-2013
Age at the Time of the Evaluation: 22 years old
Place of Evaluation: Alpha Omega Counseling Center
Dates of Evaluations:
02-06-2013(MMPI-2) and meeting,
02-12-2013 from 6:45PM to 8:45PM face-to-face clinical evaluation and review of the (MMPI-2),
02-26-2013 from 7:00 PM to 9:30 PM face-to-face interview and completion of the Hare (PCL-R: 2nd Edition)
03-15-2013 from 5:45PM to 7:10 PM to complete the (PAI) and the (STAXI-2) and brief discussion.
03-26-2013 from 7:45 PM to 9:30 PM to review the psychological evaluation.
Race: Caucasian
Educational Level: High School Graduate; Attending Millersville College for Applied Engineering.
Marital Status: single, never married, living with his girlfriend: Sarah Tome
Occupation and Work History: Presently working at G4S, part-time security officer on the weekends; and at
Millersville College at the Student Veteran Association during the week.

Evaluator: Anthony J. Fischetto, Ed.D.
Licensed Psychologist
Diplomate in Forensic Psychology

Addendum: 04/15/2013.

It is this psychologist's opinion within a reasonable degree of psychological certainty, based on the findings in
this psychologist's 23 page report dated 03-17-2013, that Mr. Yox does not appear to pose a threat to himself or
others in possession of a firearm.

*[signature]*

Dr. Anthony J. Fischetto

**Exhibit G**

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL COURT DIVISION

IN RE:                              :
                                    :
        J.Y.                        :        No. 13-07797
                                    :

### ORDER

AND NOW, this __5__<sup>th</sup> day of May, 2014, upon consideration of the Petition for

Reconsideration to Grant State Relief, the Court hereby FINDS:

1. The Petitioner no longer suffers from the mental health condition that was the basis

   for his commitments.

2. The Petitioner may safely possess a firearm without risk to himself or any other

   person.


THEREFORE, under the authority of 18 Pa. C.S. §6105 (f)(1), this Court hereby

GRANTS Petitioner's request for State Relief from the firearms disability imposed pursuant to

18 Pa.C.S.A. §6105 (c)(4).


                                        BY THE COURT


                                        _____
                                        JAY J. HOBERG
                                        JUDGE

ATTEST: C. Gerhart


Copies to:     Jonathan Yox  — |
               Joshua Prince, Esq. — |
               Carlton Smith, Esq. — |
                    Mailed

                                        5-6-14

4

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL COURT DIVISION

IN RE:                                    :
                                          :
      J.Y.                                :        No. 13-07797
                                          :

AMENDED MEMORANDUM OPINION

On August 14, 2013, J.Y. (hereinafter "Petitioner"), through his respective attorney, filed

a Petition For Relief From Disability under 18 Pa. C.S. 6105, asking the Court to expunge his

mental health commitments which wer made pursuant ot 50 P.S. §§7302 and 7303.  The

Pennsylvania State Police filed an answer to the petition.   A hearing was held on October 28,

2013.

      At the time of the hearing, Petitioner's attorney indicated that a recent Superior Court

decision in *In Re: Application to Restore Firearms Rights of Michael L. Keyes* held that a court

did not have the authority to expunge mental health records under  18 Pa. C.S. §6105.  Although

seeking to preserve the Keyes issues, Petitioner at the time of the hearing and with the agreement

of Counsel for the Pennsylvania State Police, changed the nature of the relief requested in this

proceeding from expungement under §6105 (f)(1) to state relief under §6105 (f)(1)  and the

vacating of his civil mental health commitments under 18 Pa. C.S. §6111.1(g)(1).

      Counsel for all parties filed letter briefs in support of their respective positions.  Counsel

for Petitioner's brief lead this Court to believe he changed his theory, requesting this Court to

vacate Petitioner's civil commitments under  §6111.1(g)(1) and to expunge the related records

pursuant to the Pennsylvania Supreme Court decision in Wolfe v. Beal, 384 A.2d 1187 (Pa.

1978),[1] without pursuing state relief. This Court issued an Order and Memorandum Opinion

---

[1] See Petitioner's Brief in Support of Vacating his Civil Commitments, footnote 1.

