## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL L. KEYES**, *et al*., | : | |
| Plaintiffs, | : | **Civil No. 1:15-CV-457** |
| **v.** | : | |
| | : | |
| **LORETTA E. LYNCH**, | : | Hon. John E. Jones III |
| Attorney General of the | : | |
| United States, *et al*., | : | |
| Defendants | : | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Dated: January 11, 2015

Respectfully Submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Prince Law Offices, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505
610-845-3803 ext 81114
610-845-3903     (fax)
Joshua@PrinceLaw.com

Attorney for Plaintiffs

**Table of Content**

I.  **INTRODUCTION** ............................................................................... 1

II.  **PROCEDURAL HISTORY** ................................................................. 2

III.  **STATEMENT OF FACTS** .................................................................. 3

    A.  *Michael Keyes' Personal History*........................................................ 3

    B.  *Jonathan Yox's Personal History* ...................................................... 5

    C.  *The Regulatory Scheme* ...................................................................... 7

        1. Exception for those serving the federal or state government ............ 9

        2. Federal Firearms Relief is not available under 925(c)....................... 9

        3. ATF contends that the NICS Improvement Act does not apply
           in Pennsylvania ............................................................................... 10

    D.  *Defendants' Prohibition of Plaintiffs' Intended
        Purchases/Transfers* ........................................................................ 11

IV.  **STATEMENT OF QUESTIONS INVOLVED** ................................. 12

V.  **ARGUMENT** .................................................................................... 13

    A.  *Ambiguous Criminal Statutes Are Afforded the Most Lenient
        Construction* ..................................................................................... 13

    B.  *Plaintiffs are being denied any opportunity to regain their Right
        to Keep and Bear Arms even though their judicial
        determinations qualify under NICS Improvement Amendments
        Act of 2007 ("NIAA")* ...................................................................... 14

        1. Pennsylvania's Relief Program........................................................ 18

        2. Other States' Relief Programs ......................................................... 19

           a. **Wisconsin**................................................................................. 19

           b. **Virginia** .................................................................................. 20

           c. **Oregon** .................................................................................... 20

           d. **Florida** ................................................................................... 21

        3. NIAA's Application to the Plaintiffs ............................................... 22

   C.  *Constitutional Analysis* ...................................................... 26

       1. The Second Amendment................................................... 26

       2. Second Amendment facial challenges ............................. 27

          a. The first prong – burden on conduct ............................. 27

          b. The second prong – scrutiny to be applied .................. 29

       3. Second Amendment *as applied* challenges .................... 30

   D.  *The Federal Courts in Pennsylvania have previously sustained as applied challenges under the Second Amendment in relation to non-violent misdemeanor crimes* .................................... 31

   E.  *As applied to Plaintiffs, 18 U.S.C. § 922(g)(4)'s prohibition violates their Second Amendment Rights, as the prohibition is the result of a single, isolated commitment and both Plaintiffs have been found to be competent to possess firearms without threat to themselves or others and have possessed firearms without threat to themselves or others in a law enforcement capacity* ................................................................. 33

       1. A single, isolated commitment is insufficient to strip an individual of a Constitutional Right in perpetuity .......... 34

       2. Plaintiffs have been found by a court of law to be competent to possess and use firearms without threat to themselves or others................................................................. 36

       3. Plaintiffs have possessed and used firearms, in a law enforcement capacity, without threat to themselves or others........ 38

   F.  *As applied to Plaintiff Yox, any putative prohibition pursuant to 18 U.S.C. § 922(g)(4) violates his Second Amendment Rights, as he was committed as a juvenile and federal law is silent as to juvenile commitments being prohibiting as acknowledged by Defendants* ........................................................................ 40

       1. Juvenile commitments are not sufficient to trigger a disability, pursuant to 18 U.S.C. § 922(g)(4) .................................. 40

       2. Defendants have acknowledged in their rulemaking that juvenile commitments do not currently trigger a disability, pursuant to 18 U.S.C. § 922(g)(4) .................................. 48

VI. **CONCLUSION**................................................................ 49

# Table of Authorities

## Cases

*Binderup v. Holder, et al.*, 13-CV-06750, 2014 U.S. Dist. LEXIS 135110, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014) ............................ 32

*Commonwealth v. Current*, 2016 Pa. Super. Unpub. LEXIS 5, *3 .............. 18

*Coram v. State (Ill. Dep't of State Police)*, 2013 IL 113867, 375 Ill. Dec. 1, 21, 996 N.E.2d 1057 ....................................................................... 36

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................ passim

*Growe v. Emison*, 507 U.S. 25 (1993) ............................................................ 24

*Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) .......................................... 16

*In re Alonzo J.*, No. S206720 (Cal. Ct. App. April 3, 2014) ....................... 43

*In re Keyes*, 83 A.3d 1016 (2013) ................................................................... 4

*In re Vencil*, 2015 PA Super 157, 120 A.3d 1028, 1034-35, 1037 (2015) ........................................................................................................... 18

*Jones v. United States*, 529 U.S. 848 (2000) ................................................ 14

*Logan v. United States*, 552 U.S. 23 (2007) ................................................... 9

*McDonald v. City of Chicago,* 561 U.S. 742 (2010) .................................... 27

*Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518 (1986) ............... 24

*Russello v. United States*, 464 U.S. 16, 23 (1983) ....................................... 16

*Rycoline Prods. v. C & W Unlimited*, 109 F.3d 883 (3d Cir. 1997) ............. 24

*Suarez v. Holder, et al.*, 1:14-CV-968, 2015 U.S. Dist. LEXIS 19378 (M.D. Pa. Feb. 18, 2015) ............................................................... 31, 32, 33

*Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014) ........... 35

*U.S. v. Davis*, 234 F. Supp. 2d 601 (E.D. Va. 2002) .................................... 41

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ............................ 30, 32

*United States v. Bass*, 404 U.S. 336 (1971) .......................................... 13, 14

*United States v. Booker*, 570 F. Supp. 2d 161 (D. Me. 2008) ..................... 10

*United States v. Laboy-Torres*, 553 F.3d 715 (3d Cir. 2009) ....................... 25

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................... 27, 29

*United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012)............................. 35

*United States v. Santos*, 553 U.S. 507 (2008)............................................. 14

*Younger v. Harris*, 401 U.S. 37 (1971) ....................................................... 24

**Statutes**

18 Pa.C.S. § 6105 ........................................................... 4, 6, 18, 37

18 Pa.C.S. § 6105(c)(4) .............................................................. 18

18 Pa.C.S. § 6105(f)(1) ................................................................. 4

18 Pa.C.S. § 6111.1(g) ............................................................... 18

18 U.S.C. § 4101 ....................................................................... 40

18 U.S.C. § 5031 ....................................................................... 40

18 U.S.C. § 922(d)(1) ................................................................... 7

18 U.S.C. § 922(g) ............................................................... passim

18 U.S.C. § 922(g)(4) .......................................................... passim

18 U.S.C. § 922(x) .......................................................... 41, 42, 49

18 U.S.C. § 924(a)(1)(D)(2) ......................................................... 8

18 U.S.C. § 925(a)(1) ............................................................... 1, 9

18 U.S.C. § 925(c) ......................................................... ii, 9, 14

28 U.S.C. § 1738 ....................................................................... 24

35 P.S. § 10101.1(b)(1) ............................................................. 47

35 P.S. § 10101.1(b)(4) ............................................................. 48

Fla. Stat. § 790.065 .................................................................. 21

NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121
Stat. 2559.......................................................................... passim

O.R.S. § 161.387 ...................................................................... 20

OR. Law Ch. 859 § 300 ............................................................. 20

R.C.W. § 71.34.010 ................................................................... 42

R.C.W. § 71.34.335 ................................................................... 43

The Consolidated and Further Continuing Appropriations Act, 2015,
Pub. L. No. 113–235, 128 Stat. 2130 ....................................... 9

V.T.C.A. § 55.57. ........................................................................ 42

V.T.C.A. § 58.003(a)................................................................... 43

Va. Code Ann. § 18.2-308.1:3(B) ............................................... 20

Wis. Stat. § 51.20........................................................................ 20

Wis. Stat. § 51.45........................................................................ 20

Wis. Stat. § 54.10........................................................................ 20

Wis. Stat. § 55.12........................................................................ 20

Wis. Stat. § 941.29(8)................................................................. 19

## Other Authorities

ATF FFL Newsletter, May, 2001, Issue I...................................... 8

ATF FFL Newsletter, September 1999, Issue II ........................... 8

California Department of Health Care Services, "Expanding Juvenile
   Mental Health Courts in the Children's System of Care"........................ 46

Carlton F.W. Larson, Four Exceptions in Search of A Theory: District
   of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J.
   1371, 1376 (2009) ...................................................................... 28

International Society of Psychiatric – Mental Health Nurses, "Meeting
   the Mental Health Needs of Youth in Juvenile Justice" ........................... 43

Kathleen R. Skowyra and Joseph J. Cocozza, "Blueprint for Change:
   A Comprehensive Model for the Identification and Treatment of
   Youth with Mental Health Needs in Contact with the Juvenile
   Justice System" ......................................................................... 44

Silver and Teasdale, "Mental Disorder and Violence: An Examination
   of Stressful Life Events and Impaired Social Support" ........................... 45

## Treatises

Norman J. Singer, 3 SUTHERLAND ON STATUTORY
   CONSTRUCTION § 59:3, at 167-75 (7th ed. 2008) ................................ 14

## Regulations

27 C.F.R. 478.144......................................................................... 9

**Constitutional Provisions**

U.S. Const. amend. II. .................................................................... 26

# I.     INTRODUCTION

This is an action to uphold the Constitutional right to keep and bear arms, which "guarantee[s] the individual right to possess and carry" firearms and "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 592, 635 (2008). In contravention to Plaintiffs' fundamental Second Amendment right to keep and bear arms in their private capacity, Defendants have collectively and separately prohibited a certain class of individuals from obtaining, possessing and utilizing firearms in their private capacity, while permitting those same individuals to obtain, possess and utilize firearms in their official capacity as a law enforcement officer, pursuant to 18 U.S.C. § 925(a)(1).

