## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL L. KEYES and | : | 1:15-cv-457 |
| JONATHAN K. YOX, | : | |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| LORETTA E. LYNCH, Attorney General | : | |
| of the United States, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### July 11, 2016

Presently pending before the Court are the parties' cross-motions for summary judgment. (Docs. 28, 33). For the reasons that follow, the Court shall grant in part and deny in part Defendants' motion and grant in part and deny in part Plaintiff's motion.

## I.     PROCEDURAL HISTORY

On March 5, 2015, Plaintiffs Michael L. Keyes, ("Mr. Keyes"), and Jonathan K. Yox, ("Mr. Yox"), filed a Complaint, alleging violations of their asserted Second Amendment right to keep and bear arms and Fifth Amendment equal protection and due process rights. (Doc. 1). Count I of the Complaint

1

contends that, as applied to Plaintiffs, 18 U.S.C. § 922(g)(4) violates the Second Amendment. Count II alleges that, as applied to Mr. Yox, § 922(g)(4) violates the Second Amendment because Mr. Yox was under the age of 18 when he was involuntarily committed. Count III alleges that § 922(g)(4) violates the Due Process Clause of the Fifth Amendment as applied to Plaintiffs. Lastly, Count IV alleges that § 922(g)(4) violates Plaintiffs' equal protection rights secured under the Fifth Amendment. Plaintiffs seek various forms of declaratory and injunctive relief.

Defendants filed a partial motion to dismiss on May 11, 2015. (Doc. 10). On November 9, 2015, the Court granted Defendants' motion. (Doc. 21). Counts I and IV were dismissed with prejudice with respect to Plaintiff Michael Keyes on the basis of issue preclusion, given that Mr. Keyes had previously litigated these same issues in a previous state court action. Mr. Keyes's claims alleged in Count III were dismissed without prejudice, and leave to amend was granted to the extent that there were facts, if true, which supported his due process claims. Additionally, Mr. Yox's equal protection claim alleged in Count IV was dismissed without

prejudice, and leave to amend was granted to the extent he possessed facts supporting this claim.[1]

On November 17, 2015, Plaintiffs filed an Amended Complaint. (Doc. 24). The Amended Complaint includes a new cause of action, contained in Count V, in which both Plaintiffs allege claims under the NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, 122 Stat. 2559, ("NIAA"). On December 1, 2015, Defendants filed their Answer.

Plaintiffs filed their motion for summary judgment on January 11, 2016. (Doc. 28). Defendants filed their motion for summary judgment on February 11, 2016. (Doc. 33). The motions have been fully briefed, (Docs. 29, 34, 43, 46), and thus are ripe for our review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162,

---

[1] Because Plaintiffs did not amend Count III as to Mr. Keyes, or Count IV as to Mr. Yox, these counts are deemed dismissed with prejudice pursuant to our November 2015 Memorandum & Order.

172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Layshock ex rel. Layshock v.*

*Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477

U.S. at 247-48) (internal quotation marks omitted).

## III.  FACTUAL SUMMARY

The following facts are not in dispute. Plaintiff Michael Keyes is a former

Master Trooper with the Pennsylvania State Police ("PSP"). (Doc. 37, Pl.

Amended SOF, ¶ 1). Plaintiff Jonathan Yox is a state correctional officer at the

State Correctional Institution at Graterford. (*Id.*, ¶ 22).[2]

Defendants are Loretta Lynch, in her capacity as Attorney General of the

United States, B. Todd Jones, in his capacity as Director of the Bureau of Alcohol,

Tobacco, Firearms, and Explosives, James B. Comey, in his capacity as Director of

the Federal Bureau of Investigation, and the United States of America.

---

[2]     Defendants object to the inclusion of many of the largely biographical facts offered by
Plaintiffs with regard to Mr. Keyes, on the grounds that at this stage of litigation, the only count
asserted by Mr. Keyes remaining in this lawsuit is Count V, to which they argue many of these
facts are not material. Defendants, however, do not dispute the veracity of these facts. (Doc. 36,
¶¶ 1-12, fn. 1).
        We agree with Defendants that many of the facts pertaining to Mr. Keyes are irrelevant to
our disposition of these motions. They will thus not be considered with regard to any Count to
which the facts are not material. However, we shall include in our summary some of these
biographical facts. Regardless of which specific counts remain, it is common in judicial opinions
to include some biographical facts about all plaintiffs in a lawsuit. Further, many of these
asserted facts do provide material background information for the basis of Mr. Keyes' claims
alleged in Count V.

Both Mr. Keyes and Mr. Yox were each once involuntarily committed for mental health concerns. Mr. Keyes was involuntarily committed as an adult at Holy Spirit Hospital in Cumberland County, Pennsylvania, on August 25, 2006, as a result of imbibing in alcoholic beverages and making suicidal statements as he was struggling through a divorce. (*Id.*, ¶ 1). He was released by September 8, 2006. (*Id.*).

Mr. Yox was involuntarily committed as a juvenile to the psychiatric inpatient unit of Philhaven, a mental and behavioral health care provider in Mount Gretna, Pennsylvania, on March 31, 2006. (Def. SOF, ¶ 1). At the time, he was 15 years old. (*Id.*, ¶ 3). He had been emotionally devastated by his parents' divorce and had begun cutting himself under the influence of an older girl. They also had made a suicide pact together. (Pl. Am. SOF, ¶ 13; Pl. Ex. E, ¶¶ 2-3).[3]

On the Application for Involuntary Emergency Examination & Treatment filled out with regard to Mr. Yox, ("Philhaven Application"), the person filling out the form[4] wrote that he or she believed Mr. Yox was severely mentally disabled. (Def. SOF, ¶ 5). Part I of the Philhaven Application contains the following paragraph:

---

[3] Mr. Yox's Declaration, (Ex. E), contains two paragraphs labeled "1." We have correctly renumbered his Declaration for purposes of referencing it in this Memorandum.

[4] The parties dispute the identity of the person(s) who filled out the Philhaven Application with regard to Mr. Yox. Regardless, the identity of this person is not material to our ultimate resolution of the instant matter.

> A person is severely mentally disabled when, as a result of mental illness, his/her capacity to exercise self-control, judgment and discretion in the conduct of his/her affairs and social relations or to care for his/her own personal needs is so lessened that he/she poses a clear and present danger of harm to others or to himself or herself.

(*Id.*, ¶ 6).

Mr. Yox's initial commitment, or period of treatment, was not to exceed 120 hours, as provided by state law. (Def. SOF, ¶¶ 11, 19). On or about April 3, 2006, Mr. Yox was admitted for extended involuntary emergency treatment under state law. (Def. SOF, ¶ 20). Mr. Yox was ultimately discharged on or about April 6, 2006. (Def. SOF, ¶ 36; Pl. SOF, ¶ 13).

Mr. Yox avers in his Declaration that at no point during his commitment or in the time leading up to it did he ever threaten to use a firearm against others or himself. (Ex. E, ¶ 4). Defendants contest this. They point to the Philhaven Application, on which someone has written "Told his friend Rachel of +SI last Thursday, stating that he and a classmate from Manito will shoot each other . . . He said he had a time and place arranged for the suicide/homicide, and that he does own a gun." (Doc. 36, ¶ 14; Doc. 34, Ex. 1). Mr. Yox has no recollection of making these statements involving a firearm, and further believes that these statements constitute hearsay. (Doc. 43-3).