1

denying vacating of Petitioner's civil mental health commitments under §6111.1(g)(1). State relief under §6105 (f)(1) was not addressed in the March 24, 2014 Order.

On April 7, 2013, Counsel for Petitioner filed a Petition for Reconsideration to Grant State Relief under §6105 (f). This Court granted the Motion for Reconsideration on April 9, 2014, and hereby issues this Amended Opinion.

Upon review of the Motion for Reconsideration and the official transcript of the hearing, it is now apparent that Counsel for Petitioner wished to preserve his claim for state relief under §6105 (f)(1), while seeking to vacate Petitioner's civil mental health commitments under §6111.1(g)(1).[2] This Amended Memorandum Opinion addresses only the issue of §6105 state relief, and as such preserves and maintains the holding and reasoning set forth in the Memorandum Opinion, to the extent that it is not contradicted by this Amended Memorandum Opinion.

Petitioner seeks state relief from the firearms disability imposed pursuant to 18 Pa. C.S.A §6105(c)(4). The language of 18 Pa. C.S. 6105(f)(1) states, "Upon application to the court of common pleas under this subsection by an applicant subject to the prohibitions under subsection (c)(4), the court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person".[3] As stated in its March 24, 2014 Memorandum Opinion, this Court does not believe it has the authority to grant federal relief by vacating and expunging an involuntary §303 commitment under §6105(f).[4] However, both parties have agreed that this Court may grant state relief if the Court finds that the petitioner can safely possess firearms without danger to himself or others.[5]

---

[2] See Petitioner's Motion for Reconsideration;  See also N.T. 55.
[3] 18 Pa. C.S.A. § 6105(f)(1)
[4] See In re Keyes, 2013 PA Super 326 (Pa. Super. Ct. Dec. 24, 2013).
[5] See 18 Pa. C.S.A. § 6105(f)(1);  See also N.T. at 55.

This Court found in its March 24, 2014 Memorandum Opinion that Petitioner may safely possess firearms without danger to himself or others,[6] and based upon that finding, does grant state relief pursuant to 18 Pa. C.S.A §6105(f)(1), from his firearms disability.

---

[6] *See* Mem. Op., at 4, n.2 and p. 6

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL COURT DIVISION

IN RE:                                    :
                                          :
        J.Y.                              :        No. 13-07797
                                          :

MEMORANDUM OPINION

On August 14, 2013, J.Y. (hereinafter "Petitioner"), through his respective attorney, filed

a Petition For Relief From Disability under 18 Pa. C.S. 6105, asking the Court to expunge his

mental health record. The Pennsylvania State Police filed an answer to the petition.

A hearing was held on October 28, 2013. At the time of the hearing, Petitioner's

attorney indicated that a recent Superior Court decision in *In Re: Application to Restore*

*Firearms Rights of Michael L. Keyes* holds that a court does not have the authority to expunge

mental health records under 18 Pa. C.S. §6105. Counsel for Petitioner was and is involved in

the *Keyes* case and his request for reconsideration is believed to be pending before the Superior

Court. Although seeking to preserve the Keyes issues, Petitioner at the time of the hearing and

with the agreement of Counsel for the Pennsylvania State Police, changed the nature of the relief

rquested in this proceeding from expungement under §6105 (f) to state relief under §6105 (f)

and the vacating of his civil commitments under §6111.1(g)(1).

Counsel for Petitioner, in his Brief, changed his theory once again requesting this Court

to vacate Petitioner's civil commitments under §6111.1(g)(1) and to expunge the related records

pursuant to the Pennsylvania Supreme Court decision in Wolfe v. Beal, 384 A.2d 1187 (Pa.

1978).[1]

Counsel for all parties have filed letter briefs in support of their respective positions and

the matter is now ripe for disposition.

---

[1] See Petitioner's Brief in Support of Vacating his Civil Commitments, footnote 1.

The facts set forth during the hearing are relatively straightforward and, for the most part, uncontested. Petitioner was born on November 13, 1990. Petitioner testified that when he was 15 years old, his parents got divorced. This affected Petitioner emotionally, and he began experimenting with drugs and alcohol. Petitioner was expelled from Kennard Dale High School for possession of a controlled substance, and sent to Manito Academy, an alternative school. While at Manito, Petitioner met a girl who introduced him to cutting. Petitioner began cutting himself and made a suicide pact. He told two friends about his suicide pact.