Specifically, individuals who have been involuntarily committed are prohibited in their private capacity from acquiring, possessing, or utilizing a firearm under 18 U.S.C. § 922(g), while being permitted to acquire, possess and utilize firearms when benefiting, in an official capacity, the "United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." 18 U.S.C. § 925(a)(1). However, those individuals are not afforded any means to demonstrate following their

release from commitment their fitness to regain their Second Amendment right to acquire, possess, and utilize a firearm in their private capacity.

This ban on individuals acquiring, possessing, and utilizing firearms in their private capacity based solely on the fact of a single, isolated past involuntary commitment is an overbroad infringement on the Second Amendment because there is no reasonable procedure pursuant to which an individual could regain their Second Amendment Rights upon demonstrating their current mental and emotional fitness.

As a consequence of this overbroad ban, sane, trustworthy, competent individuals who are not a threat to themselves or others and are not in any way mentally ill are prohibited, *in perpetuity*, from exercising their Second Amendment rights by the bare fact of a one-time involuntary commitment without consideration of individual present circumstances.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their Complaint on March 5, 2015. On May 11, 2015, Defendants filed a *partial* Motion to Dismiss. By Order of November 9, 2015, the Court dismissed Counts I, III, and IV relating to Plaintiff Keyes and Count IV relating to Plaintiff Yox. On November 17, 2015, after filing a Joint Motion to File an Amended Complaint, the Court granted Plaintiffs'

request to file the amended complaint, which included a new count, Count V, relative to both Plaintiffs.

## III.    STATEMENT OF FACTS

### A.    *Michael Keyes' Personal History*

Plaintiff Michael L. Keyes, a former U.S. Air Force Airman 1st Class and former Master Trooper with the Pennsylvania State Police ("PSP"), was involuntarily committed as an adult at Holy Spirit Hospital from August 25, 2006 to September 8, 2006, when, as a result of an emotionally devastating divorce, he imbibed a number of alcoholic beverages and made suicidal statements.[1] Exhibit C, ¶¶ 2 – 4.

Prior to his commitment, Mr. Keyes honorably served our County in the U.S. Air Force, leaving active duty in 1989 with an Honorable Discharge as an Airman 1st Class and was fully discharge from the Air Guard in 1993 as a Senior Airman. *See*, Exhibit A. On October 6, 1991, he was hired by the Pennsylvania State Police ("PSP"). After his commitment, Mr. Keyes returned to the PSP, where he received performance evaluations of "Outstanding" and qualified in the top of his class with the following firearms, which he utilized while on duty: AR-15 select fire (fully

---

[1] A firearm was neither involved in nor mentioned in relation to the commitment.

automatic) rifle; Remington 870 12 gauge shotgun; Sig Sauer 227 handgun; and Glock 37 handgun. *See*, Exhibit B and Exhibit C, ¶¶ 6-8.

During this time, Mr. Keyes also filed for restoration of his firearm rights on December 3, 2008. On July 1, 2009, the Honorable Keith B. Quigley issued a Memorandum and Order "that Petitioner has in fact met his burden of showing that he may possess a firearm without risk to himself or any other person under the applicable provisions of law." *See*, Exhibit D. As the July 1, 2009 Order only relieved Plaintiff Keyes' state firearm disability, on May 9, 2012, Plaintiff Keyes filed a request for expungement of the involuntary commitment, which was denied by the Perry County Court of Common Pleas. On appeal to the Superior Court, the Superior Court held that the language "the court may grant such relief as it deems appropriate" found in 18 Pa.C.S. § 6105(f)(1) does not provide the court with the power to expunge and affirmed the trial court's decision. *In re Keyes*, 83 A.3d 1016, 1022 (2013), reargument denied (Feb. 24, 2014), appeal denied, 101 A.3d 104 (Pa. 2014).

Although Mr. Keyes is prohibited in his private capacity from possessing and using firearms because of Defendants' active enforcement of the policies complained of in this action, he was permitted to possess and use firearms in his official capacity as a law enforcement officer. He did so

until his retirement on September 12, 2015.

The only putative disability that precludes Mr. Keyes from possessing and utilizing firearms is his August 25, 2006 involuntary commitment.

B.    *Jonathan Yox's Personal History*

Plaintiff Jonathan K. Yox, a former U.S. Army Corporal of the 82nd Airborne, was involuntarily committed as a juvenile at York Hospital from March 30, 2006 to April 6, 2006, at the age of 15, when in reaction to his parents going through an emotionally devastating divorce, he disclosed having entered into a suicide pact and inflicted several superficial, non-scaring cuts, on his legs.[2] Exhibit E, ¶¶ 1, 2, 5.

After his commitment, during his senior year of high school, Mr. Yox received grades of "A" and "B" and was awarded the "Student Turnaround Achievement Award." *See*, Exhibit E, ¶ 4. In 2008, at the age of 17, Plaintiff Yox enlisted in the U.S. Army. He honorably served our County in the U.S. Army, leaving the service in 2012 with an Honorable Discharge as a Corporal in the 82nd Airborne. During his service in the Army, he was trained to use, and did use, the following weapons: M4 and M16 select fire (fully automatic) rifles; .50 Caliber Machine Gun; M240 Machine Gun; M249 Machine Gun; Mark 19 Grenade Launcher; 12 gauge shotgun; M203

---

[2] A firearm was neither involved in nor mentioned in relation to the commitment.

Grenade Launcher; high explosives; incendiary grenades; and flashbangs. Upon his return from Afghanistan, Mr. Yox was not recommended for further psychological evaluation after his deployment debriefing.

On or about the end of September or early October, 2012, Mr. Yox, after a Pennsylvania Instant Background Check System (PICS) search, was denied purchase of a firearm. Mr. Yox appealed the denial to the Pennsylvania State Police, which informed him via letter dated October 16, 2012, that he was prohibited pursuant to 18 Pa.C.S. § 6105 and 18 U.S.C. § 922(g) from owning a firearm based on his involuntary commitment in 2006. *See*, Exhibit G.

On August 14, 2013, Plaintiff Yox filed a Petition to Vacate and Expunge his Involuntary Commitment with the Lancaster County Court of Common Pleas, after being evaluated by Psychologist Anthony Fischetto in February and March of 2013. *See*, Exhibit H. On May 5, 2014, after explaining that he was bound by the Superior Court's decision in *In re: Keyes* and therefore prohibited from granting expungement, the Honorable Jay Hoberg issued an order granting Plaintiff Yox state relief from any disability imposed pursuant to 18 Pa.C.S. § 6105. *See*, Exhibit I. In granting state relief, Judge Hoberg found that "[t]he Petitioner no longer suffers from the mental health condition that was the basis for his commitments" and

"[t]he Petitioner may safely possess a firearm without risk to himself or any other person." *Id*.

Although Mr. Yox is prohibited in his private capacity from possessing and using firearms because of Defendants' active enforcement of the policies complained of in this action, he is permitted to possess and use firearms in his official capacity as a State Correctional Officer at the State Correctional Institution at Graterford. Plaintiff actively possesses and uses firearms in his employment for the Pennsylvania State Department of Corrections.

The only putative disability that precludes Mr. Yox from possessing and utilizing firearms in his private capacity is his March 30, 2006 juvenile involuntary commitment.

C.     *The Regulatory Scheme*

Title 18, United States Code § 922(g)(4) prohibits the possession of firearms and ammunition by any person "who has been adjudicated as a mental defective or who has been committed to a mental institution." Similarly, 18 U.S.C. § 922(d)(1) prohibits anyone from transferring firearms or ammunition to anyone whom the transferor has reason to know "has been adjudicated as a mental defective or has been committed to any mental

institution.[3] Defendants contend that Plaintiffs each have a disability that results from a single, isolated involuntary commitment and that their respective disabilities last in perpetuity.