In 2008, when he was 17, Mr. Yox enlisted in the U.S. Army.[5] He served

until 2012, when he received an honorable discharge. (Pl. Ex. E, ¶ 6; Ex. F).

During his military service, Mr. Yox was trained to use, and did use, various kinds

of firearms, including fully automatic rifles, machine guns, explosives, and

grenade launchers. (Pl. Ex. E, ¶ 7). Upon his return from active duty in

Afghanistan, Mr. Yox was not recommended for further psychological evaluation

after his deployment briefing. (*Id.*, ¶ 8).

Mr. Yox has never again been involuntarily committed since the one time he

was committed as a juvenile. (*Id.*, ¶ 14). Yox also avers that he has never been

convicted of any felony or any misdemeanor crime of domestic violence, has never

been convicted of a crime punishable by more than a year, is not an unlawful user

of or addicted to any controlled substance, has never been adjudicated as a mental

defective, and has never been discharged from the armed forces under

dishonorable conditions. (*Id.*, ¶ 29).

As a result of their involuntary commitments, Plaintiffs lost their private

capacity firearm rights by operation of 18 Pa.C.S.A. § 6105(c)(4) and 18 U.S.C. §

922(g)(4). The Pennsylvania statute prohibits a "person who has been adjudicated

---

[5] Defendants dispute the materiality of the facts regarding Mr. Yox's military service and his current job as a state correctional officer. As will be elaborated upon at a later point in our Memorandum, the Court finds these facts highly material in assessing Mr. Yox's as-applied Second Amendment claim.

8

as an incompetent or who has been involuntarily committed to a mental institution for inpatient care and treatment . . ." from possessing or using a firearm. 18 Pa.C.S.A. § 6105(c)(4). The federal statute, 18 U.S.C. § 922(g)(4), prohibits any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing firearms or ammunition.

Notwithstanding his inability to possess firearms in his private capacity, Mr. Yox carries and uses firearms in his current job. Mr. Yox actively possesses and uses a firearm in his official capacity as a state correctional officer. (Pl. Ex. E, ¶ 13). He is permitted to possess firearms in his official capacity as a law enforcement officer by operation of 18 U.S.C. § 925(a)(1), which provides an exception to the firearms disability created by § 922(g)(4) for individuals benefitting in their official capacities the federal or state government.

On December 3, 2008, Mr. Keyes filed for Restoration of his State Firearm Rights with the Perry County Court of Common Pleas, pursuant to 18 Pa.C.S.A. § 6105(f). (Am. SOF, Doc. 37, ¶ 4). The state court judge issued an order relieving Mr. Keyes only of his state firearm disability, finding that "Petitioner has in fact met his burden of showing that he may possess a firearm without risk to himself or any other person under the applicable provisions of law." (*Id.*, ¶ 4; Exs. C, D).

On August 14, 2013, after an evaluation by a psychologist, Mr. Yox filed a Petition to Vacate and Expunge his Involuntary Commitment with the Lancaster County Court of Common Pleas. (Doc. 27, ¶ 19). The court found it was prohibited under state law from granting the relief of expungement. However, the court did grant Mr. Yox state relief from any disability imposed pursuant to 18 Pa.C.S.A. § 6105, based on a finding that Mr. Yox "no longer suffers from the mental health condition that was the basis for his commitments" and is able to "safely possess a firearm without risk to himself or any other person." (*Id.*, ¶¶ 20-21).

Upon receipt and review of this state court order, Defendant Bureau of Alcohol, Tobacco, and Firearms and Explosives', ("ATF"), Philadelphia Division Counsel Kevin White confirmed that it was ATF's position and policy that Mr. Yox remains prohibited under federal law from purchasing, possessing, or utilizing firearms in his private capacity, but that he could continue to possess and utilize firearms in his official capacity as a state correctional officer. (*Id.*, ¶ 25). Mr. White also confirmed that there is currently no mechanism available in Pennsylvania or under federal law for him to obtain relief from his federal disability, as a result of his involuntary commitment. (*Id.*).

Both Mr. Keyes and Mr. Yox presently intend to purchase and possess firearms in their private capacities for self-defense of themselves and their families

within their respective homes. (*Id.*, ¶¶ 11, 28). However, they are prevented from doing so only by Defendants' active enforcement of the laws and policies complained of in the matter *sub judice*. Mr. Keyes and Mr. Yox are unwilling to purchase, possess, or utilize a firearm in their private capacities because they fear arrest, prosecution, fine, and/or incarceration for violating 18 U.S.C. § 922(g)(4). (*Id.*, ¶¶ 7, 27).

## IV.   DISCUSSION

In Count I of the Amended Complaint, Mr. Yox[6] seeks a declaration that, as applied to him, 18 U.S.C. § 922(g)(4) violates the Second Amendment to the United States Constitution and requests injunctive relief barring Defendants from enforcing § 922(g)(4) against him. In Count II, Mr. Yox seeks a declaration that juvenile commitments such as his are not included within the statutory phrase "committed to a mental institution" in § 922(g)(4), and thus § 922(g)(4)'s firearms disability does not apply to him.[7] He relatedly seeks to bar Defendants from enforcing § 922(g)(4) in relation to any juvenile involuntary commitment. Count III alleges a due process claim, in which Mr. Yox contends that he should have

---

[6] Even though the Court has dismissed Counts I and III with regard to Mr. Keyes, Mr. Keyes asks this Court to reconsider, *sua sponte*, these claims. We decline to do so, based on the law of the case doctrine and out of fairness to Defendants. Defendants have not had the opportunity to offer evidence or argument with regard to those claims, based on their deference to our dismissal of those claims.

[7] As Defendants note, Plaintiffs' Amended Complaint characterizes Count II as asserting a Second Amendment claim, but it is actually a claim based on a question of statutory interpretation.

been afforded notice and an opportunity to be heard prior to the deprivation of his

right to possess a firearm and/or through a post-deprivation proceeding to seek

review and relief from the firearms disability.[8] However, Mr. Yox does not seek

summary judgment on this Count, for reasons elaborated upon at a later juncture in

our Memorandum. In Count V, both Plaintiffs allege that under the NIAA,

Congress provided an alternative route for relief from a federal prohibition on

acquiring a firearm in which states may implement programs by which individuals

may apply for such relief. Plaintiffs contend that Pennsylvania's program meets the

criteria of NIAA, and that they have successfully applied for relief under this

program and thus their commitments should be deemed to not have occurred for

purposes of § 922(g)(4). Plaintiffs also argue that pursuant to § 101(c)(1) of the

NIAA, all federal departments and agencies, including ATF and FBI, are

prohibited from including Plaintiffs' commitments in the National Instant Criminal

Background Check System, ("NICS"), database. Plaintiffs seek declaratory and

injunctive relief based on their claims in Count V, as well.