On March 31, 2006, Petitioner was involuntarily committed for a mental health examination to York Hospital under the Mental Health Procedures Act 50 P.S. §7302. The §302 petition states that the cause for Petitioner's commitment was the disclosure of the suicide pact and the several superficial, non-scarring, cuts on his legs. Petitioner never threatened to harm another individual and never actually attempted suicide. Petitioner was then transferred to Philhaven Hospital at 8:30 PM on March 31, 2006.

On April 3, 2006, a §303 petition for Extended Involuntary Treatment was completed. On April 4, the Court of Common Pleas of Lebanon County granted the §303 petition. Petitioner testified that he did not know of the §303 proceedings at the time. Petitioner was discharged from Philhaven on April 6, 2006. At the time of discharge, it was recommended that Petitioner attend some ongoing counseling. Petitioner completed all recommended outpatient counseling.

After discharge from Philhaven, Petitioner was prescribed Zoloft. Petitioner testified that after 3-6 months, he and his mother agreed he should stop taking the medication. They spoke with Petitioner's doctor, who agreed that he could stop taking the medication.

Petitioner did well during the remainder of high school. He received all "A's" and "B's" his senior year and graduated from Kennard Dale High School. When Petitioner was 17, he

enlisted in the United States Army. Petitioner spent one year overseas, and spent over six months in a combat zone in Afghanistan. During his Army service, Petitioner was trained and used several weapons and firearms, including: M4 and M16 assault rifles, .50 Caliber Machine Gun, M240 Machine gun, M249 Machine Gun, Mark 19 Grenade Launcher, 12 gauge shotgun, M203 Grenade Launcher, high explosives, incendiary grenades, and flashbangs.

Petitioner was Honorably Discharged on July 5, 2012. After returning from the combat zone, Petitioner was not recommended for further psychological evaluation. Petitioner currently works as a full-time corrections officer at the State Correctional Institution at Graterford, PA. Petitioner also attends West Chester University and hopes to graduate in 2018 with a degree in criminal justice. Petitioner also hopes to have a career in the Pennsylvania State Police Force or with the U.S. Marshalls.

Petitioner testified that he has not had any bouts of depression since his discharge from Philhaven in 2006. Petitioner is not currently in counseling and has not taken any prescription medication for mental health or depression since he stopped taking Zoloft. Additionally, Petitioner testified that he does not abuse drugs or alcohol.

On March 17, 2013 Dr. Anthony Fischetto issued a psychological evaluation of Petitioner. As part of Dr. Fischetto's evaluation, he performed MMPI testing on Petitioner. Dr. Fischetto states in his report that the Petitioner's "current mental state and stability appear to be intact. There were no significant current risk factors…". In an addendum to the report, dated April 16, 2013, Dr. Fischetto concludes that "by a reasonable degree of psychological certainty…[Petitioner] does not appear to pose a threat to himself or others in possession of a firearm."

At the hearing, both Petitioner's girlfriend, and brother testified. Both testified that they do not have any concerns over Petitioner owning and possessing firearms.

Petitioner seeks to have his involuntary commitments under §7302 and §7303 of the Mental Health Procedures Act ("MHPA") vacated under §6111.1(g)(1) of the Uniform Firearms Act ("UFA"). This Court cannot grant the relief sought, as this Court does not have the authority to vacate a §7303 commitment under UFA §6111.1(g)(1).[2]

Petitioner argues that while expungement of an involuntary §303 commitment is not available under §6105(f) of the UFA[3], a §303 commitment may be vacated under 18 Pa. C.S.A. § 6111.1(g)(1), which states that a "court of competent jurisdiction" may "vacate a final order or involuntary certification issued by a mental health review officer." Petitioner argues that the Pennsylvania State Police would then be required to expunge the records.[4]