To this end, Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has promulgated the ATF 4473, Firearms Transaction Record Part I – Over-The-Counter, form, which must be completed by any individual, who does not possess a Federal Firearms License ("FFL"), in order to purchase a firearm. 27 C.F.R. § 478.124. Question 11(f) asks:

> Have you ever been adjudicated mentally defective (which includes a determination by a court, board, commission or other lawful authority that you are a danger to yourself or to other or are incompetent to manage your own affairs) OR have you ever been committed to a mental institution.

*See*, http://www.atf.gov/files/forms/download/atf-f-4473-1.pdf (last visited January 8, 2016). Defendants further instruct FFLs not to sell a firearm to anyone that answers in the affirmative or "yes" to this question and even direct FFLs to deny the transaction, in the absence of even running a background check, on any individual that answers "yes" to the question.[4]

---

[3] A violation of these provisions is felony punishable by fine and imprisonment of up to ten years. *See* 18 U.S.C. § 924(a)(1)(D)(2).

[4] ATF FFL Newsletter, May, 2001, Issue I, at 14, available at https://www.atf.gov/file/56406/download (last visited January 8, 2016); ATF FFL Newsletter, September 1999, Issue II, at 2, *available at* https://www.atf.gov/file/56401/download (last visited January 8, 2016).

1. <u>Exception for those serving the federal or state government</u>

However, in relation to those serving the federal or state government in an official capacity, there exists an exception from their disability. Specifically, 18 U.S.C. § 925(a)(1) provides that, *inter alia*, a disability under 922(g)(4):

> shall not apply with respect to the transportation, shipment, receipt, possession, or importation of any firearm or ammunition imported for, sold or shipped to, or issued for the use of, *the United States or any department or agency thereof or any State or any department, agency, or political subdivision*. (emphasis added).

2. <u>Federal Firearms Relief is not available under 925(c)</u>

Unfortunately, although codified federal law seemingly provides for federal firearms relief determinations for individuals in Plaintiffs' situation, *see* 18 U.S.C. § 925(c), and ATF previously promulgated regulations relating to such determinations, *see* 27 C.F.R. § 478.144, through the annual appropriations process each year since 1992, the United States Congress has specifically precluded the expenditure of funds "to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c)." [5] Due to the funding restriction, ATF does not, in fact, provide any

---

[5] The Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, 128 Stat. 2130. *See also, Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 312 (6th Cir. 2014); *United States v. Rehlander*, 666 F.3d 45, 51 (1st Cir. 2012)(citing, *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *United States v. Booker*, 570 F. Supp. 2d

review under 18 U.S.C. § 925(c) so as to potentially grant relief from a federal disability on purchasing, possessing or utilizing a firearm; and therefore, Plaintiffs cannot avail themselves of any federal procedure to vindicate their Second Amendment rights on the grounds that they do not present a threat to themselves or others.

### 3. ATF contends that the NICS Improvement Act does not apply in Pennsylvania

Under the NICS Improvement Amendments Act of 2007 ("NIAA"), Congress provided an alternate route for relief from a federal prohibition on acquiring a firearm in which the various states may elect to provide a firearms relief program to review, approve, or deny applications for such relief. NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 121 Stat. 2559, 2569-70.[6] To date, the ATF has refused to "approve" Pennsylvania's relief program, as stated by ATF Division Counsel Kevin White. Plaintiffs cannot therefore avail themselves of any state or federal procedure providing relief from their federal prohibition on purchasing, possessing or utilizing a firearm in their private capacity, even though their state court Orders meet the findings necessary to comply with NIAA.

---

161, 164 n.2 (D. Me. 2008)); and, https://www.atf.gov/firearms/qa/there-way-prohibited-person-restore-his-or-her-right-receive-or-possess-firearms-and.

[6] *See also*, *Tyler*, 775 F.3d at 313 and fn. 26, *infra*.

D.   *Defendants' Prohibition of Plaintiffs' Intended Purchases/Transfers*

Plaintiffs Keyes and Yox both desire to possess firearms for self-defense and for defense of their families. *See*, Exhibit C, ¶ 20 and Exhibit E, ¶ 19. ATF Philadelphia Division Counsel Kevin White confirmed ATF's position and policy is that Plaintiffs Keyes and Yox remain prohibited under federal law from purchasing, possessing and utilizing firearms in their private capacities but could continue to possess and utilize firearms in their official capacities as a PSP Master Trooper and State Correctional Officer, respectively. ATF Division Counsel Kevin White also contended that there is currently no mechanism available in Pennsylvania or under federal law for either Mr. Keyes or Mr. Yox to obtain relief from their federal disabilities, as a result of their involuntary commitments.

As such, both Mr. Keyes and Mr. Yox have refrained from obtaining a firearm, as they reasonably fear arrest, prosecution, incarceration and fine, under 18 U.S.C. § 922(g)(4), instigated and directed by Defendants, if they should attempt to procure a firearm or any ammunition. *See*, Exhibit C, ¶¶ 15-19 and Exhibit E, ¶¶ 14-18. Further, both have refrained from purchasing a firearm from a private party, as doing so would subject them to arrest, prosecution, incarceration and fine, at Defendants' instigation and direction, for violating 18 U.S.C. 922(d)(4). *Id*.

As a result of Defendants' interpretation of section 922(g)(4), Plaintiffs are unwilling to state on the ATF 4473 Form that they have not, in fact, been adjudicated as mental defectives or been committed to a mental institution. *Id*. Moreover, if Plaintiffs answered "yes" on the ATF 4473 Form that they were adjudicated as mental defectives or been committed to a mental institution, any FFL who follows Defendants' directives would refuse to sell Plaintiffs a firearm on account of the fact that they are putatively prohibited from possessing firearms under section 922(g)(4). Hence, Mr. Keyes and Mr. Yox suffer from the ongoing harm of being unable to obtain firearms from a licensed firearms dealer, which Plaintiffs would, in fact, obtain, but for section 922(g)(4)'s enforcement. *Id*.

## IV.      STATEMENT OF QUESTIONS INVOLVED

1.   Whether the state court relief obtained by Plaintiffs triggers federal relief, pursuant to NIAA.

     *Suggested Answer in the Affirmative*.

2.   Whether, as applied to Plaintiffs, 18 U.S.C. § 922(g)(4)'s prohibition violates their Second Amendment Rights, when the prohibition is the result of a single, isolated commitment and both Plaintiffs have been found to be competent to possess firearms without threat to themselves or others and have possessed firearms without threat to themselves or others in a

law enforcement capacity.[7]

*Suggested Answer in the Affirmative.*

3. Whether, as applied to Plaintiff Yox, any putative prohibition pursuant to 18 U.S.C. § 922(g)(4) violates his Second Amendment Rights, when he was committed as a juvenile and federal law is silent as to juvenile commitments being prohibiting.

*Suggested Answer in the Affirmative.*

## V. ARGUMENT

A. *Ambiguous Criminal Statutes Are Afforded the Most Lenient Construction*

As declared by the U.S. Supreme Court, "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971).

It is an ancient rule of statutory construction that penal statutes should be strictly construed against the government . . . and in favor of the persons on whom penalties are sought to be imposed . . . any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute.

Norman J. Singer, 3 SUTHERLAND ON STATUTORY CONSTRUCTION

---

[7] While Plaintiff Keyes acknowledges that the Court dismissed his Second Amendment as-applied challenge, to the extent this Court decides to reconsider, *sua sponte*, its decision dismissing his claims, he also argues in support of this question presented.

13

§ 59:3, at 167-75 (7th ed. 2008) ("SUTHERLAND") (collecting cases); *see also,* id. at 187-88 (discussing Supreme Court's adoption of the rule of lenity). Courts construe ambiguous criminal statutes narrowly to avoid "making criminal law in Congress's stead." *United States v. Santos*, 553 U.S. 507, 514 (2008).

> In various ways over the years, we have stated that when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.

*Bass*, 404 U.S. at 347-48. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Jones v. United States*, 529 U.S. 848, 858 (2000).

      B.    *Plaintiffs are being denied any opportunity to regain their Right to Keep and Bear Arms even though their judicial determinations qualify under NICS Improvement Amendments Act of 2007 ("NIAA")*

As discussed *supra*, Defendants contend that Plaintiffs lack any ability to have their Second Amendment Rights restored as federal firearms relief, pursuant to section 925(c), is not available and ATF contends that the Commonwealth has failed to institute an ATF-approved program, under NIAA, that would provide for state relief to relieve/remove any federal disability. ATF Philadelphia Division Counsel Kevin White acknowledged

that under ATF's view neither Mr. Keyes nor Mr. Yox has an ability to obtain federal relief. *See*, Exhibit C, ¶ 18, and Exhibit E, ¶ 17.

As NIAA does not require ATF "approval" of a State program for ordered State relief to be effective, ATF's position is simply immaterial. There is nothing in Section 105 that provides any role for ATF. The statute itself specifies the criteria for determining whether State relief is effective to remove a federal disability.