   We shall begin with Plaintiffs' claims alleged in Count V and Mr. Yox's

claim alleged in Count II, because the parties agree that if Plaintiffs succeed with

---

[8] The Amended Complaint also continues to allege a due process claim based on the argument
that Pennsylvania's Mental Health and Procedure Act violates *Addington v. Texas*, 441 U.S. 418
(1979). The Court already dismissed this claim with respect to Mr. Keyes, pursuant to
Defendants' partial motion to dismiss. Because the same logic applies to Mr. Yox's claim, Mr.
Yox has abandoned this claim at this stage of proceedings. (Doc. 43, p. 24).

these statutory claims, the Court should not reach the constitutional claims, based on the doctrine of constitutional avoidance. S*ee New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 299 F.3d 235, 248 (3d Cir. 2002) (Alito, J., concurring in judgment) ("It is well established that, when possible, federal courts should generally base their decisions on non-constitutional rather than constitutional grounds.").

### A.    Plaintiffs' Claims Pursuant to the NIAA

As aforementioned, Plaintiffs claim that the relief they obtained from the state courts relieved them of any federal firearms disability, pursuant to § 101 and § 105 of the NIAA.

As an initial matter, Defendants question whether Plaintiffs have the ability to sue under the NIAA, which they note contains no private right of action. However, as Defendants candidly note, the Administrative Procedure Act, ("APA"), 5 U.S.C. § 551 *et seq.*, generally authorizes review of agency action "unlawfully withheld" or "otherwise not in accordance with law." *Id.* at §§ 706(1) & 2(A). Plaintiffs note that ATF has approved multiple other states' relief programs that they contend are almost identical to Pennsylvania's program. Further and as aforestated, it is ATF's position that Plaintiffs remain prohibited from purchasing or possessing firearms in their private capacities even though state

courts have found them to no longer be a danger to themselves or others, and that there is currently no mechanism under Pennsylvania or federal law for them to obtain relief from their federal firearms disabilities. Thus, Plaintiffs essentially contend that Defendants have not acted in accordance with the law by their failure to approve Pennsylvania's relief program and by maintaining the position that Plaintiffs have no mechanism to obtain relief from their firearms disabilities under Pennsylvania or federal law.[9] Accordingly, and in light of the fact Defendants appear to concede that the Court has authority to review these claims under the APA, we shall construe Plaintiffs' claims regarding the NIAA as being brought pursuant to the APA.

### 1.    Section 105(a)

Under the NIAA, "the Attorney General shall make grants to States" to improve the information they make available to the federal firearms background-check system, NICS. *Id.* at § 103. Section 103 also mandates that in order for a state to receive a grant under this statute, "a State shall certify, to the satisfaction of the Attorney General, that the State has implemented a relief from disabilities program" that is in compliance with § 105 of the statute. *Id.* at § 103(c).

---

[9] We acknowledge that Plaintiffs also argue that the NIAA does not *require* ATF's "approval" of a state's relief program. Defendants in fact agree that the NIAA does not have such a requirement. Defendants' position, as will be discussed in the next section of this Memorandum, is that even though the NIAA does not require such approval, it does require compliance with § 105 of the statute before a state's program may be deemed "implemented."

Section 105 of the NIAA provides that a disabilities relief program is considered "implemented" by a state if the program: allows a person who has been prohibited from owning firearms pursuant to § 922(g)(4) to apply to the state for relief from such disqualification; provides that a state court or other lawful authority "shall grant the relief . . . if the circumstances regarding the disabilities . . . and the person's record and reputation, are such that the person will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest"; and permits a person whose relief application is denied to "file a petition with the State court of appropriate jurisdiction for a de novo judicial review of the denial."  Section 105 further provides that if relief is granted to a person under such a state relief program, the adjudication or commitment in question is "deemed not to have occurred" for purposes of § 922(g)(4).

Plaintiffs and Defendants agree that the NIAA does not require approval by federal authorities such as ATF for a state's disability relief program to be considered "implemented" under § 105(a) of the statute. (Doc. 29, p. 15; Doc. 34, p. 49). The parties instead dispute whether Pennsylvania's relief program, codified at 18 Pa.C.S.A. § 6105(f)(1), meets all of § 105's requirements in order for the state's program to be considered "implemented" under the NIAA.

18 Pa.C.S.A. § 6105(f)(1) provides:

> Upon application to the court of common pleas under this subsection
> by an applicant subject to the prohibitions under subsection (c)(4), the
> court may grant such relief as it deems appropriate if the court
> determines that the applicant may possess a firearm without risk to the
> applicant or any other person.

Defendants argue that Pennsylvania's relief program fails to satisfy all of the specified criteria under § 105(a); namely, that the state relief program fails to require the reviewing court to make a determination that "the granting of relief would not be contrary to the public interest." *Id.* at § 105(a)(2). Plaintiffs do not respond to Defendants' interpretation of the Pennsylvania statute and its apparent failure to comply with all of the considerations outlined in § 105, other than to argue that the ATF has approved other state relief programs with similar language. Specifically, Plaintiffs point to Wisconsin and Oregon's relief programs, which have been approved by ATF and have similar statutory language, according to Plaintiffs.

We agree with Defendants that the Pennsylvania relief program as codified fails to satisfy the requirements for a state program to be considered "implemented" under §105. Section 105 specifically requires an independent determination by a reviewing court that the granting of relief from a firearms disability would not be contrary to the public interest. Were we to find that

Pennsylvania's relief program should be considered in compliance with § 105, we would in effect read the public interest requirement out of the statute, despite its clear language requiring such a determination. We do not believe Congress intended for this language to be superfluous and thus will not construe § 105 to render it as such.

Given our determination that Pennsylvania's program fails to meet the detailed requirements set out under § 105(a), and Plaintiffs' own argument that ATF's approval of a state program is "immaterial" to the question of whether the program satisfies the NIAA, we find it likely unnecessary to consider ATF's approval of other states' disabilities relief programs. Regardless, we find that both Oregon and Wisconsin's programs meet the criteria established in § 105(a), in particular the requirement of a separate finding that relief would not be contrary to the public interest. Oregon law specifically reads: "The sole issue at any Gun Relief hearing shall be whether the petitioner has demonstrated that he or she will not be likely to act in a manner that is dangerous to public safety and that granting the relief would not be contrary to the public interest." Or. Admin. R. 859-300-0090(1). The Wisconsin program also closely mirrors § 105(a), requiring a reviewing court to determine both that the "individual is not likely to act in a

manner dangerous to public safety" and that a grant of the petition "would not be contrary to the public interest." Wis. Stat. Ann. § 54.10(3)(f)(2).[10]

Given the sensitive and controversial nature of a program granting individuals relief from federal firearms disabilities, Congress outlined very specifically what is required of such state programs in §105(a). All Pennsylvania must do to comply with § 105(a) is to simply mirror those statutory criteria, as many other states have successfully done.[11] It has not yet done so.

## 2.    Section 101(c)(1)

Plaintiffs argue that under § 101(c)(1) of the NIAA, all federal departments and agencies, including ATF and FBI, are prohibited from including Plaintiffs' commitments in the NICS database, because Pennsylvania judges have found that they no longer suffer from the mental health condition that provided the basis for their commitments and  because they have been "rehabilitated through any

---

[10] Defendants additionally argue that the Pennsylvania relief program is inadequate under § 105 because it fails to take into account the specific "factors" listed in the statute for a court to consider when determining whether a person is likely to act in a manner dangerous to public safety and whether relief is in the public interest; namely, the "circumstances regarding the [applicant's] disabilities," and the person's "record and reputation." We are again inclined to agree with Defendant's interpretation of § 105(a); however, given that we have already determined that the Pennsylvania program does not meet the requirements of § 105(a), we need not elaborate further.