Petitioner cites *Wolfe v. Beal*[5], in which the Pennsylvania Supreme Court ruled that when a person is unlawfully committed to a state mental hospital, they are entitled to destruction of the hospital records that are created as a result of that illegal commitment. This Court finds that *Wolfe* is distinguishable from the present case. Unlike in *Wolfe,* Petitioner in the present case was lawfully committed under §302 and §303. When Petitioner was initially brought to the hospital for mental health treatment, he was examined within 2 hours, and found to be mentally ill and in need of treatment. This commitment was extended after a §303 hearing in which Petitioner was provided counsel and stipulated to the facts of the petition. As Petitioner was not

---

[2] While this Court believes that the Petitioner may possess a firearm without risk to himself or others, this Court finds that it lacks the authority to grant the relief sought under existing statutory and case law.

[3] *See* In re Keyes, 2013 PA Super 326 (Pa. Super. Ct. Dec. 24, 2013).

[4] 18 Pa. C.S.A. § 6111.1(g)(1).

[5] *See* Wolfe v. Beal, 384 A.2d 1187 (Pa. 1978).

illegally committed, he is not entitled to the destruction of his hospital records from the commitment, and the Pennsylvania State Police are not required to expunge their records.

Further, this Court cannot grant the relief sought by the Petitioner, as the Petitioner failed to file a timely appeal. In *In Re: Kevin Jacobs,* the Superior Court held that a petitioner could not achieve expungement of his §302 and §303 commitments under §6111.1 because he had the opportunity to appeal his commitment and chose not to do so.[6] 50 Pa.C.S. § 7303(g) explains the appeals process of a §303 commitment. § 7303(g) states: "In all cases in which the hearing was conducted by a mental health review officer, a person made subject to treatment pursuant to this section shall have the right to petition the court of common pleas for review of the certification."[7] 18 Pa. C.S.A. § 6111.1(g)(1) provides instructions for expunction only after the commitment has been appealed under 50 Pa.C.S. § 7303(g).[8]

Additionally, this Court cannot vacate the Petitioner's §302 and §303 commitments under 18 Pa. C.S.A. § 6111.1(g)(1), as this section merely serves to provide the Pennsylvania State Police with instruction in the event that a final order or certification is vacated. § 6111.1(g)(1) states, "Upon receipt of a copy of the order…which vacates a final order or an involuntary certification… the Pennsylvania State Police shall expunge all records of the involuntary treatment received under subsection (f)."[9] It contains no language that would imply that it provides an independent means through which a petitioner may obtain relief, without having previously filed a direct appeal.

---

[6] *See* In Re: Kevin Jacobs, 15 A.2d 509 (Pa. Super 2011).
[7] 50 Pa.C.S. §7303(g).

[8] 18 Pa. C.S.A. § 6111.1(g)(1) states that the Pennsylvania State Police shall expunge all records of the involuntary treatment upon receipt of an order which vacates the involuntary certification issued by a mental health review officer.

[9] *See* 18 Pa. C.S.A. § 6111.1(g)(1).

5

Furthermore, 18 Pa. C.S.A. § 6111.1(g)(2) states:

A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged. A petition filed under this subsection shall toll the 60 day period set forth under section 6105(a)(2).[10]

As this section provides instruction on petitioning the court to vacating involuntary commitments, reading § 6111.1(g)(1) as doing the same, would be mere surplusage and contradict statutory intent. For these reasons, the Court finds that it lacks the authority to grant Petitioner the relief sought, despite proving that he could safely possess a firearm without harm to himself or others.

Based upon the record and for the reasons set forth above, the Court enters the following Order:

---

[10] *See Id.* at (g)(2).

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
CIVIL COURT DIVISION

IN RE: :
:
J.Y. : No. 13-07797
:

## ORDER

AND NOW, this $\underline{24^{th}}$ day of March, 2014, upon consideration of the Petition for Relief

from Disability, the hearings conducted on this matter, and the briefs filed by the parties, the

Court hereby DENIES Petitioner's request to vacate his civil commitments under 18 Pa. C.S.

§6111.1(g)(1).

BY THE COURT

_____
JAY J. HOBERG
JUDGE

ATTEST:

Copies to:     Jonathan Yox
               Joshua Prince, Esq.
               Carlton Smith, Esq.