Pursuant to Section 105 of NIAA,

> (a) A relief from disabilities program is implemented by a State in accordance with this section if the program –
>
>> (1) permits a person who, pursuant to State law, has been adjudicated as described in subsection (g)(4) of section 922 of title 18, United States Code, or has been committed to a mental institution, to apply to the State for relief from disabilities imposes by subsections (d)(4) and (g)(4) of such section by reason of the adjudication or commitment;
>>
>> (2) provides that a State court, board, commission, or other lawful authority shall grant relief, pursuant to State law and in accordance with the principles of due process, if the circumstances regarding disabilities referenced in paragraph (1), and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of relief would not be contrary to the public interest; and
>>
>> (3) permits a person whose application for the relief is denied to file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial.

(b) If, under a State relief from disabilities program implemented in accordance with this section, an application for relief referred to in subsection (a)(1) of this section is granted with respect to an adjudication or a commitment to a mental institution or based upon a removal of a record under Section 102(c)(1)(B), the adjudication or commitment, as the case may be, is deemed not to have occurred for purposes of subsections (d)(4) and (g)(4) of section 922 of title 18, United States Code.

Unlike Section 103(c), which provides for grants to states where the relief program is "to the satisfaction of the Attorney General," nothing within Section 105, or referenced therein, conditions the effectiveness of State-granted relief upon the approval of the Attorney General or ATF. If the Congress intended for the Attorney General or ATF to have authority to disregard State-based relief to prior State-based disqualification or to determine whether a relief program met the specified criteria, Congress was well aware of how to draft and include such language.[8] Rather, the language of Section 105 was intended by the Congress to be sufficiently clear as to be self-executing, without the need for administrative interpretation or approval. Either the program meets the criteria or it misses the mark, unless,

---

[8] *Russello v. United States*, 464 U.S. 16, 23 (1983)(holding that "where Congress includes particular language in one section of a statute but omits it in another section of the same statute, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006)(holding that "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute").

where a relief program is insufficient, the court's order meets the requisite criteria.

Furthermore, pursuant to Section 101(c)(1),[9] Plaintiffs contend that all federal departments and agencies, inclusive of ATF and FBI, are prohibited from including in the NICS database a commitment, where a Pennsylvania judge has found that the individual "no longer suffer[s] from the mental heath condition that was the basis of the adjudication or commitment" or where the "individual has been "rehabilitated through *any* procedure available under the law," regardless of whether provided such a document by the Pennsylvania State Police or any other agency or department of the Commonwealth. (emphasis added).

---

[9] Section 101(c)(1) provides, "(1) IN GENERAL .—No department or agency of the Federal Government may provide to the Attorney General any record of an adjudication related to the mental health of a person or any commitment of a person to a mental institution if— (A) the adjudication or commitment, respectively, has been set aside or expunged, or the person has otherwise been fully released or discharged from all mandatory treatment, supervision, or monitoring;(B) the person has been found by a court, board, commission, or other lawful authority to no longer suffer from the mental health condition that was the basis of the adjudication or commitment, respectively, or has otherwise been found to be rehabilitated through any procedure available under law; or (C) the adjudication or commitment, respectively, is based solely on a medical finding of disability, without an opportunity for a hearing by a court, board, commission, or other lawful authority, and the person has not been adjudicated as a mental defective consistent with section 922(g)(4) of title 18, United States Code, except that nothing in this section or any other provision of law shall prevent a Federal department or agency from providing to the Attorney General any record demonstrating that a person was adjudicated to be not guilty by reason of insanity, or based on lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice."

1.    Pennsylvania's Relief Program

In turning to Pennsylvania's relief from disabilities program, pursuant to 18 Pa.C.S. § 6105(f)(1), an individual who, pursuant to section 6105(c)(4), has "been adjudicated as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment under section 302, 303 or 304" of Pennsylvania's Mental Health and Procedures Act, may petition the court for relief. "[T]he court may grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person." *Id*. Furthermore, the Superior Court recently acknowledged that *de novo* review was required of mental health commitment challenges and trial court decisions related thereto. *See, Commonwealth v. Current*, 2016 Pa. Super. Unpub. LEXIS 5, *3; *In re Vencil*, 2015 PA Super 157, 120 A.3d 1028, 1034-35, 1037 (2015).[10]

_____

[10] While Plaintiffs acknowledge that the court in *In re Vencil* mainly reviewed a companion provision found in 18 Pa.C.S. § 6111.1(g), as reflected in the unpublished decision of *Current*, both Sections 6105(f) and 6111.1(g) are treated identically in relation to *de novo* review before the trial court and before the appellate court. The undersigned, having litigated a plethora of cases pursuant to Section 6105(f), further attests that the courts in Pennsylvania always provide *de novo* review pursuant to a petition for relief under Section 6105(f) and if anything, there would exist less of an argument for *de novo* review pursuant to Section 6111.1(g), since a determination was previously made, albeit merely by a physician, unlike an application pursuant to Section 6105(f), where no prior determination has been made.

## 2. Other States' Relief Programs

There appear to be 30 states, not including Pennsylvania, with qualified relief programs, comprised of 28 states, which have been formally approved by ATF and two which qualify but have not been certified.[11]

The relief programs ATF purported to "approve" include a number of programs, which are substantially similar to Pennsylvania's relief program, resulting in any denial of Pennsylvania's program being arbitrary and capricious.

### a. Wisconsin

In 2010, Wisconsin's relief program was approved by ATF. *See* Wis. Stat. § 941.29(8). As is required under Pennsylvania's Section 6105(f), relief from disability under 922(g)(4) or (d)(4) in Wisconsin requires court adjudication, instead of administrative adjudication found in other state relief programs discussed *infra*. Wis. Stat. § 941.29(8). Further, in the course of such hearing it need only be "determine[d] that the person is not likely to act in a manner dangerous to public safety. In any action or proceeding regarding this determination, the person has the burden of proving by a

---

[11] *See*, Vermont Legislature review, *available at,* http://legislature.vermont.gov/assets/Documents/2016/WorkGroups/House%20Judiciary/Bills/S.141/Witness%20Testimony/S.141~Erik%20FiztPatrick~AFT%20Approved%20State%20Relief%20From%20Abuse%20Programs~4-10-2015.pdf (last visited January 7, 2016).

preponderance of the evidence that he or she is not likely to act in a manner dangerous to public safety." *Id.* [12]

### b. Virginia

Virginia's relief statute, which was approved in 2011 by ATF, is also very similar to that of Pennsylvania's. *See* Va. Code Ann. § 18.2-308.1:3(B).[13] Under the Virginia relief program, adjudication is formal, through a petition to the petitioner's local district, city, or county court. *Id.* Further, the adjudicatory process simply states:

> If the court determines, after receiving and considering evidence concerning the circumstances regarding the disabilities referred to in subsection A and the person's criminal history, treatment record, and reputation as developed through character witness statements, testimony, or other character evidence, *that the person will not likely act in a manner dangerous to public safety and that granting the relief would not be contrary to the public interest, the court shall grant the petition. Id.* (*emphasis added*).

### c. Oregon

Among the very first states offering a statutory relief program pursuant to NIAA and approved by ATF, Oregon's program is substantially provided for by OR. Law Ch. 859 § 300 AND O.R.S. § 161.387.

---

[12] Similar provisions are also found in Wis. Stat. §§ 51.20, 51.45, 54.10 and 55.12.

[13] Section 18.2-308.1:3 is one of three Va. relief statutes applicable to relief from mental health disability under Section 922. 1:3 concerns relief for persons involuntarily committed; 1:2 concerns persons formerly adjudicated mentally incompetent or mentally disabled; 1:1 concerns persons formerly acquitted from criminal conviction due to a finding of insanity.

Procedurally, these statutes provide that a "Psychiatric Security Review Board" is the body responsible for receiving, reviewing, and ruling upon "petitions for relief".[14] The Oregon statute clearly indicates the general principle for determining relief from 922(g)(4) or (d)(4) disability – "The *sole issue* at any Gun Relief hearing shall be whether the petitioner has demonstrated that he or she will not be likely to act in a manner that is dangerous to public safety and that granting the relief would not be contrary to the public interest." *See* OR. OAR 859-300-0090(1)(*emphasis added*). Thus, while procedurally different from Pennsylvania in that in Pennsylvania the court of common pleas hears the relief petition, the principle of relief under the Oregon statutory scheme is fundamentally similar to that of 6105(f).