[11] Plaintiffs also argue that even if the Pennsylvania program on its face fails to satisfy the criteria under the NIAA, they should still succeed on their claims because the record demonstrates that in their specific cases, all criteria were met. We disagree. Section 105(a) clearly sets forth the requirements for state relief programs—it does not set out requirements for individual applicants to meet on a case by case basis. As Defendants note, there is simply no support in the statutory text of § 105(a) for Plaintiffs' theory that a state program can be considered "implemented" as to some applicants but not as to others.

procedure available under law." (Doc. 29, Pl. Br., pp. 17, 25) (quoting § 101(c)(1)).

Section 101(c)(1) reads in relevant part:

> (1) IN GENERAL.—No department or agency of the Federal Government may provide to the Attorney General any record of an adjudication related to the mental health of a person or any commitment of a person to a mental institution if—
> (A) the adjudication or commitment, respectively, has been set aside or expunged, or the person has otherwise been fully released or discharged from all mandatory treatment, supervision, or monitoring;
> (B) the person has been found by a court, board, commission, or other lawful authority to no longer suffer from the mental health condition that was the basis of the adjudication or commitment, respectively, or has otherwise been found to be rehabilitated through any procedure available under law. . . .

*Id.* at §§ 101(c)(1)(A) & (B).

Defendants contend that § 101(c)(1) does not apply in the instant matter because "no department or agency of the Federal Government" has "provide[d] to the Attorney General any record of an adjudication related to the mental health of a person or any commitment of a person to a mental institution," quoting the statute. Defendants state that in fact it is Pennsylvania that has retained Plaintiffs' mental health records.

We perceive no evidence that the ATF or FBI has provided mental health records of Plaintiffs to the Attorney General. Defendants have provided the Court with evidence that the NICS does not in fact maintain a database of these types of

medical records. (Doc. 45, Ex. 1). According to the Bureau of Justice Statistics'
webpage on the NIAA, when a record on a person subject to a firearm disability is
entered in the NICS Index, "the entry contains only a name, other biographic
identifiers, like date of birth, and codes for the submitting entity and prohibited
category." *(Id.).* Plaintiffs have not provided any evidence to the contrary.

Moreover, as Defendants further argue, § 101(c)(1) is simply inapplicable to
the instant matter because this statute subsection applies only to situations where a
federal agency or department was the entity that conducted the adjudication or
commitment. Reading § 101(c) as a whole, it is clear that this section of the NIAA
refers to commitments and adjudications by federal agencies and departments,
rather than by state courts or other state entities. *See* NIAA § 101(c)(2)(A)
(mandating that "each department or agency of the United States that . . . imposes
any commitment to a mental institution" shall establish a firearms disability relief
program); *id.* § 101(c)(3) (imposing a requirement that any "Federal department or
agency" that conducts a mental health proceeding must provide notice to the
individual at the commencement of the process). Where the NIAA applies to
states, it explicitly states as much.

Accordingly, having found Plaintiffs' claims regarding the NIAA to be
without merit, we shall enter judgment on Count V in favor of Defendants.

Case 1:15-cv-00457-JEJ   Document 48   Filed 07/11/16   Page 21 of 47


**B.      Mr. Yox's Claim that § 922(g)(4) does not apply to Juvenile Commitments**

As aforementioned, § 922(g)(4) reads, "[i]t shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution" to possess firearms.

We shall begin our analysis of Mr. Yox's argument, as we must, with the statutory text. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). Mr. Yox argues that the statutory phrase "committed to a mental institution" does not include commitments of persons under the age of 18. However, as Defendants note, a plain reading of the statute does not evince any differentiation on the basis of age. The statute appears to broadly prohibit "*any person*" who has ever been committed to a mental institution from possessing firearms. Further, Congress clearly defined the statutory term "person" as used in § 922 to mean "any individual."[12] 18 U.S.C. § 921(a)(1). There is simply no textual basis for Mr. Yox's position that this statute subsection does not include juvenile commitments.

---

[12] Section 921(a)(1) also defines the term "person" to include any "corporation, company, association, firm, partnership, society, or joint stock company," but none of those other definitions of the term are relevant to the instant matter.

Mr. Yox contends that to the extent Congress intended to regulate the conduct of juveniles under § 922, it explicitly did so only under § 922(x). Section 922 (x)(1) provides that it is unlawful for any person to sell a handgun or handgun ammunition to a person the seller knows to be a juvenile or has reasonable cause to believe is one. Section 922(x)(2) states that it is "unlawful for any person who is a juvenile to knowingly possess" a handgun or handgun ammunition. This subsection also contains additional provisions regulating the exceptions where a juvenile may possess a handgun, such as where the juvenile possesses a handgun in the course of employment, or as a member of the military, or with the prior written consent of the juvenile's parent or guardian. *Id.* at § 922(x)(3). However, we do not find our reading of § 922(g)(4) and § 922(x) to be at odds with one another; they can coexist as part of a logical statutory scheme. With § 922(x), Congress intended to regulate the possession of firearms by persons who are currently under the age of 18. Under § 922(g)(4), Congress intended to prohibit persons who had ever at some point been committed to a mental institution, even if the person no longer was currently committed. This can include a commitment when a person was under the age of 18, even though the person is now an adult. In other words, § 922(x) applies to a person while he or she has the status of a juvenile, but this status is temporary—one ages out of such status. Section 922(g)(4), however, is not a

prohibition a person can age out of. Once a person "*has been* adjudicated as a mental defective" or "*has been* committed to a mental institution," the prohibition applies for the rest of one's life.[13]

Mr. Yox additionally argues that Defendant ATF has in effect acknowledged that it does not currently interpret § 922(g)(4) as applying to juvenile commitments. Mr. Yox cites the following quotation from the proposed rulemaking issued by ATF:

> Furthermore, ATF has received inquiries as to whether commitments of persons under the age of 18 are qualifying commitments to a mental institution. ATF is considering clarifying whether the term "committed to a mental institution" includes a commitment that occurred when the person was under the age of 18. ATF seeks comments on this option and solicits recommendations for other approaches.[14]

---

[13] Yox also references an unenacted Congressional bill for the proposition that § 922(g)(4) was not intended by Congress to include juvenile commitments. He specifically cites a 1999 bill that would have added a new subsection to § 922 that would have prohibited persons who committed an act of "violent juvenile delinquency" from possessing firearms. Plaintiff's theory is that if juveniles had already been considered in the § 922(g) statutory scheme, this provision would have been duplicative, as the juvenile would already be prohibited under § 922(g)(1). Plaintiff confuses the issue. As Defendants note, that proposed subsection appears to have related to § 922(g)(1), insofar as it concerned whether a juvenile offense should be characterized as a "conviction" of a "crime," given that states treat juvenile offenses in different ways. *See United States v. Mendez*, 765 F.3d 950, 952 (9th Cir. 2014) ("Congress . . . chose not to provide a uniform answer, as a matter of federal law, to the question whether a juvenile offense constitutes a 'conviction' of a 'crime.' We must look instead to state law to determine whether [defendant's] 2007 juvenile adjudication may serve as the predicate for his prosecution under § 922(g)(1)." Further, a possible firearms prohibition based on violent juvenile delinquency is clearly animated by Congressional concern with criminal behavior, which is not the same concern evinced by the prohibition in § 922(g)(4) based on serious mental health issues. Regardless, this Court puts little weight on an unenacted bill when interpreting the text of a federal statute.