### d. Florida

In 2010, Florida obtained ATF-approval of its relief program. The relevant Florida statute providing relief from 922(d)(4) or (g)(4) disability, Fla. Stat. § 790.065, is very similar to Pennsylvania's in terms of both substance (i.e. the stated principles justifying relief) and procedure. The most relevant portion of § 790.065(d) states:

> A person who has been adjudicated mentally defective or

---

[14] *See*, http://arcweb.sos.state.or.us/pages/rules/oars_800/oar_859/859_300.html (last visited January 7, 2016).

committed to a mental institution, as those terms are defined in this paragraph, may petition the circuit court that made the adjudication or commitment, or the court that ordered that the record be submitted to the department pursuant to sub-sub-subparagraph c.(II), for relief from the firearm disabilities imposed by such adjudication or commitment. A copy of the petition shall be served on the state attorney for the county in which the person was adjudicated or committed. The state attorney may object to and present evidence relevant to the relief sought by the petition. The hearing on the petition may be open or closed as the petitioner may choose. The petitioner may present evidence and subpoena witnesses to appear at the hearing on the petition. The petitioner may confront and cross-examine witnesses called by the state attorney. A record of the hearing shall be made by a certified court reporter or by court-approved electronic means. The court shall make written findings of fact and conclusions of law on the issues before it and issue a final order. *The court shall grant the relief requested in the petition if the court finds, based on the evidence presented with respect to the petitioner's reputation, the petitioner's mental health record and, if applicable, criminal history record, the circumstances surrounding the firearm disability, and any other evidence in the record, that the petitioner will not be likely to act in a manner that is dangerous to public safety and that granting the relief would not be contrary to the public interest*. If the final order denies relief, the petitioner may not petition again for relief from firearm disabilities until 1 year after the date of the final order. (*emphasis added*)

3. NIAA's Application to the Plaintiffs

In this matter, in relation to Mr. Keyes, Judge Quigley held that Mr.

Keyes "met his burden of showing that he may possess a firearm without

risk to himself or any other person" after finding, *inter alia*, that (1) Mr. Keyes "has made significant and substantial progress with the issues that caused the commitment and otherwise troubled him in his life;" (2) that his doctor "opined concerning the Petitioner's depression condition, found him, at the time, to not be a danger to himself or other;" (3) that "his prior behavior, suicidal in nature, has not reoccurred in recent years and never involved the use of a firearm;" and (4) that he "is certainly reasonably fit to again possess firearms." Exhibit D.

In relation to Mr. Yox, Judge Hoberg held that Mr. Yox "no longer suffers from the mental health condition that was the basis for his commitments" and that he "may safely possess a firearm without risk to himself or any other person" after finding, *inter alia*, that (1) Mr. Yox possessed numerous fully automatic firearms and explosives, post-commitment, while in the 82nd Airborne; (2) after returning from combat, he "was not recommended for further psychological evaluation;" (3) that he was evaluated by Dr. Anthony Fischetto, who found that he could possess a firearm without threat to himself or others; and (4) that his girlfriend and brother testified that they did not have concerns about him possessing firearms. Exhibit I.

Accordingly, NIAA Section 105(a)'s requirements are met, as

Pennsylvania's relief program specifically provides for relief from an involuntary commitment occurring in Pennsylvania, requires that the court find that the individual does not pose a risk to himself or others in possession of a firearm and provides for *de novo* court review, in the event of a denial (and even in the initial proceeding).

Even if there was an argument that on its face it may not be clear that every relief determination under Pennsylvania's relief program would necessarily satisfy the criteria of the NIAA, the record developed, procedures followed, and determinations made with respect to these Plaintiffs demonstrates beyond any doubt that the criteria were satisfied in this matter. Where the State has *actually* met the criteria, ATF is not free to simply disregard the determination as doing so violates the principles of comity and federalism embodied in the full faith and credit requirement of 28 U.S.C. § 1738.[15] Neither ATF nor the federal courts can afford less

---

[15] In *Younger v. Harris*, 401 U.S. 37, 44 (1971), the Supreme Court articulated some of the principles and policies that underlie the "notion of 'comity'" that exists between our national and state governments. The "notion of 'comity' . . . is [] a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate way." *Id*. The Supreme Court would thereafter declare that these "elementary principles of federalism and comity" are "embodied in the full faith and credit statute, 28 U.S.C. § 1738." *Growe v. Emison*, 507 U.S. 25, 35-36 (1993); see also *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523 (1986). In *Rycoline Prods. v. C & W Unlimited*, 109 F.3d 883, 887 (3d Cir. 1997), the Third Circuit acknowledged that "a federal court must give the same preclusive effect to a state-court judgment as another court of that State would give." (citation omitted). Further, in

respect to the determination than the courts of the rendering State itself and it would be particularly bizarre to do so when the very predicate for any claimed disability is an earlier action of the same State that the State has determined is no longer based in fact. To permit otherwise makes as much sense as basing a federal disability on a State felony conviction while refusing to recognize a subsequent grant of post-conviction relief and dismissal of the original charges.

Moreover, in turning to Section 101(c)(1) of NIAA, Defendants are prohibited from including Plaintiffs' commitments in the NICS database, as Mr. Keyes and Mr. Yox were both found to no longer suffer from the mental health condition that was the basis for their commitments and both were rehabilitated pursuant to Pennsylvania law.[16] Exhibit D[17]; Exhibit I.[18]

---

relation to whether a Puerto Rican judgment relating to a prohibiting conviction was afforded full faith and credit pursuant to Section 1738, the Third Circuit held that it was in *United States v. Laboy-Torres*, 553 F.3d 715, 721 (3d Cir. 2009).

[16] While "rehabilitated through any procedure available under the law" is not defined in NIAA, Pennsylvania's relief program, Section 6105(f), is clearly comprised therein, as it requires a court to determine that the individual can possess a firearm without threat to himself or others and is therefore completely rehabilitated. Furthermore, the Congress' use of the word "any" signifies its intent for such procedures to be liberally interpreted and construed.

[17] "[W]e are impressed that the Petitioner has made significant and substantial progress with the issues that caused the commitment and otherwise troubled him in his life…We are impressed that even the doctor that opined concerning the Petitioner's depression condition, found him, at the time, to not be a danger to himself or others. We also note that some of his prior behavior, suicidal in nature, has not reoccurred in recent years and never involved the use of a firearm. We also observed the Petitioner as he testified and

Therefore, the Defendants should be directed to accept Plaintiffs'

Orders, and any such similar orders, as granting relief, pursuant to NIAA

Section 105(b), or otherwise be prohibited from including Plaintiffs'

commitments in the NICS database, pursuant to NIAA Section 101(c)(1).

C.    *Constitutional Analysis*

1.    The Second Amendment

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and

bear arms, shall not be infringed." U.S. Const. amend. II. The Supreme

Court held that the Second Amendment confers "an individual right to keep

and bear arms." *Heller*, 554 U.S. at 577, 595 (2008).[19]

---

were impressed [sic] what appears to be a reasonably stable mental position at this point.
We noted nothing close to what would mandate any type of inpatient, involuntary or
otherwise, treatment."

[18] "The Petitioner no longer suffers from the mental health condition that was the basis
for his commitments…[After his juvenile commitment], Petitioner did well during the
remainder of high school…After returning from the combat zone, Petitioner was not
recommended for further psychological evaluation…[Petitioner] has not had any bouts of
depression since his discharge from Philhaven in 2006. Petitioner is not currently in
counseling and has not taken any prescription medication for mental health or depression
since he stropped taking Zoloft [3-6 months after discharge from Philhaven]."

[19] As explained *infra*, the Third Circuit has seemingly held that different analyses exist
for facial and as-applied challenges. Although Plaintiffs have only brought as-applied
challenges, they review the different analyses for the benefit of the Court, especially
given the generally understood overlap between the analyses.

## 2. Second Amendment facial challenges

The Third Circuit Court of Appeals has set-forth a two-pronged approach to Second Amendment facial challenges.

> First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)(citations omitted).[20]

### a. *The first prong – burden on conduct*

In *Heller*, the Court defined "bear arms" as to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584. The Court then went on to hold that at the core of the Second Amendment was the right of an individual to have a firearm in one's home for purposes of self-defense. *Heller*, 554 U.S. at 630.

---

[20] While Plaintiffs acknowledge the Third Circuit's precedent, they respectfully call into question this two-pronged approach, based on the Supreme Court's decisions in *Heller*, and *McDonald v. City of Chicago*, where the Court specifically stated that lower courts should not conduct interest balancing or apply levels of scrutiny. *Heller*, 554 U.S. at 634-35 (noting that "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."); *McDonald*, 561 U.S. 742, 790-91 (2010)(noting that the *Heller* Court "specifically rejected" "an interest-balancing test").

In this matter, both Mr. Keyes and Mr. Yox desire to purchase and possess a firearm for self-defense in their homes. *See*, Exhibit C, ¶ 20 and Exhibit E, ¶ 19. Accordingly, section 922(g)(4)'s prohibition clearly imposes a burden on already established conduct falling within the scope of the Second Amendment's guarantee.

Nevertheless, even if one ignored the *Heller* decision and analyzed section 922(g)(4)'s prohibition in the historical context of when the Second Amendment was ratified, as Professor Larson declares, "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." [21] Professor Larson concludes that "[s]pecific eighteenth-century laws disarming the mentally ill … simply do not exist." *Id*. at 1378. In fact, it was not until the Uniform Fire Arms Act of 1930, which "prohibited delivery of a pistol to any person of 'unsound mind'" that the law first restricted Second Amendment Rights to those with any form of mental illness. *Id*. at 1376.

Moreover, Plaintiffs have been unable to uncover any other historical source that suggests that the right to possess a firearm or ammunition was denied to any individual who had ever been committed to a mental institution, regardless of time, circumstance, or present condition.