[14] ATF Notice of Proposed Rulemaking, 79 Fed. Reg. 774, 775 (Jan. 7, 2014).

As is clearly evident from this quotation, it simply does not stand for what Mr. Yox claims it represents. Far from being a clear statement that ATF does not interpret § 922(g)(4) to include juvenile commitments, it simply states that ATF has "received inquiries" about this issue and is considering "clarifying," one way or the other, whether the term "committed to a mental institution" includes a commitment while a person was a juvenile. Thus, Mr. Yox's argument on this ground is unavailing.

Mr. Yox also makes what appear to be policy arguments as to why we should not read § 922(g)(4) to apply to commitments while a person was a juvenile. For example, Mr. Yox points to the various ways in which states treat juveniles differently from adults, particularly when it comes to criminal matters. Mr. Yox also highlights statistics showing that 20% of all youth in America will experience a mental health disorder, largely as a result of the particular stresses of youth, and that many of these mental disorders are temporary. Mr. Yox additionally cites evidence that juveniles who suffer from mental health conditions typically fare well after treatment and can be fully recovered in adulthood. While this Court is sympathetic to these policy arguments, they do not provide grounds for us to overwrite the clear intent of Congress as expressed in the statutory text of § 922(g)(4).[15]

---

[15] Mr. Yox also cites to the rule of lenity at the beginning of his brief, but does not argue how it applies to the instant matter. Assuming he is asking the Court to apply it to § 922(g)(4) based on

Accordingly, we reject Mr. Yox's argument that § 922(g)(4) does not apply to him due to the fact he was under 18 when he was committed. Thus, we shall enter judgment on Count II of the Amended Complaint in favor of Defendants.

## C.    Mr. Yox's Second Amendment Constitutional Claim

Given our findings that Plaintiffs cannot obtain the relief they seek on non-constitutional grounds, we must proceed to the remaining constitutional claims. As aforementioned, Mr. Yox argues that, as applied to him, 18 U.S.C. § 922(g)(4)'s firearms prohibition violates his Second Amendment right to bear arms, because the prohibition is based on an isolated mental health commitment while he was a juvenile and because he has been permitted under the law to possess and use firearms while he served in the military and in other law enforcement capacities. Mr. Yox also points to the fact that a Pennsylvania court has found him to be competent to possess and use firearms without threat to himself or others.

---

his argument that the statute is silent as to whether it encompasses juvenile commitments, we decline to apply the rule of lenity in this way. This is because the rule of lenity only "applies in those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *United States v. Kouevi*, 698 F.3d 126, 138 (3d Cir. 2012) (quoting *United States v. Doe*, 564 F.3d 305, 315 (3d Cir. 2009)). Further, the Third Circuit has emphasized that the rule only applies where there is a "*grievous* ambiguity." *Id.* (emphasis added). There is simply no clear ambiguity, much less a grievous one, in the text of § 922(g)(4), which can be reasonably interpreted as intended by Congress to apply to all commitments.

### 1.      Applicable Framework for an As-Applied Second Amendment Challenge

The parties first dispute what the appropriate legal framework is to analyze Mr. Yox's as-applied Second Amendment challenge. Defendants argue their position under the two-prong framework established by the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *cert. denied*, 131 S.Ct. 958, 178 L.Ed.2d 790 (U.S. 2011). In analyzing a Second Amendment challenge by applying *Marzzarella*, a court under the first prong examines "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." 614 F.3d at 89. "If it does not, our inquiry is complete," and there is no Second Amendment violation. *Id.* However, if the law does burden such conduct, a court must "evaluate the law under some form of means-end scrutiny." *Id.* "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

Defendants argue under this framework that, as applied to Mr. Yox, § 922(g)(4) affects conduct that falls outside the scope of the Second Amendment's protection and thus his claim should fail at the first prong. Further, Defendants state that even if this Court were to find that Mr. Yox's as-applied challenge passes the first prong, that § 922(g)(4) nonetheless survives any level of means-end

scrutiny. Defendants' position is that if any scrutiny need be applied, it is intermediate.

In contrast, Mr. Yox argues that *Marzarrella* does not provide the appropriate standard for a Second Amendment as-applied challenge, insofar as he believes Supreme Court precedent—specifically, *District of Columbia v. Heller*, 554 U.S. 570 (2008)—suggests that courts should not apply means-end scrutiny to as-applied Second Amendment challenges. If the Court does use the *Marzzarella* framework, though, then Mr. Yox argues that strict scrutiny is the appropriate level to be applied. However, Mr. Yox cites to another Third Circuit precedential case, *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011), which he believes provides the binding framework for assessing such challenges. In *Barton*, a case concerning an as-applied challenge to 18 U.S.C. § 922(g)(1), the felon gun dispossession statute, the Third Circuit stated that

> [t]o raise a successful as-applied challenge, [the challenger] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections. For instance, a felon convicted of a minor, non-violent crime might show that he is no more dangerous than a typical law-abiding citizen. Similarly, a court might find that a felon whose crime of conviction is decades-old poses no continuing threat to society.

633 F.3d at 174.

The Third Circuit applied this framework to find that the plaintiff in that case had failed to present the required distinguishing "facts about himself" to succeed on his as-applied challenge.

Admittedly, the appropriate framework to apply to Mr. Yox's Second Amendment claim is not pellucid. However, we find other district courts' recent comprehensive discussions of this issue with regard to as-applied Second Amendment challenges to be instructive. *Binderup v. Holder*, Civ. A. No. 13-cv-6750, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014); *Suarez v. Holder*, No. 1:14-cv-968, 2015 WL 685889, at *7 (M.D. Pa. Feb. 18, 2015).

In *Binderup*, the court found that *Barton* "supplies the controlling framework." 2014 WL 4764424, at *13. Specifically, the court found the *Barton* framework to apply to an as-applied challenge to 18 U.S.C. § 922(g)(1), but its rationale is just as compelling to the instant case concerning an as-applied challenge to § 922(g)(4). There, the court noted that the Supreme Court in its *Heller* decision found that the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" were "presumptively lawful." *Binderup*, 2014 WL 4764424, at *14 (quoting *Heller*, 554 U.S. at 626-627 n.26). As the court in *Binderup* noted, the Third Circuit in *Barton* reasoned that by describing laws regulating or prohibiting the possession of firearms by felons and the mentally ill

as only presumptively lawful, "the Supreme Court clearly implied that the presumption could be rebutted." 2014 WL 4764424, at *17. Consequently, *Barton* found that it is possible that a felon could successfully pursue an as-applied challenge to a felon gun dispossession statute. 633 F.3d at 173.