---

[21] Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009)

Accordingly, even if analyzed in the historical context, section 922(g)(4)'s prohibition imposes a burden on already established conduct falling within the Second Amendment, as there is no support for the proposition that those with mental health issues were excluded from the protections of the Second Amendment in 1791.

b. ***The second prong – scrutiny to be applied***

In turning to the level of scrutiny applicable to this matter, assuming *arguendo* that this Court will follow the precedent set-forth in the *Marzzarella* decision, the question becomes whether strict or intermediate scrutiny applies, as the *Heller* Court already declared that rational basis scrutiny in inappropriate. *Heller*, 544 U.S. at 628 n.27.[22]

Unfortunately, the *Marzzarella* court did not set-forth the scrutiny to be applied in the Third Circuit, but did ponder whether the Second Amendment "can trigger more than one particular standard of scrutiny" and applied intermediate scrutiny to section 922(k)'s prohibition on possession of a firearm with an obliterated serial number. *Marzzarella*, 614 F.3d at 97. However, the *Marzzarella* court specifically declared that "[t]he District of Columbia's handgun ban is an example of a law at the far end of the

---

[22] As raised in fn. 20 *supra*, the holding in *Heller* suggests that courts should not apply levels of scrutiny to Second Amendment challenges, as interest-balancing is not appropriate for core constitutional protections. 554 U.S. at 634-35

spectrum of infringement on protected Second Amendment rights,"
suggesting that strict scrutiny applies where an individual is being denied a
handgun for purposes of self-defense in his home. *Id*. The court even
acknowledged that its decision to utilize intermediate scrutiny was "not free
from doubt" but believed it appropriate in analyzing section 922(k) because
it did not "severely limit the possession of firearms," unlike section
922(g)(4)'s prohibition, which completely restricts Plaintiffs' possession of
firearms. *Id*.

In this matter, Plaintiffs aver that strict scrutiny applies, as their
established core right to possess and carry a firearm for purposes of self-
defense in their homes is being infringed.

        3.     <u>Second Amendment as-applied challenges</u>

The Third Circuit in *United States v. Barton*, 633 F.3d 168, 170-171,
173 (3d Cir. 2011) held that that because the prohibitions discussed in *Heller*
are only "presumptively" valid, the presumption could be rebutted with an
as-applied challenge, unlike with a facial challenge. Third Circuit explained
that to raise a successful as applied challenge to a presumptively valid
prohibition, the challenger "must present facts about himself and his
background that distinguish his circumstances from those of persons

historically barred from Second Amendment challenges." *Id*., at 174. This means, as eloquently explained by the court in *Suarez*, that in the "Third Circuit, to raise a successful as-applied challenge to a presumptively valid prohibition, the challenger 'must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment challenges.'" *Suarez*, 2015 U.S. Dist. LEXIS 19378, *17 (citations omitted).

      D.     *The Federal Courts in Pennsylvania have previously sustained as-applied challenges under the Second Amendment in relation to non-violent misdemeanor crimes*

Over the past year, both the Eastern District of Pennsylvania and the Middle District of Pennsylvania have sustained as-applied challenges under the Second Amendment in relation to non-violent misdemeanor crimes. While acknowledging that the decisions are in relation to 18 U.S.C. § 921(g)(1) and not in relation to section 922(g)(4), Plaintiffs respectfully aver that the analysis and outcome should be identical to their challenge, as unlike those cases, Plaintiffs are not prohibited due to criminal conduct; but rather, due to a single, isolated involuntary commitment of almost a decade ago and they have already established, through judicial determinations, that they do not pose a greater risk of future violent conduct than the average law-abiding citizen, as discussed *infra*.

In *Binderup v. Holder, et al.*, 13-CV-06750, 2014 U.S. Dist. LEXIS 135110, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014), Mr. Binderup challenged, *inter alia*, his ongoing federal prohibition under 18 U.S.C. § 921(g)(1) as violating the Second Amendment, as applied. In 1998, he had pled guilty to corruption of a minor, as a result of an illicit sexual relationship with a 17 year old employee. *Id.*, at *13. Like the Plaintiffs in this matter, he obtained state relief but was still prohibited under federal law. *Id.* The Honorable James Gardner of the Eastern District of Pennsylvania, in an 86 page decision, held that "application of § 922(g)(1) to [Mr. Binderup] violates the Second Amendment to the United States Constitution under the framework set for the [sic] by the United States Court of Appeals for the Third Circuit in *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011)" because "he poses no greater risk of future violent conduct than the average law-abiding citizen." *Id.*, at *87.

Similarly, in *Suarez v. Holder, et al.*, 1:14-CV-968, 2015 U.S. Dist. LEXIS 19378 (M.D. Pa. Feb. 18, 2015), Mr. Suarez challenged, *inter alia*, his ongoing federal prohibition under 18 U.S.C. § 921(g)(1) as violating the Second Amendment, as applied. In 1990, Mr. Suarez was convicted of carrying a firearm in Maryland without a license. *Id.*, at *2. Again, like

Plaintiffs in this matter, Mr. Suarez obtained state relief in Pennsylvania.[23]

*Id.*, at *25. The Honorable William Caldwell of the Middle District of

Pennsylvania in finding that Mr. Suarez "is no more dangerous than a typical

law-abiding citizen and poses no continuing threat to society" held that "the

application of § 922(g)(1) violates Plaintiff's Second Amendment

protections." *Id.*, at *28, 36.

> E. *As applied to Plaintiffs, 18 U.S.C. § 922(g)(4)'s prohibition violates their Second Amendment Rights, as the prohibition is the result of a single, isolated commitment and both Plaintiffs have been found to be competent to possess firearms without threat to themselves or others and have possessed firearms without threat to themselves or others in a law enforcement capacity*

Initially, Plaintiffs[24] contend that as-applied to them in their private

capacity, 18 U.S.C. § 922(g)(4)'s blanket, all-encompassing and perpetual

prohibition, as a result of a single, isolated involuntary commitment violates

their Second Amendment Rights, especially in light of judicial

determinations that they do not pose a risk to themselves or others in

possession of a firearm and when they have both possessed numerous

---

[23] The background and decision do not reflect whether Mr. Suarez was eligible for or applied for state relief in the State of Maryland.

[24] While Plaintiff Keyes acknowledges that this Court dismissed his Second Amendment as-applied challenge, to the extent this Court decides to reconsider, *sua sponte*, its decision dismissing his claims, he also argues in support of this analysis.

firearms, including fully automatic firearms, in their official capacity, post-involuntary commitment without issue.

> 1.    <u>A single, isolated commitment is insufficient to strip an individual of a Constitutional Right in perpetuity</u>

In enacting 18 U.S.C. § 922(g)(4), there exists no evidence or debate to support that the U.S. Congress intended that an individual, who was involuntarily committed on one, isolated occasion be stripped of their right to keep and bear arms in perpetuity. In fact, even the U.S. Supreme Court's decision in *Heller* supports that any putative prohibition *only* relates to individuals who are *currently* mentally ill. *Heller*, 554 U.S. at 626 (declaring that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by … *the mentally ill*").[25] The Court specifically utilized the present tense, reflecting that any prohibition is in relation to those that are currently mentally ill and not those, who on a single, isolated occasion, almost a decade ago, were involuntarily committed for less than two weeks. The class of individuals constituting those ever previously institutionalized for mental health reasons is not identical to, or even closely equivalent to, the class of individuals that are presently

---

[25] It is extreme important to note that the Court in acknowledging that this statement was dicta, went on to say "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned *if and when those exceptions come before us*." *Heller,* 554 U.S. at 635 (emphasis added).

mentally ill.

In this vein, the First Circuit Court of Appeals addressed constitutional concerns in relation to Maine's involuntary commitment statute and section 922(g)(4)'s prohibition, declaring that in finding that Maine's statute was insufficient to trigger a permanent deprivation of one's right to keep and bear arms, its decision might be different "if section 922 permitted one temporarily hospitalized on an emergency basis to recover, on reasonable terms, a suspended right to possess arms on a showing that he now no longer posed a risk of danger." *United States v. Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012).

Additionally, the Sixth Circuit Court of Appeals more recently held that a single, isolated involuntary commitment is insufficient to strip an individual of his Second Amendment rights in perpetuity, in a case that is extremely similar to the facts of this case. *Tyler*, 775 F.3d at 317, 343 (6th Cir. 2014)(noting that section 922(g)(4) "prohibits firearm possession not just by the mentally ill but by anyone 'who has been committed to a mental institution'" and "[t]hat these two categories are not coextensive is made clear by the very fact that the language of § 922(g)(4) expressly refers to two separate groups).[26]

---

[26] It must be noted that the Sixth Circuit has granted rehearing *en banc* in *Tyler* and

Accordingly, neither Mr. Keyes nor Mr. Yox should be denied their right to keep and bear arms, as any putative disability stems from a single, isolated involuntary commitment almost a decade ago.