We see no reason that the same logic would not apply to the ability of a person who had previously been committed for mental health reasons to assert an as-applied challenge to § 922(g)(4)—a law prohibiting his or her ability to possess a firearm based on that commitment. The Supreme Court spoke of the "longstanding prohibition[]" on the possession of firearms by the mentally ill in tandem with the parallel prohibition on felons, and stated that laws concerning both categories of people were only "presumptively lawful." We also note that Defendants do not challenge that Mr. Yox falls into this category of "mentally ill" persons; indeed, most of their arguments are premised on the fact that he falls in this category of persons historically barred from Second Amendment protection.

Although the Third Circuit found that a person in a prohibited category could pursue an as-applied challenge, the circuit court also noted that "*Heller* does not catalogue the facts [the court] must consider when reviewing a felon's as-applied challenge."  Given this lack of Supreme Court guidance, the Third Circuit in *Barton* concluded that "to evaluate [Mr.] Barton's as-applied challenge, [it

would] look to the historical pedigree of 18 U.S.C. § 922(g) to determine whether the traditional justifications underlying the statute support a finding of permanent disability in this case." 633 F.3d at 173. The Third Circuit then went on to provide the aforementioned framework to the facts of the case before it.

In *Suarez*, the district court also ultimately applied the *Barton* framework to an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1), although it framed its analysis slightly differently. There, the court stated that *Marzzarella* provided the governing framework for Second Amendment challenges as a general matter, and that some sort of means-end scrutiny would in theory be appropriate. *Suarez*, 2015 WL 685889, at *7. It found *Barton* to only "speak[] to" the first prong of *Marzzarella* in as-applied challenges. *Id.* However, the court continued:

> if a challenger satisfies *Barton* by demonstrating that he is outside the scope of § 922(g)(1), and thereby shows he is a law-abiding citizen who falls within the core of the Second Amendment's protection, any means-end scrutiny would be fatal in fact. *See Heller*, 554 U.S. at 628 ("Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home ... firearm[s] ... to keep and use for protection of one's home and family would fail constitutional muster."). As a practical matter, therefore, an analysis of the second prong of *Marzzarella* is futile.

*Id.* at *7.

Therefore, the *Suarez* court held that the analysis of an as-applied Second Amendment challenge "begins and ends with *Barton*." *Id.*

30

Also and as noted in *Binderup* and *Suarez*, in a recent non-precedential opinion, the Third Circuit appeared to affirm the application of *Barton* to as-applied Second Amendment challenges. *Dutton v. Pennsylvania*, 503 F. App'x 125, 127 n.1 (3d Cir.2012) (briefly analyzing possible as-applied Second Amendment challenge to § 922(g)(1) under *Barton*).

We agree with the courts' analyses in *Binderup* and *Suarez* that *Barton* provides the appropriate framework to review an as-applied Second Amendment challenge, regardless of whether *Marzzarella* "theoretically" still applies with a phantom means-end prong. As the court in *Suarez* notes, the two precedents can be read harmoniously. 2015 WL 685889, at *6. *Marzzarella* seems to be a more appropriate framework for reviewing facial challenges under the Second Amendment, whereas *Barton* clearly and specifically concerns as-applied challenges. We also agree with the court in *Binderup* that there is a clear burden-shifting in *Barton* to the plaintiff challenging a firearms law as applied to him or her, but in *Marzzarella*, the burden is on the party seeking to uphold the law, as is consistent with means-end scrutiny analysis. *See Binderup*, 2014 WL 4764424, at *21.

In light of the foregoing, we shall analyze Mr. Yox's as-applied challenge under the *Barton* framework.

## 2.    Analysis of Mr. Yox's As-Applied Challenge

To reiterate, *Heller* does not make clear the facts a court must consider in reviewing an individual's as-applied challenge to a "presumptively" lawful statute regulating firearm possession by the "mentally ill"; here, a statute prohibiting firearm possession by persons adjudicated mentally ill or by persons who have been committed at some point in their lives to a mental institution. *See Barton*, 633 F.3d at 173. The Supreme Court decided that it was not yet necessary to clarify the full scope of the Second Amendment's reach, finding that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635. Consequently, *Barton* advises, as discussed, that a court must "look to the historical pedigree of 18 U.S.C. § 922(g) to determine whether the traditional justifications underlying the statute support a finding of permanent disability in this case." *Barton*, 633 F.3d at 173.

Therefore, we shall begin our analysis by looking to the historical pedigree of § 922(g)(4), to determine whether the "traditional justifications" underlying the federal prohibition on firearms possession by those who have ever been committed to a mental institution support a finding of "permanent disability" in the instant matter.

Mr. Yox argues that there is no historical evidence of a common law right to bear arms that excluded from its scope individuals who had once been committed to a mental institution, much less individuals who do not exhibit any presently-existing mental illness. Mr. Yox cites to a very pertinent law review article on the topic, in which Professor Carlton Larson comprehensively examines the historical underpinnings of what he refers to as the "*Heller* exceptions" to the Second Amendment right to bear arms, including the exceptions for felons and the mentally ill. Carlton F.W. Larson, *Four Exceptions In Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1376 (2009). With regard to the exception for the mentally ill, Professor Larson writes, "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." *Id.* He finds that these types of laws do not begin to appear until the twentieth century. He specifically cites the Uniform Fire Arms Act of 1930, which prohibited delivery of a pistol to any individual of "unsound mind." *Id.* at 1377. However, and as Defendants also note, one could make the argument that such laws were unnecessary in eighteenth-century America because judicial officials were authorized to " 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *Id.*(internal citation omitted). If eighteenth century America viewed it as

a permissible infringement on liberty to "lock up" individuals of unsound mind, then a lesser intrusion on liberty such as a prohibition on firearm possession would seem to have been permissible, as well. *Id.* Professor Larson ends his examination of the topic by concluding that "the strongest originalist argument for the exception for the mentally ill rests on the traditional ability of justices of the peace to confine individuals with dangerous mental impairments. Specific eighteenth-century laws disarming the mentally ill, however, simply do not exist." *Id.* at 1378.

Indeed, it was not until 1968 that Congress prohibited firearm possession by those who had been committed to a mental institution or adjudicated mentally ill. *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (citing Pub.L. 90-618, 82 Stat. 1213, 1220). However, *Yancey* also noted Professor Larson's theory that this "absence of historical statutory prohibitions" could have been due to the fact that eighteenth century judicial officials could confine individuals suffering from mental impairments that made them dangerous. *Id.*

With regard to justifications for modern firearm dispossession laws in general, multiple circuit courts have noted that 18 U.S.C. § 922(g) was intended "to keep firearms out of the hands of presumptively 'risky people." *Barton*, 633 F.3d at 173 (internal citation omitted); *accord Yancey*, 621 F.3d at 683 (internal citations omitted).

The thrust of Defendants' argument with regard to the past justifications of a prohibition on firearm possession by the mentally ill is that there is historical documentation of disarmament of persons "perceived to be dangerous," which they contend includes as a subset the mentally ill. Defendants are correct, in that the "highly influential" Pennsylvania, Massachusetts, and New Hampshire ratifying conventions show that "the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses." *Barton*, 633 F.3d at 173 (citing *Heller*, 554 U.S. at 604). However, there does not appear to be a specific mention of mentally ill individuals and the extent to which this concern over propensity for violence applied to them.