2. <u>Plaintiffs have been found by a court of law to be competent to possess and use firearms without threat to themselves or others</u>

In *Coram v. State (Ill. Dep't of State Police)*, 2013 IL 113867, ¶ 5, 375 Ill. Dec. 1, 21, 996 N.E.2d 1057, 1059, the Illinois Supreme Court addressed the refusal by the Illinois State Police to grant a firearms license to Mr. Coram, after he had successfully petitioned for state relief relating to a domestic violence conviction. After spending a significant portion of the decision reviewing state and federal case law, NIAA and declaring that "Congress clearly intends for there to be meaningful avenues to relief from federally imposed firearms disabilities, and it intends for the states to take an active role in those relief efforts," the Court held that the trial court and circuit court correctly held that state relief triggered federal relief. While not binding on this court, Plaintiffs aver that as the Illinois Supreme Court recognized, state courts are in the best position to determine whether an

---

therefore, it is not being cited for any authoritative effect on this Court, as the Sixth Circuit's local rules automatically vacate a prior decision, when the court grants *en banc* rehearing. Rather, it is being cited merely for the analysis that the court utilized in determining that the statute violated Mr. Tyler's right to keep and bear arms.

individual should be granted relief.

It this matter, both Mr. Keyes and Mr. Yox have obtained judicial determinations finding that they do not pose a risk to themselves or others in possession of a firearm and granting them state relief, pursuant to 18 Pa.C.S. § 6105(f).

In relation to Mr. Keyes, the Honorable Keith Quigley on July 1, 2009, issued an Order declaring, "the Court finds that Petitioner has in fact met his burden of showing that he may possess a firearm without risk to himself or any other person under the applicable provisions of law." *See*, Exhibit D.

In relation to Mr. Yox, after an extensive evaluation by Dr. Fischetto (Exhibit H), on May 5, 2014, the Honorable Jay Hoberg issued an Order and Memorandum declaring that "[t]he Petitioner no longer suffers from the mental health condition that was the basis for his commitments" and "[t]he Petitioner may safely possess a firearm without risk to himself or any other person." *See*, Exhibit I.

Accordingly, neither Mr. Keyes nor Mr. Yox should be denied their right to keep and bear arms, as they have both obtained judicial determinations that they may safely possess firearms without risk to themselves or others and, as discussed *infra*, they have possessed firearms,

including fully automatic firearms, post-commitment, without issue.

      3.    <u>Plaintiffs have possessed and used firearms, in a law enforcement capacity, without threat to themselves or others</u>

As discussed *supra*, section 925(a)(1) permits individuals, who are serving the federal or state government in an official capacity as a law enforcement officer to possess and use firearms and ammunition, while in their official capacity. In this matter, both Mr. Keyes and Mr. Yox have possessed firearms in their official capacity as law enforcement officers for the Commonwealth of Pennsylvania.

In relation to Mr. Keyes, he was originally hired by the PSP on October 6, 1991. See, Exhibit C, ¶ 3. After his involuntary commitment, Mr. Keyes returned to the PSP, where he received performance evaluations reflecting "Outstanding" (Exhibit B) and on November 14, 2011, Captain Maynard H. Gray of the PSP issued a determination reinstating Mr. Keyes to full, unrestricted, duty, based upon the evaluations of Mr. Keyes's doctor, Richard W. William, Ph.D., and an independent evaluation by the PSP's chosen doctor, Roger J. Cadieux. *See*, Exhibit J. The PSP's doctor found, "that Trooper Keyes is medically and psychiatrically cleared to perform all the duties of a full, unrestricted trooper" and the PSP's Psychologist,

Michael A. Asken, Ph.D., and the Department accepted these determinations. *Id*.

In his official capacity as a PSP Master Trooper, Mr. Keyes actively possessed and carried on a daily basis a Sig Sauer 227 handgun (previously a Glock 37 handgun) and when on patrol, he possessed and carried an AR-15 select-five (fully automatic) rifle and a Remington 870 shotgun. In qualifying with his firearms, he qualified in the top tier, scoring a perfect score of 150 out of 150 with his AR-15, scoring 99 out of 100 with his Remington 870, scoring 279 out of 300 with his Glock 37, and scoring a 272 out of 300 with his Sig Sauer. *See*, Exhibit C, ¶¶ 7-8.

In relation to Mr. Yox, after his juvenile commitment, he joined the Army and honorably served with the 82nd Airborne, where was trained to use, and did use, the M4 and M16 select fire (fully automatic) rifles, a .50 Caliber Machine Gun, an M240 Machine Gun, an M249 Machine Gun, a Mark 19 Grenade Launcher, a 12 gauge shotgun, an M203 Grenade Launcher, high explosives, incendiary grenades, and flashbangs. *See*, Exhibit E, ¶¶ 5-6. After his honorable discharge in 2012, Mr. Yox gained employment as a State Correctional Officer at the State Correctional Institution at Graterford, where he possesses firearms in his official capacity. *Id*. ¶ 12.

Accordingly, neither Mr. Keyes nor Mr. Yox should be denied their right to keep and bear arms, as they have both have possessed firearms, including fully automatic firearms, post-commitment, without issue.

F.    *As applied to Plaintiff Yox, any putative prohibition pursuant to 18 U.S.C. § 922(g)(4) violates his Second Amendment Rights, as he was committed as a juvenile and federal law is silent as to juvenile commitments being prohibiting as acknowledged by Defendants*

Plaintiff Yox avers that as applied to him, any putative prohibition pursuant to 18 U.S.C. § 922(g)(4) violates his Second Amendment Rights, as he was committed as a juvenile and federal law is silent as to juvenile commitments being prohibiting, as acknowledged by Defendants.

1.    <u>Juvenile commitments are not sufficient to trigger a disability, pursuant to 18 U.S.C. § 922(g)(4)</u>

It is important to note that all of the section 922(g) prohibitions relate to a person and federal law, generally considers those under the age of 18 to be juveniles and incompetent. *See*, 18 U.S.C. § 4101 (*defining* a juvenile as "(1) a person who is under eighteen years of age; or (2) for the purpose of proceedings and disposition under chapter 403 of this title because of an act of juvenile delinquency, a person who is under twenty-one years of age."); 18 U.S.C. § 5031 (*defining* a juvenile as "a person who has not attained his

eighteenth birthday, or for the purpose of proceedings and disposition under this chapter for an alleged act of juvenile delinquency, a person who has not attained his twenty-first birthday"); and 18 U.S.C. § 922(x)(5) (*defining* a juvenile as "a person who is less than 18 years of age.")  Furthermore, in the context of federal acts of juvenile delinquency, one is considered a juvenile until attaining the age of twenty-one. 18 U.S.C. §§ 4101, 5031.[27]

In turning to 18 U.S.C. § 922(g)(4), it declares, "It shall be unlawful for any person … who has been adjudicated as a mental defective or who has been committed to a mental institution." The term juvenile is noticeably absent; yet, the Congress implemented 18 U.S.C. § 922(x) specifically in relation to prohibited conduct of juveniles and defined "juvenile" in subsection 922(x)(5).[28] Cognizant of the Congress's apparent desire to exclude juvenile convictions, the court in *U.S. v. Davis* found that adjudications of delinquency under Virginia law do not trigger the prohibitions of 18 U.S.C. § 922(g)(1). 234 F. Supp. 2d 601, 605-06, fns. 2, 3 (E.D. Va. 2002) *aff'd sub nom*.

Furthermore, demonstrating the incompetency of one under the age of

---

[27] Accordingly, while Plaintiff Yox was only 15 at the time of his commitment, he contends that an individual, under the age of 21 at the time of his adjudication or commitment, is not subject to any prohibition under 18 U.S.C. § 922(g)(4).

[28] Nowhere within section 922(x) does it specify that a juvenile that has been adjudicated as a mental defective or who has been committed to a mental institution is prohibited.

18, the Congress mandated that in relation to a violation of Section 922(x), "the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings." 18 U.S.C. § 922(x)(6).

Federal law's treatment of juveniles as separate and distinct from adults is consistent with many state laws. For example, Texas has a separate statutory provision for the commitment of juveniles. V.T.C.A. § 55.57. Washington also utilizes a separate statutory code for juvenile commitment proceedings, R.C.W. § 71.34.010, *et seq.,* because the legislature found that "the large number of youth involved in the juvenile justice system with mental health challenges is of significant concern" and "[a]ccess to effective treatment is critical to the successful treatment of youth . . ." Act of March 6, 2013, ch. 179, 2013 Wa. Laws 1. While Iowa follows the same procedures for involuntarily committing both minors and adults, commitment proceedings for juveniles are conducted in juvenile court. Polk County (Iowa) Solicitor, Juvenile Bureau Website, "Mental Health and Substance Abuse Commitments."[29]

In addition to mental health commitments, many states treat juveniles differently than adults in other regards. Besides the obvious examples of federal age restrictions on activities such as voting, purchasing and using

---

[29] *Available at* https://www.polkcountyiowa.gov/attorney/juvenile/mental-health-and-substance-abuse-commitments (last visited January 7, 2016).

alcohol, and purchasing and consuming alcohol, most states recognize a distinct difference between juveniles and adults in many criminal matters. For example, in California, a minor must have his attorney's consent before he enters a no contest plea or a guilty plea. *See In re Alonzo J.*, No. S206720 (Cal. Ct. App. April 3, 2014), slip op. at 2.