This brings us to another issue at the heart of the instant matter. The parties dispute the category of persons to which the Supreme Court was referring in *Heller* when it spoke of the longstanding prohibition on firearms possession by the "mentally ill." Mr. Yox contends that this statement was only meant to capture persons who are currently mentally ill. In contrast, much of Defendants' argument with regard to the historical justifications for this firearms prohibition is based on the theory or presumption that all persons who have experienced some form of mental illness are more prone to violent or dangerous behavior. Indeed, Defendants make little substantive effort to distinguish among various types of mental illness.

In this regard, we find Defendants' argument unenergetic at best and stigmatizing of mental illness at its worst.

It is difficult for this Court to determine the exact parameters of the category of "mentally ill" persons to which the Supreme Court referred in *Heller*. We acknowledge that this could be construed as a very broad category, potentially including individuals who have mental impairments such as an eating disorder, attention deficit disorder, anxiety, and numerous other conditions. *See Larson*, 60 HASTINGS L.J. at 1383 (citing the Diagnostic and Statistical Manual of Mental Disorders). In other words, the generic term "mental illness" includes conditions that may not be considered dangerous. It also is unclear whether *Heller*'s category includes mental illnesses that may be more temporary conditions, as well.

Regardless, we find that while there is little historical evidence of mentally ill people being subject to laws specifically disarming them, there is a clear history in this country of the institutionalization of persons with severe mental illness or mental illness that made the afflicted persons dangerous. Obviously, institutionalized persons have not as a general rule been permitted to possess firearms. Also, we find there is clear historical evidence that persons prone to violent behavior were outside the scope of Second Amendment protection. Further, to the extent that there is documented evidence regarding the justifications

underlying § 922(g)(4), it appears that this statute subsection was likely animated by the same concerns that justified the felon gun dispossession statute subsection in § 922(g)(1), as elaborated upon in *Barton*. That is, the concern that certain individuals, whether those with felonies or those with mental illness, were too irresponsible or too dangerous to be trusted with firearms. Thus, while we do not know the exact intended parameters of the category of "mentally ill" that the Supreme Court referred to in *Heller*, it logically appears that the historical justifications for the prohibition on firearm possession by the "mentally ill" most likely involved a concern over individuals who had mental impairments that made them dangerous to themselves or others in society.

Accordingly, we shall again rely on *Barton* for its analytical guideposts in reviewing an as-applied challenge under § 922(g), albeit this time a challenge under § 922(g)(4). We are thus tasked to determine whether Mr. Yox has presented "facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections." Specifically, we will resolve whether Mr. Yox has shown that he is "no more dangerous than a typical law-abiding citizen," or that he "poses no continuing threat to society." And if he has made such a showing, then his ability to possess a firearm "for protection of hearth and home is not just conduct protected by the

Second Amendment, it is the core of the Second Amendment's guarantee." *Suarez*, 2015 WL 685889, at *6 (citing *Heller*, 554 U.S. at 635).

As discussed in our Factual Summary above, Mr. Yox has only ever been committed to a mental institution once, for approximately 8 days, at the age of 15. He states that his mental and emotional trauma was due to the fact his parents were going through an emotionally devastating divorce at the time.

Defendants do not provide evidence of any episode of mental illness since this one and only commitment. It is indeed significant that Mr. Yox's predicate commitment occurred because his behavior was dangerous to himself and possibly others. Without more, this might weigh against finding in favor of his as-applied challenge. However, there is no evidence that Mr. Yox has ever been violent or acted in an unstable or dangerous manner toward himself or others since his commitment. This weighs in favor of finding that he poses no "continuing threat."

Additionally, as also detailed in our Factual Summary, there is a dispute among the parties as to whether during the time preceding his commitment Mr. Yox ever specifically threatened to harm himself or another with a firearm. The statements in the Philhaven Application cited by Defendants are likely hearsay; regardless, we do not find the issue of whether he made a threat involving a firearm particularly material, as it is undisputed that during that time he entered

38

into a "suicide pact" with another person. This shows that during that time Mr.

Yox was dangerous toward himself and possibly others, and so this fact is not in

dispute.

What is most striking about Mr. Yox's as-applied challenge, though, is the

fact that he has been authorized to possess and use, and has in fact possessed and

used, firearms while he served in the military and while he worked as a state

correctional officer in Pennsylvania. Indeed, Mr. Yox used fully automatic rifles,

machine guns, grenade launchers, and incendiary grenades while serving in the

82nd Airborne of the United States Army. Again, Defendants have submitted no

evidence that Mr. Yox misused firearms or acted in a dangerous manner in those

professional capacities. Thus, the record indicates that throughout his adulthood,

despite his personal firearms disability due to § 922(g)(4), Mr. Yox has possessed

and used firearms in his professional capacity without incident.

Further, it is noteworthy that a state court has already found Mr. Yox to not

be a continuing threat to himself or others. As detailed earlier, in May 2014, a

Pennsylvania state court reviewed Mr. Yox's petition to vacate and expunge his

involuntary commitment and issued an order granting him state relief from any

disability imposed pursuant to state law. The judge found that "[t]he Petitioner no

longer suffers from the mental health condition that was the basis for his

commitments" and "[t]he Petitioner may safely possess a firearm without risk to himself or any other person." While we have determined that Pennsylvania's relief program is not in compliance with § 105 of the NIAA, this finding does not preclude using the state court determination as evidence in an as-applied challenge.

The state court issued its relief from disability in part based on a comprehensive evaluation of Mr. Yox by psychologist Anthony Fischetto, referenced *supra*, whose report has been provided to this Court for review. (Doc. 28, Ex. H). Dr. Fischetto concluded that Mr. Yox does not appear to pose a threat to himself or others with regard to possession of a firearm. He also noted that Mr. Yox's "current mental state and stability appear to be intact."

Notably, Defendants hardly mention at all in their briefing, much less challenge, the specific facts of Mr. Yox' case. Defendants reference Mr. Yox's possession and use of firearms as a member of the military and as a correctional officer only to argue that there is no legal support for the position that his Second Amendment right can be restored "merely by virtue of his employment history." (Doc. 46, p. 4). That this dismissive treatment of Mr. Yox's public service is ungracious is clear. But more importantly, Defendants avoid addressing the clear irony of Mr. Yox's situation. It requires a suspension of logic to believe that Mr. Yox is mentally stable enough to possess and use various types of firearms in his

professional capacity, including putting his life on the line for his country while on active military duty, but is not mentally stable enough to possess a firearm for self-protection in his home.

Additionally, Defendants mainly rely on general statistics purportedly showing that persons who have been committed pose an enhanced risk of violence involving firearms. They also rely on studies showing that individuals who have been involuntarily committed are frequently subject to relapse into mental illness "and, hence, potential dangerousness." As an initial matter, general statistics have less weight in an as-applied challenge in which the court must review the specific facts of an individual's case.[16] *Accord Suarez*, 2015 WL 685889, at *12. Statistics regarding the frequency of relapse might supply some momentary pause, given that it is always difficult to predict the future; namely, whether a person will ever experience an episode of mental illness again. However, there is no evidence that Mr. Yox has experienced a relapse in the decade since he was committed while a juvenile. That interval is significant. Indeed, the United States and Pennsylvania have trusted Mr. Yox day after day with firearms for many years, despite the theoretical possibility of a relapse. Were we to find that Mr. Yox failed in his as-applied challenge on the grounds that there is an apparent statistical likelihood he

---

[16] As Plaintiffs note, much of Defendants' briefing appears more appropriate for a facial challenge, which has not been alleged in the instant matter.

may experience a relapse, this would render the absurd result of effectively barring all future plaintiffs who have ever been committed from ever successfully asserting an as-applied challenge to § 922(g)(4).[17]

We further note that Mr. Yox's as-applied challenge is strengthened by the fact that Pennsylvania does not have a mechanism that has the power to relieve him of his federal firearms disability. Were he to live in one of the multiple states that have such a program, our analysis might be different.