Texas requires the sealing of any juvenile record indicating that the juvenile engaged in conduct "indicating a need for supervision." V.T.C.A. § 58.003(a). Washington goes a step further and provides that the records relating to mental health proceedings of minors "are confidential and available only to the minor, the minor's parents, and the minor's attorney." R.C.W. § 71.34.335. The court may only authorize release of documents where the "appropriate safeguards for strict confidentiality" are maintained. *Id*.

It is estimated that twenty percent (20%) of all youth in America will experience a mental health disorder.[30] This is very likely due to the stresses of adolescence and the natural inclination of parents and loved ones to seek help for their children, [31] rather than regret not having done so should the

---

[30] *See*, International Society of Psychiatric – Mental Health Nurses, "Meeting the Mental Health Needs of Youth in Juvenile Justice", *available at* http://www.ispn-psych.org/docs/JuvenileJustice.pdf.

[31] Indeed, many commitments are "the result of a parent's anxiety rather than the severity of the child's condition." American Psychiatric Association Comment to ATF Proposed

juvenile harm himself or someone else.[32]

Research into the causes of mental health disorders supports this contention. For example, Eric Silver and Brent Teasdale conclude that "stressful life events raise the risk of mental disorder." [33] Thus, rather than stressful life events causing those who are already mentally disabled to lash out violently, the stressful event *itself* causes the mental disorder.[34] Therefore, juveniles who are committed are not necessarily permanently mentally ill; they are just more prone to the stress of life in the transition from childhood to adulthood. Hence, they are more likely to suffer from a temporary mental disorder as a result of that stress than an adult in the same situation.

Not only are minors more prone to stressful situations, their neurological responses are markedly different than in a normal, functioning

---

Rule 51P ["APA Comment"], Docket No. 0182, at 3, *available at* http://www.regulations.gov/#!documentDetail;D=ATF-2014-0002-0182 (last visited January 7, 2016).

[32] *See,* Kathleen R. Skowyra and Joseph J. Cocozza, "Blueprint for Change: A Comprehensive Model for the Identification and Treatment of Youth with Mental Health Needs in Contact with the Juvenile Justice System," at vii, *available at* http://www.ncmhjj.com/wp-content/uploads/2013/12/Blueprint.pdf (last visited January 7, 2016).

[33] Silver and Teasdale, "Mental Disorder and Violence: An Examination of Stressful Life Events and Impaired Social Support," 52 Soc. Probs. 62, 63, 2005, *available at* http://www3.uakron.edu/publications/Social%20Problems.pdf (last visited January 8, 2016).

[34] *Id.,* at 63-64.

adult brain. *See* APA Comment, at 2. According to the APA Comment, "Adolescents behave differently because their brains are not fully developed and exhibit functional differences from mature, adult brains. Recent research has demonstrated that the brain continues to change and develop throughout the teen years and into early adulthood." *Id.* This is true even where the juvenile otherwise indicates a high level of intellect, as adolescents may exhibit earlier adult levels of intellectual capability, while the impulse control has not yet matured, or, more importantly, the *capacity* to "override impulses in emotionally charged situations that require decisions in the heat of the moment" has not yet matured alongside the intellectual capacity.[35]

Supporting the conclusions of Silver and Teasdale, the APA Comment reported that "adolescents are more likely to respond impulsively [to risk taking behavior], utilizing a more primitive part of their brain, and are more likely to act out in ways that may cause them to be involuntarily committed to a mental institution or deemed mentally defective." APA Comment, at 2. "[I]mportantly," however, "this is a temporary stage" and as a result, "the psychiatric issues [adolescents] experience are often transitory." *Id.* Thus,

---

[35] *See* National Disability Rights Network Comment to ATF Proposed Rule 51P, Docket No. 0181, at 2, *available at* http://www.regulations.gov/ - !documentDetail;D=ATF-2014-0002-0181 (last visited January 7, 2016).

[r]eporting is a fixed event that marks a person for life while the clinical and developmental realities for persons under 18 are, in fact, dynamic" and frequently, if not usually, change when the individual reaches adulthood. *Id.* The APA Comment concluded that a "policy that would designate a permanent status to an individual in this age group ignores this reality." *Id.*

Furthermore, minors who suffer from mental health conditions typically fare well after treatment, whether that treatment is voluntary or involuntary.[36] Treatment for juveniles can "not only restore young people to good health, but also prevent future harmful or criminal behavior." *Id.* "In fact, treatment in childhood for mental health issues may well increase the likelihood that an individual will reach adulthood without the kind of serious mental health issues that should be reportable to NICS." APA Comment, at 2. Reporting these childhood "defects" to NICS, then, creates a disconnect between an individual's capacity to recover from a mental health issue as a juvenile, which is often referred to as a "transitory" affliction resulting from the brain's developmental stage in adolescence, and the goal of NICS to create a database of individuals *currently* suffering from dangerous mental health issues. *Id*. Added to this high rate of successful treatment is the fact

---

[36] *See* California Department of Health Care Services, "Expanding Juvenile Mental Health Courts in the Children's System of Care," at 1 ["CDHCS"], *available at* http://www.dhcs.ca.gov/services/MH/Documents/ExpandingJuvenileMentalHealthCourts .pdf (last visited January 7, 2016).

that only approximately 3-5% of violence acts towards others can be attributed to those with mental health disorders, with only about 2-3% involving firearms.  APA Comment, at 2.

The parents' involvement in juvenile commitments is also concerning. Since many courts consider the parents to have only the best interests of the child involved, juveniles are not always appointed a guardian in an involuntary commitment situation (if there is any court proceeding at all). Given the potentially permanent ramifications of the commitment, due process demands that the juvenile have a full and fair opportunity to defend himself in court, because in many states, a juvenile can be involuntarily committed merely with the consent of the parents.[37] In Pennsylvania, for example, a juvenile may be committed to inpatient treatment *over his objections* by his parents' consent, so long as a physician examines him and recommended treatment.  Minor's Consent Act, 35 P.S. § 10101.1(b)(1). This is noticeably different than an involuntary for an adult, wherein the physician must determine that the adult is a danger to himself or others; under the Minor's Consent Act, the physician need only *recommend* treatment, rather than conclude that the juvenile is a danger to himself or

---

[37] Consortium for Citizens with Disabilities Comment to ATF Proposed Rule 51P ["CCDC Comment"], Docket No. 0193, at 6, *citing* to North Carolina and Idaho statutes, *available at* http://www.regulations.gov/#!documentDetail;D=ATF-2014-0002-0193 (last visited January 7, 2016).

others.  *Id.*  Furthermore, under Pennsylvania law, a minor may not abrogate his parents' consent to inpatient treatment.  35 P.S. § 10101.1(b)(4).

          2.      <u>Defendants have acknowledged in their rulemaking that juvenile commitments do not currently trigger a disability, pursuant to 18 U.S.C. § 922(g)(4)</u>

On January 7, 2014, ATF published a Notice of Proposed Rulemaking in the Federal Register at Volume 79, pages 774 through 777 ("ATF-51P"), to institute rulemaking with respect to an individual "adjudicated as mental defective" or "committed to a mental institution" pursuant to 18 U.S.C. § 922(g)(4).[38] In its proposed rulemaking, it declared:

> Furthermore, ATF has received inquiries as to whether commitments of persons under the age of 18 are qualifying commitments to a mental institution. ATF is considering clarifying whether the term "committed to a mental institution" includes a commitment that occurred when the person was under the age of 18. ATF seeks comments on this option and solicits recommendations for other approaches.

As such, ATF has acknowledged that it does not currently interpret 18 U.S.C. § 922(g)(4) as applying to juveniles; yet, Attorney White for ATF has stated that Plaintiff Yox is prohibited under federal law. Exhibit E, ¶ 17

In this matter, it is undisputed that Mr. Yox was involuntarily

---

[38] *Available at* http://www.regulations.gov/#!documentDetail;D=ATF-2014-0002-0001 (last visited January 7, 2016).

committed, as a juvenile, at the age of 15, and he is being federally prohibited from purchasing and possessing a firearm. *See*, Exhibit E, ¶¶ 2, 17. Accordingly, as Mr. Yox was a juvenile at the time of his involuntary commitment, neither section 922(g) nor 922(x) specify that a juvenile commitment is prohibiting, and ATF has acknowledged in ATF-51P that juvenile commitments are not currently prohibiting, Mr. Yox is entitled to judgment in his favor.

## VI.      CONCLUSION

For the reasons specified herein, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

Respectfully Submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Prince Law Offices, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505
610-845-3803 ext 81114
610-845-3903 (fax)
Joshua@PrinceLaw.com

Attorney for Plaintiffs

## Certificate of Compliance

I certify that the foregoing brief complies with the Court's Order of January 8, 2016, as the brief does not exceed 55 pages or 18,333 words as counted by the Microsoft Word program on which it was prepared.

_Joshua Prince_
Joshua Prince