Upon a thorough review of the facts of the instant matter, we find that Mr. Yox has adequately and compellingly demonstrated the factual grounds for his as-applied challenge. He has shown that he is "no more dangerous than a typical law-abiding citizen" at this point in his life, and that he is not a "continuing threat" to himself or others. *See Barton*, 633 F.3d at 174.

Indeed, Mr. Yox provides the perfect test case to challenge § 922(g)(4), as the illogical contradiction of being able to possess firearms in his professional capacities but not being able to possess a firearm for protection in his own home puts in relief a factual scenario where an as-applied Second Amendment challenge to this statute may succeed. In fact, the Court is not aware of any other case where another plaintiff has successfully challenged his firearms disability pursuant to §

---

[17] We also note that were Mr. Yox to ever relapse and be committed again, he would likely be again subject to the enforcement of § 922(g)(4) against him by Defendants.

922(g)(4). *Cf. United States v. Johnson*, 2016 WL 212366, at *9 (N.D. Iowa Jan.

19, 2016) (rejecting plaintiff's as-applied challenge to § 922(g)(4) because Iowa

had an authorized state relief program and thus the plaintiff had the opportunity to

have his federal rights restored by showing he did not pose a danger); *Petramala v.*

*United States Dep't of Justice*, No. 10-2002-PHX-FJM, 2011 WL 3880826, at *1-2

(D. Ariz. Sept. 2, 2011) (rejecting a plaintiff's challenge to § 922(g)(4) where a

state court had found the plaintiff incompetent on multiple occasions and in need

of a guardian). This is logical and expected, as it is highly unlikely that most of the

people who have been adjudicated as a "mental defective" or who have been

committed to a mental institution will be able to present a court with sufficiently

compelling facts to warrant relief from the federal firearms disability. But that does

not mean that it is impossible for *any* plaintiff to present such facts. Indeed, if Mr.

Yox were not to succeed on his as-applied challenge, we cannot imagine that there

exists any person who could.

We are compelled to note that circuit courts have struggled with the

constitutionality of the mental health commitment provision of § 922(g)(4). In a

lengthy opinion, a Sixth Circuit panel analyzed a very similar challenge to §

922(g)(4), and held that the plaintiff had stated a claim for a violation of the

Second Amendment, finding that "the government's interest in keeping firearms

out of the hands of the mentally ill is not sufficiently related to depriving the mentally healthy, who had a distant episode of commitment, of their constitutional rights." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 344 (6th Cir. 2014). However, this opinion was vacated by the circuit and a rehearing *en banc* was granted, which is still pending. In *United States v. Rehlander*, the First Circuit avoided the constitutional question raised by *Heller* by narrowly construing the phrase "having been committed to a mental institution" to not include a short-term psychiatric hospitalization pursuant to an ex parte procedure. 666 F.3d 45, 47-49 (1st Cir. 2012).

In conclusion, we find that the application of 18 U.S.C. § 922(g)(4) to Mr. Yox violates the Second Amendment to the United States Constitution, based on the analytical framework set forth in *United States v. Barton*. We shall thus enter judgment in favor of Mr. Yox on Count I of his Amended Complaint.

### D.    Mr. Yox's Due Process Challenge

In his remaining due process claim, Mr. Yox asserts that he has been deprived of his Second Amendment right to keep and bear firearms without being afforded notice and an opportunity to be heard on the matter prior to the deprivation, and/or through a post-deprivation proceeding to seek review and relief from the deprivation, all in violation of his Fifth Amendment right to due process.

44

Mr. Yox did not formally move for summary judgment on his as-applied due process claim, based on the Court's analysis of that claim with regard to Mr. Keyes in our November 9, 2015 Memorandum & Order dismissing in part Plaintiffs' Complaint. He correctly noted that the Court would have also dismissed his due process claims had Defendants requested that dismissal. (Doc. 43, p. 24). However, Mr. Yox does ultimately re-argue the issue in his reply brief regarding the instant motions. Given that there is no issue of lack of notice or unfair prejudice to Defendants, who have themselves argued for summary judgment on this claim, we will briefly consider Mr. Yox's claim.

The rationale for our merits dismissal of Mr. Keyes' due process claim is equally applicable to Mr. Yox's claim, and we thus incorporate that discussion into this Memorandum. We also find it fruitful to briefly address the claim in light of our analysis of *Barton* and our holding that Mr. Yox has succeeded on his as-applied Second Amendment challenge to § 922(g)(4).

Our merits decision on Mr. Keyes' claim in our earlier Memorandum & Order was heavily influenced by the Third Circuit's admittedly unpublished decision in *Bell v. United States*, 574 F. App'x 59 (3d Cir. 2014). There, the Third Circuit rejected a procedural due process challenge to 18 U.S.C. § 922(g)(1), holding that "for the reasons stated by the District Court, that [the plaintiff's]

procedural due process claim . . . [is] without merit." *Id.* at 61. The plaintiff in that case had claimed that § 922(g)(1) violated due process because it deprived him of the ability to possess a firearm without a hearing to determine his "future dangerousness." *Bell v. United States*,  No. 13-5533, 2013 WL 5763219, at *3 (E.D. Pa. Oct. 24, 2013) (internal citation omitted). The district court determined that "[t]he plain language of [that statute] makes clear Congress' decision to bar *all* convicted felons (not merely those with violent tendencies or who otherwise present an ongoing danger to society) from possessing firearms." *Id.*

The district court's reasoning may at first glance appear to be at odds with *Barton*, in which the Third Circuit clearly approves of as-applied challenges to § 922(g)(1) on the grounds that the challenger can make a factual showing that he no longer presents a continuing danger or threat to society. However, *Bell* can easily be squared with *Barton*. While certain prohibitions under § 922(g) are subject to as-applied Second Amendment challenges, they are not appropriately subject to due process as-applied challenges. Under *Bell*, a plaintiff does not have a due process right to a hearing to determine his "future dangerousness." Similarly, in the instant matter, we do not believe the law supports Mr. Yox's contention that he deserved some kind of hearing before or after being subjected to the disability under § 922(g)(4). The statute subsection is clear that anyone who has been

committed for mental health reasons is subject to it; thus a hearing on whether the plaintiff is still dangerous is not in fact relevant. However, *Barton* holds that a plaintiff may still contest the prohibition with an as-applied Second Amendment challenge to the statute.

Accordingly, we shall grant Defendants' motion for summary judgment on Count III with regard to Mr. Yox's claims contained therein.

## V.      CONCLUSION

For all the reasons stated herein, we shall grant in part and deny in part Defendants' motion for summary judgment, and grant in part and deny in part Plaintiffs' motion for summary judgment.

An appropriate Order shall ensue.